Matthew J. Platkin*
Angela Cai*
Ravi Ramanathan*
Aaron E. Haier*
Conor Bradley*
**Platkin LLP**
413 Washington Ave.
Unit 174
Belleville, NJ 07109
(973) 561-1951
mplatkin@platkinllp.com

David R. Irvine
(Utah Bar No. 1621)
Attorney and Counselor at
Law
P.O. Box 1533
Bountiful, Utah 84011
(801) 949-6693
drirvine@aol.com

Alan L. Smith
(Utah Bar No. 2988)
Attorney and Counselor at
Law
1169 East 4020 South
Salt Lake City, Utah 84124
(801) 822-6076
alanakaed@aol.com

*Attorneys for Plaintiffs*

**pro hac vice applications forthcoming*

---

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ALLIANCE FOR A BETTER UTAH, INC.; ELEVATE STRATEGIES, LLC; JOSHUA S. KANTER; and GABRIELLE S. FINLAYSON,<br><br>Plaintiffs,<br><br>v.<br><br>KEVIN O'LEARY and FOX NEWS NETWORK, LLC,<br><br>Defendants. | **COMPLAINT**<br><br>Civil No. _____<br><br>**JURY DEMANDED** |

Plaintiffs Alliance for a Better Utah, Inc. (the "Alliance" or "Alliance for a Better Utah");

Elevate Strategies, LLC ("Elevate Strategies" or "Elevate"); Joshua S. Kanter; and Gabrielle S.

Finlayson (together "Plaintiffs"), by their attorneys Platkin LLP, David R. Irvine, and Alan L.

Smith, for their Complaint against Defendants Kevin O'Leary and Fox News Network, LLC

1

("Fox," and together "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.    When celebrity investor Kevin O'Leary announced a plan in April 2026 to build a massive 40,000-acre data center campus in Box Elder County, Utah—a project approximately the size of Washington, D.C.—he encountered what virtually all data center developers across the country have had to contend with over the last few years: intense scrutiny from local residents, community organizations, and elected officials on both sides of the aisle seeking transparency and accountability.

2.    Rather than answering the community's questions and addressing their concerns about his project, O'Leary went on the attack and singled out Plaintiffs in particular, even though Plaintiffs had barely engaged with the data center project.  On May 11, 2026, O'Leary appeared as a guest on Fox Business' *Mornings with Maria* show and claimed to host Maria Bartiromo, Fox's millions of viewers, and O'Leary's millions of social media followers that the backlash his data center project was facing following a controversial approval process was the product of a China-funded misinformation campaign aimed at undermining American artificial intelligence ("AI") development.  Specifically, he claimed that a team of data scientists he had hired discovered "two cells inside of Utah" operating on behalf of the Chinese Communist Party ("CCP"), identifying those purported "cells" as Alliance for a Better Utah and Elevate Strategies and explicitly implicating their founders, Mr. Kanter and Ms. Finlayson.  Without any evidence whatsoever, O'Leary stated that Plaintiffs were "proxies for the Chinese government," insisting "[t]his is the [CCP] at work here.  There's no question about it."

3.      Shocked to have been thrust into the national spotlight as a result of these outrageous accusations—and facing a barrage of questions from colleagues, clients, vendors, friends, family, and members of the press who had seen the *Mornings with Maria* segment— Plaintiffs immediately responded by publicly and unequivocally denying O'Leary's baseless claims.  But it was of no use.  O'Leary was just getting started.

4.      O'Leary proceeded to engage in a weekslong smear campaign against Plaintiffs. Across at least ten separate media appearances broadcast to millions of viewers and shared with millions more online, O'Leary repeated his malicious, false claims that Plaintiffs were agents of China and engaging in criminal conduct.  In each appearance, O'Leary was unequivocal.  He insisted that he was not "suggesting" or "inferring" that Plaintiffs were operating on behalf of a foreign adversary.  Rather, he claimed he had "proven it" thanks to the work of his alleged team of data scientists, adding that he had shared "90 pages of evidence with federal law enforcement." During multiple appearances, he even held up a chart from his team's purported "Investigative Report" that he suggested contained proof that supported his claims, even though the chart—which was also published online—made no mention of China, the CCP, or any other entity that connected any dots between Plaintiffs and the Chinese government.

5.      Fox was instrumental in O'Leary's defamatory smear campaign, putting him on air to attack Plaintiffs five times in three weeks.  Despite O'Leary's inherently unreliable claims, and his clear lack of support for them, Fox repeatedly invited O'Leary onto its programs and allowed him to broadcast his false accusations to millions of viewers without any qualification.  Through its hosts, Fox repeatedly affirmed or outright endorsed O'Leary's wild statements during his appearances.  Fox did so even after Plaintiffs immediately and vociferously denied O'Leary's

claims. It did so without contacting any of the Plaintiffs for comment or to verify O'Leary's statements. And Fox continued to do so even after O'Leary's own business partner distanced himself from the claims. It is clear that Fox either knew O'Leary's claims were false or, at the very least, recklessly disregarded the truth and veracity of O'Leary's statements.

6. Over and over, on Fox's programs and others, O'Leary called his fabricated accusations "irrefutable fact." But they were not. They were lies. O'Leary and Fox eventually admitted as much.

7. On June 25, 2026, after receiving a legal demand from Plaintiffs for a retraction and compensation for the harms caused by Defendants, O'Leary wrote in a social media post that he "ha[s] no evidence that the Alliance for a Better Utah, Elevate Strategies, Gabrielle Finlayson, . . . or Josh Kanter are funded by China or the Chinese Communist Party." Fox, for its part, reported on O'Leary's "clarification" shortly thereafter and delivered an apology. But these efforts, which were intended to dissuade Plaintiffs from asserting their legal claims, fail to even remotely address the harms that O'Leary and Fox have caused. Indeed, despite the "clarification," several videos of O'Leary's malicious attacks against Plaintiffs are still publicly accessible on Fox-controlled platforms. Through their smear campaign, O'Leary and Fox—who collectively have some the largest media and communications platforms in the world—undermined Plaintiffs' years of hard work in building their sterling reputations as trusted local advocates, community members, and business leaders in Utah by defining Plaintiffs to a global audience as covert foreign agents.

8. Because Defendants' false and defamatory statements charged Plaintiffs with engaging in criminal conduct and impugned Plaintiffs' professional competence and ethics, Defendants' conduct constitutes defamation per se. And, as a direct result of Defendants' conduct,

Plaintiffs have suffered devastating reputational harm, significant economic losses, severe emotional distress, and ongoing threats to their physical safety. Plaintiffs, therefore, bring this action to recover presumed, actual, punitive, and other economic damages arising from Defendants' malicious publication of false and defamatory statements of fact.

## PARTIES AND RELEVANT NON-PARTIES

9. Plaintiff Alliance for a Better Utah, Inc. is a nonprofit corporation organized under the laws of the State of Utah, with its principal place of business in Salt Lake City, Utah.

10. Plaintiff Elevate Strategies, LLC is a limited liability company with a principal place of business in Salt Lake City, Utah. Elevate is comprised of three members: Gabrielle Finlayson, Jacqueline Morgan, and John Benjamin Haynes. Ms. Finlayson and Ms. Morgan are citizens of Utah, while Mr. Haynes is domiciled in Washington, D.C. Thus, because a limited liability company takes the citizenship of its members, Elevate is a citizen of Utah and Washington, D.C.

11. Plaintiff Joshua Kanter is an individual who is a citizen of Utah. Mr. Kanter is, among other things, the founder and former Board Chair of the Alliance for a Better Utah. Currently, he is a member of the Alliance's Board.

12. Plaintiff Gabrielle Finlayson is, as stated above, an individual who is a citizen of Utah.. Ms. Finlayson is a founder and member of Elevate Strategies.

13. Defendant Kevin O'Leary is a businessman and television personality who is a citizen of Canada, domiciled in Florida. Starting in the early 2000s, O'Leary built a public media persona. First, he appeared on a series of Canadian television programs. Then, in 2009, O'Leary appeared on the American reality television show *Shark Tank*. O'Leary's persona on *Shark Tank*,

5

where he adopted the nickname "Mr. Wonderful," allowed him to amass global visibility that he has in turn used to develop a media and business empire. For example, he is now a regular contributor on television discussing business topics and he frequently appears on shows produced and broadcast by Fox, including the appearances discussed herein.

14. O'Leary has also cultivated a large social media following. He has approximately 2 million followers on Instagram, 1.5 million followers on TikTok, 1 million followers on X (the social media platform formerly known as Twitter), and 3.7 million followers on LinkedIn. He also has his own YouTube channel which has approximately 1.2 million subscribers. O'Leary claims to have an aggregate following of over 12 million people across his social media accounts.

15. Defendant Fox News Network, LLC is a limited liability company with a principal place of business in New York. Upon information and belief, its sole member is Fox Television Stations, LLC, whose sole member is Fox Television Holdings, LLC. Fox Television Holdings, LLC's sole member is Foxcorp Holdings, LLC. All of these limited liability companies are organized in Delaware. Upon information and belief, the sole member of Foxcorp Holdings, LLC is Fox Corporation, which is a Delaware corporation with its principal place of business in New York. Because Fox News Network, LLC is a limited liability company, it takes the citizenship of Fox Corporation and is, therefore, a citizen of both Delaware and New York.

16. Fox News Network, LLC is the primary legal and operating entity behind the brand Fox News Media. Fox News Media includes the Fox News Channel, which has been the most watched cable news network in America for 24 years in a row. Fox News Media also includes the Fox Business Channel and Fox News Radio. Together, the Fox News Channel and Fox Business Channel are available in over 60 million American households. Fox News Media also operates

Fox News Digital, which includes the fox.com, foxnews.com, and foxbusiness.com websites, Fox's social media accounts, and Fox's digital subscription services, such as Fox Nation. In the first quarter of 2026, Fox News Digital averaged approximately 187 million unique visitors per month to its various platforms. Fox routinely publishes content produced and broadcast on Fox News and Fox Business, including the shows discussed more fully below, on its Fox News Digital platforms.

17.     *Mornings with Maria* is hosted by Maria Bartiromo and airs weekday mornings on Fox Business. According to Fox, *Mornings with Maria* is the number one pre-market business news program in cable. On July 1, 2026, Fox reported that, in the second quarter of 2026, *Mornings with Maria* averaged 123,000 daily viewers, which marked its third highest quarter ever. At all relevant times, Ms. Bartiromo, along with *Mornings with Maria*'s production and editorial team, were agents of Fox.

18.     *Saturday in America* is hosted by Kayleigh McEnany and airs Saturday mornings on Fox News. In the first quarter of 2026, *Saturday in America* averaged 2.3 million viewers, which ranked it mong the top 10 programs in cable news. At all relevant times, Ms. McEnany, along with *Saturday in America*'s production and editorial team, were agents of Fox.

19.     *The Big Money Show* is hosted by co-hosts Brian Brenberg, Jackie DeAngelis, Dagen McDowell, and Taylor Riggs and airs weekdays on Fox Business. In the first quarter of 2026, *The Big Money Show* averaged 224,000 viewers and it averaged 216,000 viewers in the second quarter of 2026. At all relevant times, *The Big Money Show*'s co-hosts, along with the show's production and editorial team, were agents of Fox.

20.    *The Bottom Line* is hosted by Dagen McDowell and Brian Brenberg and airs weekday evenings on Fox Business.  In the second quarter of 2026, *The Bottom Line* averaged approximately 162,000 daily viewers.  At all relevant times, *The Bottom Line*'s co-hosts, along with its production and editorial team, were agents of Fox.

21.    *The Big Weekend Show* is hosted by Johnny Joey Jones and Tomi Lahren and airs weekend evenings on Fox News.  In the first quarter of 2026, *The Big Weekend Show* averaged approximately 1.6 million viewers.  At all relevant times, *The Big Weekend Show*'s co-hosts, along with its production and editorial team, were agents of Fox.

## JURISDICTION AND VENUE

22.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).  There is complete diversity of citizenship because Plaintiffs Alliance for a Better Utah, Joshua Kanter, and Gabrielle Finlayson are citizens of Utah; Plaintiff Elevate Strategies is a citizen of Utah and Washington, D.C.; upon information and belief, Defendant Kevin O'Leary is a citizen of Canada who is domiciled in Florida; and upon information and belief, Defendant Fox is a citizen of New York and Delaware.  The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23.    This Court has personal jurisdiction over Defendant Kevin O'Leary under Utah Code Ann. § 78B-3-205 and the Constitution.  O'Leary has transacted business in Utah where he has, through corporate entities that he controls, sought to build a data center in Box Elder County, Utah and, in so doing, purposefully engaged with Utah, its elected officials, and its residents.  Moreover, O'Leary's tortious conduct, described herein, was expressly aimed at, and its effects were felt directly in, Utah.  On numerous occasions, O'Leary published statements that identified

8

Plaintiffs as agents of the Chinese government and specifically referenced Plaintiffs' operations, presence, and activities in Utah. O'Leary knew that Plaintiffs—the subject of his statements—were based in and connected to Utah and knew that the brunt of any reputational harm and other damages would be felt in Utah. Indeed, as a direct result of O'Leary's conduct, Plaintiffs have suffered reputational harm and other injuries in Utah.

24.     This Court also has personal jurisdiction over Defendant Fox under Utah Code Ann. § 78B-3-205 and the Constitution. Fox transacts substantial business in Utah and regularly, continuously, and deliberately distributes its content in Utah. For example, upon information and belief, Fox maintains cable carriage contracts with multiple cable and satellite providers that distribute Fox's content, including the programming on the Fox News Channel, the Fox Business Channel, and all of the broadcasts identified herein, to consumers throughout Utah. Plaintiffs estimate that Fox News Channel and the Fox Business Channel are available in approximately 650,000 households in Utah.[1]

25.     Fox also purposefully targets Utah consumers via Fox News Digital, which, as described above, includes the fox.com, foxnews.com, and foxbusiness.com websites, Fox's social media accounts, and Fox's digital subscription services, such as Fox Nation. And, Fox enters contractual relationships with Utah residents who use and transact on these platforms via its Terms of Use and Privacy Policy. Therefore, upon information and belief, Fox derives substantial

---

[1] Based on data from the United States Census Bureau, as of 2025, Utah's population was approximately one percent of the population of the United States. Taking one percent of the 60 million households nationwide in which Fox News Channel and Fox Business Channel are available results in approximately 650,000 households in Utah that have access to Fox News Channel and Fox Business Channel.

revenue in Utah, both directly from Utah consumers and via advertisements directed at Utah residents.

26.    Finally, like O'Leary, Fox's tortious conduct was expressly aimed at, and its effects were felt directly in, Utah.  Fox published statements that identified Plaintiffs as agents of the Chinese government and specifically referenced Plaintiffs' operations, presence, and activities in Utah.  Fox knew that Plaintiffs—the subject of the statements—were based in and connected to Utah and knew that the brunt of any reputational harm and other damages would be felt in Utah. As a direct result of Fox's conduct, Plaintiffs have suffered reputational harm and other injuries in Utah.

27.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.  Plaintiffs Have Cultivated Sterling Reputations in their Community.

28.    Plaintiffs Joshua Kanter and Gabrielle Finlayson are proud Utahns who are highly respected in their communities, both for their commercial success as business founders and for their advocacy work on behalf of the residents of Utah.

29.    Mr. Kanter is a Director and Vice President of the Kanter Family Foundation.  He founded the Alliance for a Better Utah and was formerly the President of its Board.  He has also been a board member, committee member, or otherwise involved with the Community Foundation of Utah, Rowland Hall; the Utah Museum of Fine Arts; Temple Har Shalom; the Utah Museum of Contemporary Art; Governor Huntsman's Utah Methamphetamine Joint Task Force Subcommittee on Public Awareness; the University of Chicago Law School; and various public art projects,

among many other community projects and organizations.  In 2011, Mr. Kanter received a Heart and Hands Award from the Utah Nonprofits Association, was named to the Community Foundation of Utah's E-5-0, an annual selection of 50 "enlightened entrepreneurs," and helped co-found the Utah Grantmakers Alliance, an alliance of philanthropic families in Utah.

30.     Commercially, Mr. Kanter is an attorney and runs a single-family office.  He is also an advisor to other families and family offices.  Most recently, Mr. Kanter founded leafplanner, Inc., a digital platform that creates a family "owner's manual," through the collection, organization and mapping of a family's, and family enterprise's, information in a single-source manner, allowing a family to identify blind spots, educate family members and advisors, and prepare for an effective, comprehensive, and efficient succession-of-information.  Mr. Kanter has spent decades building a reputation of integrity and commitment to his career and community, all of which has been jeopardized by Defendants' baseless and malicious attacks alleging that he is an agent of a foreign government.

31.     Ms. Finlayson is a highly successful political consultant and strategist who built her reputation working in some of the highest-profile political battlegrounds in the country.  She has worked on multiple campaigns across Utah, in the United States Senate, and in Iowa for a 2020 presidential primary campaign.  She also ran a statewide campaign in New Hampshire focused on youth engagement for the 2020 presidential general election, as well as a mayoral campaign in Boston, and a historic Massachusetts State Senate Campaign.  At age 23, she was one of the youngest Chiefs of Staff in the Massachusetts legislature's history.

32.     Since moving back to her home state of Utah in 2022, Ms. Finlayson has been active in Utah politics and civic issues, including serving on Utah's American Cancer Society's GenNow

Board.   Ms. Finlayson is highly sought after by candidates, elected officials, and advocacy organizations who seek her help to connect with and engage the local community.  As described in further detail below, the attacks levied by Defendants on Ms. Finlayson directly jeopardize her ability to operate her business and undermine her years of tireless work to develop a reputation of competence, commitment, and honesty within her community.

33.     Building on their experience and reputations, and their involvement in and love for their home state of Utah and their local communities, Mr. Kanter and Ms. Finlayson founded the Alliance and Elevate Strategies, respectively.

34.     The Alliance is a nonprofit organization founded in 2011 and based in Salt Lake City, Utah.  The organization's mission is to drive a public narrative that empowers Utah's electorate and holds public officials accountable, championing good governance, transparency, and civic engagement.  The Alliance pursues this mission through paid, earned, and digital media efforts focused on issues including voting rights, redistricting, government ethics, education, public health, and environmental policy.  Among its most recognized tools is its annual Progress Report, which tracks significant legislative votes and grades every Utah lawmaker, providing constituents with a transparent record of their representatives' conduct.  Over many years of advocacy and work in the state, the Alliance has emerged as one of the most trusted organizations by communities across Utah.

35.     Plaintiff Elevate Strategies is a political consulting firm based in Salt Lake City, Utah.  The firm was founded with the goal of building a bench of talented campaign staff and candidates to improve Utah's political landscape.  A full-service firm, Elevate draws on its staff's more than 35 years of combined campaign experience to support candidates, elected officials,

12

causes, and organizations, providing services that include strategic messaging, data-driven voter outreach, media, and campaign management. Over the past several years, Elevate has trained and advised more than 100 candidates—from first-time office-seekers to statewide campaigns—helping their clients advance in races across Utah. Elevate's work, furthered by the excellent reputations of Ms. Finlayson and her partners, has helped it emerge as one of the most respected political and advocacy consultancies in Utah and across the country.

36.     While Plaintiffs, and in particular Mr. Kanter and Ms. Finlayson, have developed their sterling reputations over many years, they were not widely known figures beyond their professional and personal circles before Defendants, through their defamatory acts, thrust them into the spotlight.

### B. The National Debate Over Data Center Development.

37.     A flashpoint in the public debate over AI has been the construction of the massive data centers needed to power new and stronger AI models and systems. Plans to build data centers in local communities across the country have frequently been met with intense scrutiny for several reasons. For one, data centers are large, noisy and resource-hungry. Locals in areas where data centers have already been built have reported a constant humming noise associated with the facilities.

38.     Data centers also consume massive amounts of local resources. For example, larger data centers can consume up to five million gallons of water per day, which is equivalent to the amount of water consumed by a city of 50,000 people. Data centers also consume electricity at

13

astonishing rates—a report last year stated that a proposed data center in Wyoming would consume more electricity than every home in the state combined.[2]

39.    For these reasons and others, a Gallup Poll in May 2026 found that 70% of Americans would oppose the construction of a data center in their community.[3] Similarly, a recent Fox News poll of registered voters in Ohio found that approximately 65% of respondents would oppose building a data center in their area.[4]

40.    Indeed, concern over the local impact of data center construction has been a cross-cutting political issue. It has brought together unlikely coalitions from across the political spectrum.

41.    Fox itself has noted the legitimate reasons local community members might question or oppose the construction of a data center in their area on numerous occasions. For example, on May 22, 2025, Fox's show, *The Bottom Line*, aired a segment on local opposition to a proposed data center in Davis, West Virginia, including an interview with the mayor of the town. The Fox host—Dagen McDowell—started the interview by noting that she had personal experience with the data center debate because a data center had been proposed in the county next to the one in which she grew up. She noted: "These kinds of developments, they're monstrosities,

---

[2] Mead Gruver & Matt O'Brien, *Cheyenne to host massive AI data center using more electricity than all Wyoming homes combined*, AP (Jul. 28, 2025), https://apnews.com/article/ai-artificial-intelligence-data-center-electricity-wyoming-cheyenne-44da7974e2d942acd8bf003ebe2e855a.

[3] Jeffrey M. Jones, *Americans Oppose AI Data Centers in Their Area*, Gallup (May 13, 2026), https://news.gallup.com/poll/709772/americans-oppose-data-centers-area.aspx.

[4] Fox News Poll, *Ohio Senate and Governor* (June 3, 2026), https://static.foxnews.com/foxnews/content/uploads/2026/06/fox_may-28-june-1-2026_complete_ohio_topline_june-3-release.pdf.

they don't create jobs and, correct me if I'm wrong, they create few jobs, and they're a blight on the landscape which is a huge selling point for the community."

42. During the segment, the mayor of Davis also offered a similar sentiment. He explained: "You're exactly right Dagen, we are very concerned with keeping our community . . . with fresh air [and] open space."

43. On August 13, 2025, *The Bottom Line* again aired a segment discussing local debate over a proposed data center, this time in North Carolina. The segment highlighted the perspective of local residents who expressed concerns about "changing their rural community." A local resident who was interviewed stated: "God's not making any more land . . . once you turn this land industrial, you don't ever take it back to residential."

44. Similarly, on October 1, 2025, *The Big Money Show* aired a segment on data centers. Dagen McDowell—the same personality who hosted the May 22, 2025 segment on *The Bottom Line*—noted that the data center boom was "sending electricity prices soaring." And, Ms. McDowell again highlighted the legitimate reasons for local residents to question or oppose data centers, stating "these data centers have been put in . . . and electricity prices in some areas have gone up—the bills—25 to 80 percent on their power costs," and arguing that "the problem is . . . that all of the people in rural communities where these data centers are going to have to go or are trying to go, folks see this and read this and they throw up . . . blockades to these data centers." She emphasized that "this is happening in West Virginia, it's happening in North Carolina."

45. On December 3, 2025, multiple Fox shows, including *Mornings with Maria* and *The Bottom Line* aired segments on a proposed data center in Georgia. The host of *Mornings with Maria*—Maria Bartiromo—began the segment by noting that the "rapid growth" of data centers

15

was causing "concerns from the locals." The show then included a live report from a data center in Georgia by a Fox reporter named Ashley Webster. Mr. Webster noted that "not everyone is happy" about the data center boom.

46.    Mr. Webster appeared again that same day on *The Bottom Line*, which was again co-hosted by Dagen McDowell. On that show, Mr. Webster highlighted that the "pace of expansion [of data centers] isn't sitting well with some rural residents."

47.    Days later, Fox again aired a data center segment, this time on *The Big Money Show*. A guest, Marcus Lemonis, noted that he was concerned about the effect on local economies because data centers are "building[s] with no employees." Ms. McDowell pushed back on that characterization, again drawing on her personal experience with data centers from the area in which she grew up. She noted, however, that pushback against data centers was a bipartisan issue and the broadcast then cut to a clip of Governor Ron DeSantis of Florida stating that Florida electricity ratepayers should not "foot the bill" for rising electricity costs caused by data centers. After the clip was played, another co-host of *The Big Money Show*, Brian Brenberg, explained that he thought it was "ok" for local communities to have "concerns" about data centers because the data centers will create "a ton of negative externalities" and not pay for them.

48.    On April 17, 2026, *The Bottom Line* aired a segment about the political backlash to the approval of a data center in Festus, Missouri. The hosts interviewed a newly elected councilmember who had won his election primarily by opposing a proposed data center project in the community. The councilmember explained "there are people that are against the data center and the environmental impact," but really the public was concerned about the lack of transparency regarding the town council's approval of the construction of the data center.

C.  **O'Leary's Data Center Project and the Community's Response.**

49.     In late April 2026, against the backdrop of this contentious debate, Defendant Kevin O'Leary unveiled his plan to build a massive, 40,000-acre data center in Box Elder County, Utah.

50.     On April 27, 2026, O'Leary appeared on the Fox show *Fox and Friends* to discuss his proposed project.  During the show, O'Leary elaborated on his view that construction of data centers is necessary for the United States keep up with China in the AI arms race.  At the time, O'Leary recognized that local residents might have concerns about the data center.  He noted that "most people don't like data centers for good reason" because "you tap it to the [power] grid and all of the sudden the electrical costs for their church, the community, and the residents all go up." However, O'Leary sought to justify his project by explaining that it would not draw from the electricity grid at all but would rather use a natural gas pipeline and contribute energy back to the community.

51.     O'Leary appeared on Fox's *Varney & Co* on or about the same day and discussed the data center project.  He again mentioned the need to build data centers to keep pace with China. During his appearances on *Fox and Friends* and *Varney & Co*, O'Leary did not accuse community members raising concerns about data center construction of being funded by the Chinese government or the CCP.

52.     Despite O'Leary's public attempts to justify the project, it drew intense scrutiny from local Utahns calling for transparency around the impact the project would have on their community.  Residents of Box Elder County and neighboring areas expressed grave concerns that the project—which would require nine gigawatts of power to operate, more than double the

17

amount of continuous power the entire state of Utah currently demands—would consume scarce water resources, pollute the air, and disrupt the Great Salt Lake ecosystem, among other issues. Indeed, in the weeks leading up to the Box Elder County Commissioners' vote on the data center project on May 4, 2026, nearly 4,000 public comments were submitted to the county.

53.    Prior to the first time O'Leary publicly aired his allegations against them on May 11, Plaintiffs spoke about the O'Leary data center project only a few times, and in limited ways. Specifically, Plaintiffs Alliance for a Better Utah and Elevate each published a few posts on their various social media platforms voicing their concerns about O'Leary's data center project and calling for transparency about the project's impacts and accountability around the process by which it would be approved. For example, on April 28, 2026, the Alliance reposted a clip of O'Leary discussing the project on *Varney & Co.* and included the caption:

> Our drought-ridden and wildfire-prone state is currently facing several serious environmental issues . . . . Fast-tracking a massive facility like this is not something to brag about – it's yet another example of our state's most powerful politicians showing that they cannot be trusted to care about environmental impact or public input when profits is on the line.[5]

54.    On May 2, days before the Box Elder County Commissioners were set to vote on the project, the Alliance posted on Instagram and identified "[s]ome ways that [citizens could] take action on the newly announced data center."[6] Similarly, on May 7, the Alliance posted a video clip in which state Senator Jerry Stevenson, who is a member of the Utah Military Installation Development Authority ("MIDA") board and, in that role, had approved the data center project,

---

[5] @betterutah, Instagram (Apr. 28, 2026), https://www.instagram.com/reel/DXrvhbXgLoA/?igsh=MXR1M2dmdDN4bnAzeg%3D%3D.
[6] @betterutah, Instagram (May 2, 2026), https://www.instagram.com/p/DX2vRC7mbBX/?igsh=MTFma2oycXNpbnpkNw%3D%3D.

smacked a phone out of a reporter's hand.  The caption associated with the Alliance's post stated that "[t]his conduct is unacceptable.  It's also a clear sign that Stevenson is feeling some of the consequences that come with making unpopular, detrimental decisions with no public input or transparency."[7]  In addition to this content, the Alliance sporadically reposted content from individuals opposing the project, and calling for transparency and seeking accountability, between April 27 and O'Leary's first comments about Plaintiffs on May 11.

55.    Around this same time, the Alliance also circulated a petition calling for an ethics investigation into Utah Senate President J. Stuart Adams.  The press release accompanying the petition explained that Senate President Adams was the chair of the MIDA board and that his political action committee had recently received $135,000 in donations from companies (none of which were associated with O'Leary) that had business before the board.  The Alliance, therefore, sought an investigation into Senate President Adams' conflicts of interests.  The press release and the petition did not mention O'Leary's data center project at all.

56.    On May 7, Elevate published a Substack article endorsing the Alliance's call for an investigation into Senate President Adams.  The article also criticized several Utah politicians for their role in fast-tracking O'Leary's data center project.  Elevate's limited public social media posts were similar.  For example, on May 1, Ms. Finlayson appeared in a video on Elevate's Instagram page discussing the project and O'Leary's role in it, among other things.[8]  Elevate posted again on May 7 and included an explanation of "who approved [the data center project,] how it got fast

---

[7] @betterutah, Instagram (May 7, 2026),
https://www.instagram.com/reel/DYBpecIOL1D/?igsh=MThiOWxqNXd0Y3pqaQ%3D%3D.
[8] @elevate_utah, Instagram (May 1, 2026),
https://www.instagram.com/reel/DX0SRuUJcm8/?igsh=MXN2Mm9nb2Q3cDRqaA%3D%3D.

tracked, and how [people could] join the fight."[9]  Finally, on May 8, Elevate posted similar content about O'Leary's data center project on Instagram.[10]

57.    Thus, prior to O'Leary's comments on May 11, in which he drew Plaintiffs into the data center project debate and forced them to defend themselves, the Alliance and Elevate's engagement with the data center project consisted of a few social media posts on the local impact of the data center.

58.    Plaintiff Joshua Kanter never appeared in any videos or other content opposing the data center project, made any other public comments, published any op-eds, or made any media appearances in which he opposed the data center.  In fact, Mr. Kanter no longer has any public-facing role with the Alliance—although he founded the organization, he is no longer the Chair of the Alliance's Board.  And, even as Chair, Mr. Kanter's public-facing role was extremely limited because public-facing duties usually fell to the Alliance's Executive Director and other staff.

59.    Apart from the one video appearance on Elevate's Instagram, Plaintiff Gabrielle Finlayson likewise never posted or appeared in any content discussing the data center project, made any other public comments, published any op-eds, or made any media appearances in which she opposed the project.

60.    Since O'Leary's public accusations on May 11, the Alliance, Elevate, and Ms. Finlayson have sought to defend themselves via statements and some public appearances, as detailed more fully below, and, in so doing, addressed the O'Leary Data Center project.  And, on

---

[9] @elevate_utah, Instagram (May 7, 2026), https://www.instagram.com/p/DYDQT4gjwJ0/?igsh=MndheGxtd24xNWF3.
[10] @elevate_utah, Instagram (May 8, 2026), https://www.instagram.com/reel/DYFOjHKgdAq/?igsh=dTJpNXFsZm4xdjhv.

June 3, 2026, the Alliance joined a lawsuit challenging the creation, composition, and constitutionality of MIDA, the authority that initially approved O'Leary's data center project. Even after O'Leary's comments on May 11, however, Mr. Kanter has never made any public statements or appearances where he discussed the project.

61.     Plaintiffs also have never publicly engaged with any issues related to the Chinese government.  They have never spoken on foreign funding of American protests of local issues.

62.      Despite the public backlash around Box Elder County's process for approving O'Leary's data center project, the Box Elder County Commissioners approved the project on May 4, 2026.  Public scrutiny, however, persisted after that date.

63.     Indeed, elected officials on both sides of the aisle began to echo the community's concerns about O'Leary's data center plan, including those who previously appeared to support the project.

64.     Following intense public backlash, on May 15, Utah House Speaker Mike Schultz called for independent studies to measure the project's environmental impact.

65.     On May 20, State Senator Scott Sandall, who represents all of Box Elder County, and State Representative Doug Owens, followed suit and expressed support for a legislative study of the impacts data centers have on wildlife, water, and air quality.

66.     On May 29, Governor Spencer Cox signed Executive Order 2026-03, establishing a statewide framework directing state agencies to prioritize protection of water resources, safeguard utility ratepayers, protect air quality, mitigate wildlife impacts, and support transparent public engagement for all large data center projects.

67. On June 1, 2026, Senate President Adams, once a staunch advocate for the project, sent a letter to O'Leary, demanding a 75% reduction in the project's footprint, along with demands for greater transparency, stronger conservation commitments, and a requirement that any excess water be treated and dedicated to the Great Salt Lake.

68. Also, on June 1, 2026, during a Republican primary election debate, candidates for Utah's second congressional district, Blake Moore and Karianne Lionsbee, both raised concerns about the impact O'Leary's data center project would have on Utah's water resources.

## D. O'Leary's Malicious and Defamatory Smear Campaign.

69. As public concern around his data center project grew, O'Leary became less interested in justifying the project on its merits. Instead, he decided to use his global communications platform to maliciously smear and defame those scrutinizing his data center project by accusing them of acting as agents of the Chinese government.

70. In so doing, O'Leary zeroed in on Plaintiffs specifically. Plaintiffs were confused by O'Leary's focus on them because, as detailed above, they played virtually no role in any organized opposition to the project. The Alliance and Elevate had simply posted about the project a couple of times on their social media platforms. Beyond the one video in which Ms. Finlayson appeared under Elevate's social media account, neither Mr. Kanter nor Ms. Finlayson had ever publicly discussed the project.

71. Nevertheless, in at least *10 separate media appearances* that were broadcast to millions of audience members and then posted and shared online for millions more viewers, O'Leary baselessly accused Plaintiffs of being agents of the Chinese government whose concerns

22

about his data center project were part of a China-funded misinformation campaign aimed at undermining American AI development.

72.    Fox participated in O'Leary's campaign by repeatedly inviting O'Leary onto its shows to use its platform to air his baseless accusations against Plaintiffs and affirming or otherwise endorsing his statements despite multiple indicia that his claims were false.

73.    **O'Leary's First Attack:**[11] O'Leary's smear campaign began on or around May 11, 2026.  On that date, while in the midst of the debate about the data center project, O'Leary appeared as a guest on the *Mornings with Maria* show on the Fox Business channel with host Maria Bartiromo.  During his appearance, O'Leary discussed the backlash his data center project was facing and falsely and outlandishly asserted that he and a purported team of data scientists—none of whom he has ever identified by name—had discovered that the protests were orchestrated by "two cells inside of Utah" operating on behalf of the CCP.  O'Leary explicitly identified those purported "cells" as the Alliance for a Better Utah and Elevate Strategies and levied these same false accusations at the founders of each organization, calling out Mr. Kanter and Ms. Finlayson by name on the air.

74.    O'Leary concluded the segment by stating as fact that Plaintiffs were working against American interests on behalf of the Chinese government: "These two cells, it's the CPP [sic] at work here.  There's no question about it."

75.    Rather than challenge, question, qualify, or even attempt to verify O'Leary's grave accusations that Plaintiffs were operating as unregistered agents of the Chinese government and therefore violating federal criminal law—allegations for which O'Leary provided no evidence—

---

[11] *See* Exhibit 1 (May 11 Appearance on *Mornings with Maria*).

23

Fox host Maria Bartiromo legitimized O'Leary's statements, affirming that his conclusions were consistent with stories Fox previously ran about one particular individual, unaffiliated with Plaintiffs, who allegedly was connected to the CCP.

76.    O'Leary posted a clip of the interview on his public social media accounts—including accounts on YouTube, X (formerly Twitter), TikTok, Instagram, and Facebook—which he claims have a total of more than 12 million followers.



77.    In his social media posts, O'Leary included a caption in which he calls Plaintiffs "proxies for the Chinese government" and repeats in writing, "This is the CCP at work here. There's no question about it."  O'Leary's posts of this interview received over 650,000 views.[12] Moreover, as of July 14, 2026, the clip of O'Leary is still available on the Fox Business website.[13]

---

[12] View counts described herein account only for the number of views the specific described posts have received on the named social media accounts as of the time this Complaint was filed. They do not account for the number of viewers the clipped interviews received when they aired live, nor the potentially millions more views that may have resulted from further dissemination of the posts over social media or private communications.

[13] Fox Business, *Trump digs in on Iran, sending warning signals to Beijing ahead of key summit* (May 11, 2026), https://www.foxbusiness.com/video/6395222677112.



78.    Almost immediately after O'Leary launched his smear campaign, Plaintiffs took steps to defend themselves and refute his false allegations. On May 11, 2026, the Alliance posted a video on its Instagram account that included a snippet of O'Leary's clip on Fox and stated "Alliance for a Better Utah is a nonprofit that holds politicians accountable and advocates for progressive policies in Utah." The caption of the post also mocked the outrageous nature of O'Leary's claims, explaining "[t]his post was NOT funded by the Chinese Communist Party."

79.    Elevate Strategies and Ms. Finlayson similarly were left with no choice but to defend themselves and issued their own statement.[14] They wrote:

> No one is secretly wiring us foreign intelligence money to ask obvious questions about a massive industrial project that could reshape Utah's land, energy grid, air quality, water future, carbon emissions, and political corruption profile.

---

[14] Elevate Utah, *Mr. Wonderful Discovers Local Utah Cells* (May 11, 2026), https://www.elevateutah.news/p/mr-wonderful-discovers-local-utah?r=8ndj9&utm_medium=ios&utm_source=notes-share-action.

80.     The statement continued, explaining that Elevate was funded by "Utahns" and "small-dollar donors."  It stated plainly, "[t]here is no secret benefactor.  There is no shadowy foreign government."

81.     Ms. Finlayson also appeared in a YouTube video, posted to Elevate's YouTube channel on May 11, 2026, in which she and a co-worker at Elevate denied the claims.[15]

82.     Moreover, in the days after O'Leary made his initial claim, Ms. Finlayson and others from Elevate made several media appearances in which they denied O'Leary's outrageous claims.  In one such appearance, Ms. Finlayson stated "I never thought I would have to say this in my career, but no, we are absolutely not operatives for the Chinese government or any other government."

83.     Upon information and belief, Defendants were aware that Plaintiffs refuted O'Leary's false claims.  Their posts denying O'Leary's baseless charges remain publicly accessible on their social media accounts and were widely shared at the time.

84.     Nevertheless, O'Leary's smear campaign against Plaintiffs, and Fox's active participation in it, was only just beginning.

85.     **O'Leary's Second Attack:**[16]  Despite these highly public and visible denials, O'Leary persisted.  On or around May 13, 2026, O'Leary appeared on *The Tucker Carlson Show*, where he continued to peddle his baseless, defamatory claims about Plaintiffs.  During the interview, Mr. Carlson grilled O'Leary about the details of his data center project, including what

---

[15] Elevate Utah, *Shark Tank Billionaire Kevin O'Leary Accused Us Of Being Chinese Operatives on Fox News*, YouTube (May 11, 2026), https://www.youtube.com/watch?v=JDy6UrHittQ&t=96s.

[16] *See* Exhibit 2 (May 13 Appearance on *The Tucker Carlson Show*).

26

percentage of the development's materials would be American-made, whether O'Leary would pay market rate for the natural gas he intended to use to power his data center, and the source of the water O'Leary's data center would require.

86.    But O'Leary did not want to engage on the merits of the debate around his controversial data center project.    Instead, he relentlessly steered the conversation back to his unsubstantiated claims that he was the target of a misinformation campaign orchestrated by Plaintiffs on behalf of the Chinese government:

> I must tell you and this is the first time this has happened to me.  I have a pretty big team, as I'm sure you do, on social media.  I'm managing a network of 12 million plus followers on different platforms, on all of them.  And so about four hours after the vote was unanimously passed on — it was a Monday night, at around 6:05 Utah time, I got a phone call from one of the people that watches our network, looks for abnormalities, and he said, "there's something going on here, something very unusual on Instagram and on Twitter," which is now X, and I said, "what do you mean?"  He said, "the spiking of a bunch of IP addresses that we don't know, and it's spewing out a tremendous amount of information."  I said, "okay guys, let's get our team—" because I'm very fortunate, I've got a bunch of very good data scientists, investigative data scientists if you want to call them that, probably one of the best teams privately outside of the government in the Department of Defense.  My team's pretty good.  You can make the assumption they once worked in these agencies.  Alright, let me give you some names here, Tucker.  Party for Socialism and Liberation, apparently shares offices with the CPP [sic] all over my social media."

87.    Multiple times, Mr. Carlson tried to get the conversation back on track, granting that perhaps there are individuals or entities linked to China that might try to influence the public debate but caveating that China actually has an enormous amount to gain from O'Leary's data center project given that more than 40% of the material slated to be used in constructing the data center would be manufactured in China.

27

88.     Each time, O'Leary insisted on returning to his planned attack, disparaging and defaming Plaintiffs rather than addressing the merits of Mr. Carlson's critiques.  He stated:

> I wanted to just finish with the list because I don't think, Tucker, you get the enormity of what's going on here.  Well, I want to mention two, which are cells inside of Utah, which really stunned me.  This I'd never seen before: Alliance for a Better Utah, Elevate Strategies, taking the content from the CPP [sic], repurposing it, and jamming it down the throats of the people of Utah on my social media feed.

89.     Mr. Carlson told O'Leary that he had no reason to doubt the information O'Leary was presenting, but that he was focused on questions that were "relevant to the country" and therefore wanted to know, for instance, "where's the water coming from?"

90.     Mr. Carlson posted a video of his full interview with O'Leary on his YouTube channel, which has 5.68 million followers, among other platforms.[17]  The video, which, as of July 14, 2026, is still publicly accessible, has received more than a million views on Mr. Carlson's YouTube channel alone.



Tucker Debates Kevin O'Leary on AI, American Jobs and the Fall of the American Empire

---

[17] Tucker Carlson, *Tucker Debates Kevin O'Leary on AI, American Jobs and the Fall of the American Empire*, YouTube (May 13, 2026), https://www.youtube.com/watch?v=xTAJnJUos3g.



Tucker Debates Kevin O'Leary on AI, American Jobs and the Fall of the American Empire

91.    **O'Leary's Third Attack:**[18]    O'Leary was far from done.  On May 15, 2026, O'Leary called into the *Cuomo Mornings* radio show with host Chris Cuomo for an interview and reiterated his false and malicious attacks on Plaintiffs.  O'Leary stated without equivocation:

> I hired some forensic digital auditors, and I just got the report back last night.  There is something called, in Utah, the Alliance for a Better Utah, run by . . . Josh Kanter.  So my team went back for the last 24 months and looked at every IRS filing, Form 990s, that would have funded this organization and wow, wow, here's what we found out.  Arabella, which is a Chinese CPP [sic] organization, has funded in three different directions, this thing in Utah, so this guy Josh Kanter . . . good luck to those guys.  They are going to have to explain—it's irrefutable—these are IRS 990 filings.  This thing in Utah is funded by the Chinese government.

92.    During this appearance, O'Leary also explicitly referenced purported evidence for his claims, stating "we are going to publish this this weekend, this entire report."

---

[18] *See* Exhibit 3 (May 15 Appearance on *Cuomo Mornings*).

93.    After airing live, O'Leary's interview with Mr. Cuomo was posted on Mr. Cuomo's public social media accounts and has been viewed over 26,000 times. As of July 14, 2026, it is still publicly accessible on Mr. Cuomo's Instagram.

94.    On May 16, 2026, the Alliance again refuted O'Leary's claims. This time it issued a press release in which it called O'Leary's statements "baseless" and stated, "[t]he only foreign interest in this data center is Kevin from Canada."[19]  Similarly, on or about the same date, a local reporter asked an employee for the Alliance whether the organization was funded by the Chinese government. The Alliance employee responded, in an effort to defend the organization against unfounded and malicious accusations put forth by one of the most powerful people in the world:

> No. I would probably get paid a lot more if I was. I would hope if I were doing some foreign international espionage, but no, we are not. We're funded by a lot of grassroots donors, and a lot of people from around Utah that believe in what we do and it's as simple as that.

95.    **O'Leary's Fourth Attack:**[20]  O'Leary's smear campaign nevertheless continued full throttle thanks to Fox. On May 16, 2026, Fox put O'Leary back on the air, just days after his appearance on *Mornings With Maria* during which he made the outrageous and baseless claims that there was "no question" that Plaintiffs were "cells" of the CCP, and after Plaintiffs made it unequivocally clear that this was a lie. Yet again, this time in an interview with Fox host Kayleigh McEnany on Fox News' *Saturday in America* program, Fox gave O'Leary a platform to spin his dangerous and defamatory narrative. He stated: "We found this organization in Utah that was

---

[19] Alliance for a Better Utah, *"The Only Foreign Interest In This Data Center Is Kevin From Canada"* (May 16, 2026), https://betterutah.org/the-only-foreign-interest-in-this-data-center-is-kevin-from-canada/.

[20] *See* Exhibit 4 (May 16 Appearance on *Saturday in America*).

really, really pushing out misinformation into Box Elder County . . . so I launched an audit and lo and behold, this money's coming from China."

96.    He continued, again repeating his unsubstantiated allegations without any equivocation, and declaring that his findings were the result of an audit carried out by expert data scientists on his payroll:

> We looked at all the IRS Form 990s.  Through a really clandestine—it's amazing—they're basically bringing in millions of dollars into Utah to push out PR trying to stop any advance in power generation or AI compute or any kind of compute . . . I couldn't believe it, but they should rename this thing 'Alliance for a Better China in Utah' after you look at how much money is coming out of China pouring into this organization.

97.    O'Leary concluded his appearance by making clear that it was not merely his opinion that Plaintiffs were operating on behalf of the Chinese government—he insisted that it was fact:

> This is irrefutable.  This is Form 990 from the IRS.  Now it's done through a whole bunch of clandestine different entities, and I've traced every single one, and I'm going to publish it today.  And I hope these people, . . . Josh Kanter, whoever they are who run this organization, they've got a lot of explaining to do to their fellow citizens in Utah . . . They're supporting China.

98.    Just like her Fox colleague Ms. Bartiromo, Ms. McEnany affirmed O'Leary's outrageous claims and allowed him to air them unchecked, despite his claim that he had evidence that was available and about to be "publish[ed]."   Ms. McEnany called O'Leary's claims "fascinating" and accepted without qualification O'Leary's assertion that the information he was presenting was "irrefutable fact."

99.    O'Leary posted clips of the segment on his public social media accounts, which received over 1.9 million views.

31



100.    In a written caption that accompanied these social media posts, O'Leary repeated his claim that he "conducted a digital audit and traced a large amount of activity back to an organization called Alliance for a Better Utah" and that "[a]fter reviewing IRS Form 990 filings and tracing the network behind it, the money appears tied to Chinese linked funding channels . . . ."



101.    Shortly after O'Leary promised to publish the results of his purported investigation, a web page was published detailing an alleged "Investigative Report." Upon information and belief, this web page contains information gathered by O'Leary's so-called "team of data scientists." The web page states that it is a "primary analysis of IRS Form 990 filings." However, contrary to O'Leary's claims, the "Investigative Report" contains no references to China, the CCP, or any other foreign entity. Nor does the "report" contain any explanation as to how its contents even implicitly support the inference that the Alliance for a Better Utah, or any other Plaintiff, is supporting China or funded by China. Indeed, to date, O'Leary has not produced a shred of evidence to support his false assertions—nor could he, because no such evidence exists.

102.    **O'Leary's Fifth Attack:**[21] O'Leary and Fox did not let up. On or around May 20, 2026, Fox gave O'Leary yet another platform to continue his malicious attacks on Plaintiffs, putting him on air for a segment of Fox Business' *The Big Money Show*. This time, O'Leary upped the ante. In addition to reiterating his false and grave accusations that Plaintiffs are funded by and operating on behalf of the CCP, O'Leary shared that he had reported Plaintiffs to federal law enforcement authorities:

> I'm breaking some news here. I got a call yesterday from a Special Agent, I will not tell you from which part of the government, along with four other Special Agents from all different parts. You have IP addresses that only we know about . . . So I said to the government, guys, let's form a team. I will give you 90 pages of IP addresses that hit my social media. I know who they are because I hired my own guys, Ph.D. guys that can do this stuff. I have all the addresses, now you have them. . . so let's shine the light of transparency on these people . . . IRS 990 filings just to the Alliance for a Better Utah. What the hell are they taking Chinese money for? All proven,

---

[21] Exhibit 5 (May 20 Appearance on *The Big Money Show*).

all through these nefarious entities.  My guys found this.  I gave it
to the government.  Good luck boys.  Enjoy your new friends.

103.    During his rant, O'Leary held up for the hosts—and for millions of Fox viewers—

a chart purporting to contain documentary evidence proving that the Alliance for a Better Utah is

tied to the Chinese government.  The chart, however, appears to be the same chart that was

published as part of O'Leary's "Investigative Report."  And as described above, the "Investigative

Report" does not connect Alliance for a Better Utah, or any other Plaintiff, to China, the CCP, or

any other foreign entity.  Nor does it contain any information that even implicitly appears to

connect the Alliance, or any other Plaintiff, to China.



104.    Once again, Fox's hosts accepted O'Leary's claims without questioning, qualifying,

or verifying them..  They did not bat an eye when O'Leary not only claimed that Plaintiffs had

engaged in criminal conduct but also stated that he had urged law enforcement to investigate

Plaintiffs.  *The Big Money Show* co-host Taylor Riggs even went as far as to "echo" O'Leary's

statements and affirm that his falsehoods were consistent with an unrelated report by the Bitcoin

Policy Institute that supposedly outlined a CCP "influence operation" against American AI development.

105.    Upon information and belief, Fox did not inspect, review, investigate, or verify the purported documentary evidence O'Leary held up to the camera claiming it contained proof that Plaintiffs were covert Chinese agents whose conduct violated federal law.  If they had, they would have seen that the chart provided no basis for O'Leary's claims.

106.    Fox posted a clip of this interview on its Fox Business YouTube channel, which has more than 3 million subscribers.[22]  The clip is still publicly accessible.



107.    **O'Leary's Sixth Attack:**[23]  O'Leary and Fox's perpetuation of the malicious, false, and unsubstantiated claims that Plaintiffs are agents of the Chinese government did not stop with O'Leary's appearance on *The Big Money Show*.  On May 20, 2026, Fox put O'Leary on air yet

---

[22] Fox Business, *'MISINFORMATION': Kevin O'Leary fires back at AI data center protesters*, YouTube (May 20, 2026), https://www.youtube.com/watch?v=dIVaRvoE2jg.
[23] Exhibit 6 (May 20 Appearance on *The Bottom Line*).

again to reiterate his disparaging and defamatory claims, this time joining hosts Dagen McDowell

and Brian Brenberg for a segment of *The Bottom Line*.  During the segment, Fox co-host Brian

Brenberg prompted O'Leary to explain how he is navigating the opposition to his Utah data center

project, including opposition that Mr. Brenberg stated he "think[s] is not home-grown."

108.    O'Leary responded with another round of dangerous, false accusations:

> . . . So a lot of people spreading a lot of misinformation, and I was interested as just one guy, where's it coming from?  And who's paying for it?  And so, I hired some data scientists, some experts to scrape IP addresses, and wow, I got some crazy things . . . Alliance for a Better Utah, where are they getting the money from?  Bad places.  This is all IRS filings.  This is all the money that's going to these guys from nefarious content that's being investigated right now by Congress.  I mean, there's some bad dudes doing this stuff . . . I took my 90 pages of IP addresses from foreign countries and gave it to the government.  They're having a hay day with it.

109.    During the interview, O'Leary again waved around the chart from his so-called

"Investigative Report," representing to Fox's millions of viewers that he possessed documentary

evidence that supported his false claims.



110.     And once again, upon information and belief, Fox's hosts, producers, and editorial teams apparently refused to verify the purported evidence O'Leary was presenting.  If Fox had taken *any* steps to verify O'Leary's claims, including simply asking him for permission to review the piece of paper in his hand, they would have seen they were baseless; his purported evidence showed no connection between Plaintiffs and China.  Alternatively, Fox's hosts, producers, and editorial teams, did look at O'Leary's purported evidence, saw that they provided no support for his claims, and, therefore, knew the claims were false.

111.     Fox posted a clip of this interview on the Fox Business website and the Fox Business YouTube channel, which has more than 3 million subscribers.[24]  As of July 14, 2026, the clips are still publicly accessible on both platforms.

112.     Notably, just a short while after O'Leary attacked Plaintiffs on Fox's *The Bottom Line*, his business partner sought to clean up his claims.  In an article published on May 21, Paul Palandjian, the CEO of O'Leary Digital, one of O'Leary's companies that is involved in developing his proposed Utah data center, stated: "We are not asserting that any specific local organizer is acting on behalf of a foreign government, and we are not characterizing any individual . . . as a foreign agent."[25]  Mr. Palandjian continued, correctly explaining that "[m]any" of the organizations raising concerns about data center project "are legitimate civic groups with long operating histories in Utah."

---

[24] Fox Business, *'FALSEHOODS': Kevin O'Leary says opponents are spreading misinformation*, YouTube (May 21, 2026), https://www.youtube.com/watch?v=tEkpAtuIV0Y; Fox Business, *Kevin O'Leary Pushes Back on Data Center Misinformation Campaign* (May 20, 2026), https://www.foxbusiness.com/video/6396219825112.

[25] Tim Vandenack, *Data center proponent steps back from China charges, puts focus on funding of critics*, KSL (May 21, 2026), https://www.ksl.com/article/51500467/data-center-proponent-steps-back-from-china-charges-puts-focus-on-funding-of-critics.

113.    The article also quoted a representative of the Alliance for a Better Utah who pointed out the outrageousness of O'Leary's claims by noting that the organization transparently publishes all of its donor information.  She told the news outlet:

> All of our information on donations and stuff like that is publicly available.    [O'Leary]'s kind of treating this as a very deep investigative dive, and it's really not.  We are not beholden to China, we don't take directives from the Chinese government, we don't work on behalf of the Chinese government.  We're working on behalf of the people of Utah.

114.    But O'Leary was not deterred by the Alliance plainly refuting his allegations once again, let alone his own business partner's attempts to correct the record—his smear campaign continued.

115.    **O'Leary's Seventh Attack:**[26]  O'Leary and Fox were relentless.  On May 24, 2026, Fox brought O'Leary back for a *fifth* time for an interview with the hosts of *The Big Weekend Show* to once again air his malicious, dangerous, false, and defamatory claims about Plaintiffs, including that they have engaged in criminal conduct by operating on behalf of the Chinese government to spread misinformation about his Utah data center project.



---

[26] Exhibit 7 (May 24 Appearance on *The Big Weekend Show*).

116.    During the interview, O'Leary stated as follows:

> So, I was wondering, where's all this information coming from when it started the evening of May 4th when we got approved? Look, I'm just a very open guy. I think people know that about me. Something called Alliance for a Better Utah, run by . . . Josh Kanter. Who's funding them? Arabella Ventures. How did I find that out? I put my auditors on top of them and look at their IRS filings, 990s. Foreign money going into Utah? . . . Where's that money coming from? How can they afford to bus these people in? Here are the facts from the IRS, okay? Open your books, let's talk about it. This is happening all over America. People want to stop the development of power. The facts from the IRS filings. I'm sorry, but I'm a little unhappy. I want to tell the truth, so let's get it out there and put it on because I don't like foreign money telling people what to do in America. You shouldn't either.
>
> I've hired people to investigate who's funding these claims, and it all leads back to foreign dark money and the people in Utah who are accepting it. I gave this data to the feds on Friday . . . I've had enough. Every American should be concerned when power projects or data centers are being blocked by foreign influence. If you want the information, I've got it. All of it. IRS irrefutable filings.

117.    Even while acknowledging that local communities have had genuine concerns about data centers being developed in their neighborhoods, the Fox hosts still endorsed O'Leary's false statements as legitimate, with co-host Tomi Lahren responding:

> You know, Kevin, I totally understand that. And I do think that there's a lot of propaganda, anti-AI propaganda, that's getting pumped in on TikTok and elsewhere. We're seeing a lot of young folks even at their college graduations when AI is brought up, them audibly booing. So, it's obvious to me that there are definitely campaigns, foreign-funded campaigns, into discouraging AI and the things needed for AI here in the US, which I think is, to your point, also BS.

39





118.    The segment concluded with another lengthy tirade by O'Leary during which he again claimed that he possessed "irrefutable" evidence that Plaintiffs were funded by and operating on behalf of a foreign government:

> . . . And I'm getting a little ticked off, so I've had enough and I've hired a lot of people to go find out who's funding these falsehoods, and it all leads from foreign dark money.  And the people in Utah that are taking this money, I gave this data to the feds on Friday. . . I'm showing it all to everybody.  I've had enough of this stuff.  And you should be unhappy too, and everybody in America that's watching every single progress on power and data centers being shut down by foreign influences should be unhappy.  And if you want the information, I've got it.  All of it.  IRS irrefutable filings.  What are those people doing in Utah?  Why do they have a say of what happens in Utah?  Let the people in Utah vote, I'm 100% good with that, and I want to give them the true information . . . Enough already.  I'm just one person saying this is ridiculous.  It's got to stop.  Let's get the facts in front of the people and ask who you're

marching beside.  Who paid for you to be here?  Are they from Cuba?  Are they from China?  Where'd this come from?  Why are you here if you don't live in Utah?

119.    When O'Leary's hysterics subsided, the panel of Fox hosts let the falsehoods he spewed go unchecked.  They did not seek further clarification or explanation of the purported evidence O'Leary allegedly possessed, and upon information and belief, they made no attempt to verify O'Leary's claims.  Instead, the Fox hosts took O'Leary's falsehoods at face value and wrapped the segment.  One host simply responded with "Alright.  Kevin O'Leary.  Thank you for joining us."  Another added "Thanks, Kev."

120.    O'Leary posted a video of this interview to his public social media accounts with a caption, stating in writing that "[a]fter reviewing IRS filings and conducting audits, I became convinced that foreign linked money, including interests connected to China, is helping fuel efforts to slow power generation and data center development in the United States."

121.    His social media posts of this interview received more than 138,000 views.

122.    **O'Leary's Eighth Attack:**[27]  O'Leary remained on the attack, hurling grave, false accusations at Plaintiffs on any platform that would have him.  On May 25, 2026, O'Leary posted a clip to his public social media accounts titled "Exposing foreign powers funding misinformation about data centers" featuring an interview he gave to an unidentified reporter or producer during which he maliciously repeated his dangerous, false accusations against Plaintiffs, again claiming to rely on expert evidence that never existed.

---

[27] Exhibit 8 (May 25 Social Media Clip).



EXPOSING FOREIGN POWERS FUNDING
MISINFORMATION ABOUT DATA CENTERS

123.    During the interview, O'Leary stated:

. . . [W]e hired and started working with a very advanced data science team.    What we learned was, to me, shocking—just stunning.  I couldn't believe it.  I still can't because I'm getting the data by the four-hour cycle now . . . .  [M]ost of the IP addresses in Utah were coming from two IP addresses: Alliance for a Better Utah and one called Elevate.

We found out that Alliance for a Better Utah was actually a tax filer, and we went to the IRS Form 990s, which are public, and started to drill down into what the filings were.  Lo and behold, multiple filings through multiple entities all over the world were all going back to something called Arabella [and] Neville Singham, under investigation by multiple branches of the government, shares offices with the CCP.  So then I said, "I want more.  Can you tell me the exact amounts?"  We got those the next day.  We're talking about millions, hundreds of millions of dollars here.  It's not just Utah.  These guys are doing campaigns everywhere there's a proposed increase in power and/or a data center. . .

So I called my contacts at the White House.  I raised a flag and said, "What the hell's going on here?"  They put me in touch with various law enforcement agents.  We had a meeting last week with my entire data set team and multiple law enforcement agencies, and we started sharing data.  I gave them 90 pages of IP addresses from all over the place, all around the world, hitting these locations.

42

124.    O'Leary was then asked to clarify whether he is "suggesting that these entities are taking funds from the Chinese Communist Party and using those funds to run a digital blackmail campaign against your projects."  O'Leary responded categorically and again held up the chart from his so-called "Investigative Report," insisting "I'm not suggesting it.  It's an irrefutable fact. This is IRS 990 filings with the exact dollars and dates showing exactly where it came from.  No, I'm not inferring it.  I'm saying that is exactly what's happening."

 

125.    In the caption of his post, O'Leary stated, "I shared 90 pages of evidence with federal law enforcement and raised concerns directly with contacts at the White House.  This isn't speculation.  The filings, funding records, dates, and connections are documented."

126.    O'Leary's social media posts sharing this clip received more than 3.7 million views.

127.    **O'Leary's Ninth Attack:**[28] O'Leary broadened his reach by continuing his assault on another major network, NBC. On May 27, 2026, O'Leary appeared on NBC News' *Top Story* segment during which he repeated his dangerous, false claims about Plaintiffs yet again.



128.    After being confronted with video clips of local Utahns speaking out against O'Leary's data center project in their community, O'Leary stated that the community members had been misled by Chinese operatives, by which he meant Plaintiffs. This was not just O'Leary's opinion; he declared that he had proven it.

129.    O'Leary stated:

> I've started to spend a fair amount of money in working with the federal government to find out who is funding this misinformation and we found out some fascinating stuff. Just since [May] 4th, and I've given it all back, starting from the White House to all the special agents I'm working with, with all the federal agencies. There's some very bad people funding this misinformation . . . I'm talking about money coming from nefarious foreigners by the hundreds of millions funding organizations within Utah like the Alliance for a Better Utah. I have the IRS filing that show they took money from Arabella, funded by the Chinese. I handed it over to the government. They said they've already been investigating this, not just in Utah. They're doing this everywhere where power is being built, not just

---

[28] Exhibit 9 (May 27 Appearance on *Top Story*).

44

data centers. Anywhere America tries to build power onto its grid, you've got Chinese money bringing in protesters and funding protesters and misinformation, not just in Utah . . . All of this stuff is false, funded by foreign money, and I've proven it with IRS filings.



130.    O'Leary posted clips of this interview to his public social media accounts. In the caption of those posts, O'Leary reiterated in writing several of the defamatory statements he made during the interview, stating as follows:

After conducting audits and reviewing IRS filings, we found organizations like Alliance for a Better Utah receiving funding through networks connected to Arabella and foreign linked money tied to Chinese interests. I've turned everything over to federal authorities because people deserve facts, not fear campaigns when deciding the future of their communities.

131.    O'Leary's social media posts containing clips of his *Top Story* appearance received more than 400,000 views.

45

132.   **O'Leary's Tenth Attack:**[29]  Intent on ensuring that his malicious false claims were heard by as large an audience as possible, O'Leary next brought his smear campaign to CNN when, on June 3, 2026, he appeared on *The Lead with Jake Tapper*.  Mr. Tapper noted during the segment that the Chairman of the Ways and Means Committee in the United States House of Representatives was investigating whether there is "Chinese money . . . funding some of these NGOs that are opposed to this data center," an inquiry that, upon information and belief, stemmed, at least in part, from O'Leary's repeatedly broadcast falsehoods about Plaintiffs.

133.   In response, O'Leary repeated his malicious, false claims yet again, stating:

> About 8:00 on May 4th when it was announced, all of a sudden on my Instagram, X formerly Twitter feeds, unbelievable explosion of DMs with false information, and I thought to myself, this is really expensive.  Who is doing this?  . . . So I hired some forensic auditors and some IP scientists.  It led back—because some of this was going to Utah—Alliance for a Better Utah.  And I said okay, they're tax-free.  Pull their 990s.  Go do a forensic audit on their IRS filings.  Let's find out who's funding this incredibly expensive campaign against our project.  And lo and behold, I couldn't believe it, they all go back to an entity called Arabella, which is funded by a guy named Neville Singham, who shares offices with the Chinese Party, and apparently he's under investigation by multiple agencies in the government, so I took all the data and I gave it to the government . . . It's irrefutable . . . I know the company's been under scrutiny, but I don't know how they're going to explain this.

134.   The following day, O'Leary posted clips of his CNN interview to his public social media accounts that received more than 230,000 views.

---

[29] Exhibit 10 (June 3 Appearance on *The Lead with Jake Tapper*).



135.    O'Leary posted the clips with a caption reiterating what he shared on air, stating:

I've been investigating who is funding some of the opposition campaigns and have turned evidence over to federal authorities regarding organizations and funding networks that appear linked to Chinese backed interests.  My focus now is simple, address the concerns honestly, provide the facts, and show the people of Utah exactly what this project is and what it isn't.

\*     \*     \*

136.    In total, across at least ten separate media appearances and numerous accompanying social media posts spanning May 11 through June 3, 2026, O'Leary repeatedly and falsely stated to an aggregate audience of many millions of viewers that: (a) Plaintiffs are agents of the Chinese government and the CCP; (b) Plaintiffs accepted funds from and operated on behalf of the CCP to spread misinformation about the Utah data center project, as opposed to working on behalf of their actual clients, supporters, and community members; and, therefore, (c) Plaintiffs have willfully engaged in conduct that violates numerous criminal laws, including federal offenses such as operating as an unregistered foreign agent in violation of the Foreign Agents Registration

47

Act and related laws governing foreign agents (22 U.S.C. §§ 612, 618(a); 18 U.S.C. § 951), as well as transferring funds in violation of federal money laundering statutes (18 U.S.C. §§ 1956, 1957).

137.    Over and over again, O'Leary made clear that he was not voicing his personal opinion.  He characterized his statements as "irrefutable" and established facts—facts that he had "proven" through evidence gathered and analyzed by a team of unnamed expert data scientists he employed.

138.    But O'Leary's statements were false.  Plaintiffs are not agents of the Chinese government.  Plaintiffs do not accept funds from the CCP or the Chinese government.  And aside from one trip Mr. Kanter took 35 years ago, Plaintiffs have never been to China.  Plaintiffs have not violated the Foreign Agents Registration Act, nor any other statute regulating foreign agents, federal money laundering laws, or any other criminal law Defendants stated or suggested Plaintiffs violated.

139.    Despite his declaration that his claims were "irrefutable," O'Leary never presented any evidence that supports the contention that Plaintiffs were funded by, acting at the behest of, or otherwise agents of, the Chinese government or the CCP.

140.    For example, on numerous occasions, O'Leary claimed that his statements were supported by IRS Form 990 filings.  But none of Alliance for a Better Utah's Form 990 filings reference China or even suggest that the organization is funded by China or Chinese interests.

141.    Nor did O'Leary's so-called "Investigative Report" support the conclusion that any of the Plaintiffs are funded by Chinese interests.  Indeed, the "investigation" appears to be wholly reliant on IRS Form 990 filings, which are publicly available and which, as explained above,

48

provide no link between Plaintiffs and China or the CCP. Thus, O'Leary's own purported evidence refuted his accusations.

142. Worse yet, despite consistently leveling serious accusations of wrongdoing against Plaintiffs, and even in the face of Plaintiffs' prompt denials of the accusations, O'Leary never contacted any of the Plaintiffs to verify his claims. O'Leary did, however, apparently contact federal law enforcement and his "contacts in the White House"—or so he claims—to air his false accusations against Plaintiffs. Upon information and belief, O'Leary did so in an effort to prompt law enforcement authorities to investigate and/or prosecute Plaintiffs—despite possessing no evidence that they committed any wrongdoing—in retaliation for Plaintiffs' purported participation in the scrutiny of his data center project.

143. Upon information and belief, the reason that O'Leary spread these vicious lies is because he did not like Plaintiffs' speech about his business venture. Thus, he sought to discourage Plaintiffs from calling for transparency and accountability around his data center project, as well as to inflict harm on Plaintiffs as retribution. [30]

144. No one has presented any evidence that supports O'Leary's false statements about Plaintiffs. In fact, as explained above, when confronted with O'Leary's claims, his own business partner disavowed the statement that Plaintiffs and other organizations were agents of a foreign government.

145. There is a very simple reason no one has ever presented evidence that supports O'Leary's defamatory claims. No such evidence exists. O'Leary and Fox admitted as much.

---

[30] In the alternative, if O'Leary did not in fact contact law enforcement to lodge a false report against Plaintiffs, his statements that he did so constitute additional false statements in furtherance of his defamatory smear campaign against Plaintiffs.

146.    On June 10, 2026, after a weekslong onslaught of false accusations and malicious public attacks against Plaintiffs—and days after receiving a legal demand from Plaintiffs on June 5, 2026—O'Leary revealed the truth.  In an interview with FOX 13, when asked whether he still thought the Chinese government is influencing public opinion about is data center project, O'Leary changed his tune and pleaded ignorance.  Despite having made at least 10 media appearances to declare that it was "irrefutable fact" that Plaintiffs were opposing his data center project on behalf of the Chinese government, O'Leary told FOX 13, "I don't know who's doing this.  But this is not normal, and I'm going to find out."

147.    And on June 25, 2026, in an untimely and insufficient attempt to avoid liability for his obvious misconduct, O'Leary posted on his X, Facebook, and Instagram accounts a "clari[fication]" that he "ha[s] no evidence that the Alliance for a Better Utah, Elevate Strategies, Gabrielle Finlayson, . . . or Josh Kanter are funded by China or the Chinese Communist Party."



50

148. Fox similarly—and belatedly—sought to reduce its liability for its role in O'Leary's smear campaign by having multiple Fox hosts report on the "clarification" O'Leary posted and state that "Fox News Media is likewise aware of no evidence that [Plaintiffs] are funded by or acting at the direction of or in coordination with Chinese interests in opposing Kevin O'Leary's project." Each of the hosts concluded their statement with an apology from the network. All of these "clarifications" were untimely and insufficient to remedy the harms Fox has caused.

149. Indeed, Fox still has not fully and completely corrected its error. Unlike NBC, which removed "removed [its] interview with Kevin O'Leary that appeared on NBC News Now on May 27, 2026 because of information it learned after the interview was published"—i.e., that O'Leary "has 'no evidence' [that Alliance for a Better Utah is] 'funded by China or the Chinese Communist Party,'"—Fox did not take effective remedial measures. As of the date of this filing, videos and clips of least three of O'Leary's appearances in which he made his dangerous claims about Plaintiffs remain accessible on Fox-controlled platforms, and via Fox-affiliated YouTube accounts, where any user can watch and share videos of O'Leary uttering his baseless, defamatory statements. Unlike on NBC's platform, Fox's videos and their accompanying captions provide no suggestion that the statements had been retracted as without basis.

150. O'Leary's posts admitting he possesses no evidence that Plaintiffs are Chinese cells operating on behalf of the CCP confirm that from the time O'Leary first launched his malicious attacks against Plaintiffs, he knew that his statements were false or, at the very least, that he acted with reckless disregard to their falsity.

151. Moreover, O'Leary's admission confirms that the numerous statements and representations he made in furtherance of his smear campaign against Plaintiffs—including

(1) O'Leary's statement to millions of viewers that a team of expert data scientists he employed uncovered evidence tying Plaintiffs to China; (2) O'Leary's representation to millions of viewers that he was in physical possession of evidence to that effect during several media appearances, including by holding that purported evidence up to the camera; and (3) O'Leary's alleged statements to law enforcement authorities and his "contacts in the White House" that Plaintiffs were agents of China—were false as well.

### E.  Fox's Participation in O'Leary's Smear Campaign.

152.   Kevin O'Leary did not simply show up unannounced on *Mornings with Maria* on May 11 and begin spewing his defamatory falsehoods.  Nor were his next four repeat appearances over the course of several weeks on Fox a surprise.  Rather, as set forth below, Fox—through its hosts, production teams, and executive leadership—consciously and deliberately chose to platform O'Leary knowing his statements about Plaintiffs, and particularly his statements about the Alliance and Mr. Kanter, were false.  Or, at the very least, Fox acted with reckless disregard as to their truth.

153.   Beyond the inherent unreliability of O'Leary's outlandish claims, Fox had ample reason to doubt their veracity each time he made them on its airwaves.  As detailed above, prior to airing O'Leary's claims, Fox repeatedly produced segments that noted the legitimate local concerns surrounding data centers.  These segments aired on shows that later affirmatively and without qualification aired O'Leary's defamatory statements that Plaintiffs' scrutiny of O'Leary's data center project in Utah was a Chinese foreign influence operation.

154.   For example, on the December 3, 2025 broadcast of *Mornings with Maria*, host Maria Bartiromo noted that the explosion of data center construction in some areas was being met with "concern from the locals."  Yet, on May 11, she interviewed O'Leary and affirmed his

52

statements that Plaintiffs' scrutiny of O'Leary's data center project was not motivated by local concerns but rather was the result of Chinese backing.

155.    The same is true of Fox host Dagan McDowell.  Across multiple Fox broadcasts in 2025, Ms. McDowell discussed the legitimate concerns local residents have about data centers being developed in their communities.  She spoke from personal experience, referencing the proposed construction of a data center in an area near where she grew up.

156.    Then, on May 19, 2026, *The Bottom Line*, co-hosted by Ms. McDowell, broadcast a story on the (false) allegations that the opposition to O'Leary's data center project was funded by "foreign" or "dark" money.  She noted that she believed an entity unrelated to Plaintiffs was amplifying foreign propaganda but that "a lot of the opposition [to data centers] is grassroots."

157.    Nevertheless, Ms. McDowell and her co-host Brian Brenberg brought O'Leary on *The Bottom Line* the next day—after he had already aired his defamatory statements about Plaintiffs multiple times—and specifically asked him about the opposition to his data center project.  When O'Leary outright accused Plaintiffs of receiving money from and operating on behalf of China, Ms. McDowell made light of the accusation without ever identifying her previously held, and oft-repeated, view that data center opposition from rural communities was grounded in legitimate local concerns, not foreign influence.

158.    So, too, for Mr. Brenberg.  As noted above, on the December 5, 2025 broadcast of *The Big Money Show*, Mr. Brenberg stated that it was "okay" for local communities to have concerns about data centers because of their negative impacts.  Yet, O'Leary still appeared on *The Big Money Show* on May 20 and *The Bottom Line* shortly thereafter to repeat his falsehoods about Plaintiffs while Mr. Brenberg stood idly by.

159.    Moreover, as O'Leary repeated his statements, the reasons for Fox to seriously doubt their veracity only grew.  For example, as explained above, the Alliance and Elevate promptly and repeatedly issued forceful public denials of O'Leary's claims after they first aired on May 11.

160.    On May 21, according to public reporting, O'Leary's business partner disavowed the claims.  Nevertheless, Fox gave O'Leary a platform to air his false accusations on *The Big Weekend Show* after that date.

161.    Doubts about the veracity of O'Leary's claims also came from inside Fox.  For example, on May 27, 2026, only days after O'Leary appeared on Fox's *The Big Weekend Show*, *Mornings with Maria* aired a Fox Business correspondent named Darren Botelho who addressed claims that China was influencing data center opposition.  He specifically noted O'Leary's wild accusations against Plaintiffs and then stated "there has been no independent verification" of O'Leary's claims.

162.    That same day, Mr. Botelho also appeared on *The Big Money Show* and again stated that O'Leary's claim had not been independently verified.  Immediately after Mr. Botelho's appearance, Fox pundit Larry Kudlow stated "anybody for whatever reason who opposes data centers . . . is actively promoting China."  He then continued "the Chinese infiltrating, I'm sure they are, I don't have any evidence for that I haven't followed the story."  Thus, Fox's own personalities questioned the evidence for O'Leary's claims only days after Fox repeatedly aired them.

163.    Despite these and other reasons to doubt O'Leary's claims, upon information and belief, Fox did not seek to check or verify them, even when O'Leary purported to wave around

54

evidence for his claims on Fox's sets. Or worse yet, upon information and belief, Fox simply knew that O'Leary's claims were false, and that he had no evidence for his claims, but still let him air them.

164. Certainly, however, Fox made no attempt to contact Plaintiffs to verify the accusations against them that it had broadcast, even after Plaintiffs and others publicly refuted the claims. Fox never offered them an opportunity to appear to share their side of the story. And only after Fox realized its legal exposure did it offer the untimely and insufficient "clarifications," all some of the original videos of O'Leary disparaging and defaming Plaintiffs remained untouched on its platforms.

165. Upon information and belief, Fox had the institutional capacity to verify O'Leary's claims. For one, checking O'Leary would not have been particularly difficult—he brought his purported evidence to Fox's studio and brandished it on air. One form of verification would have simply entailed asking O'Leary for permission to inspect the documents he had in his hand.

166. Even further, public reporting indicates that Fox has an internal apparatus—called the "Brain Room"—which is responsible for fact-checking and verifying the claims that Fox airs. Problematically, however, Fox has a history of ignoring the Brain Room's fact checking, most notably during its coverage of the aftermath of the 2020 election when Fox repeatedly aired lies that the election was rigged or stolen. Fox famously paid nearly one billion dollars to settle just some of the defamation claims that resulted from its 2020 election coverage.

167. Discovery material from the suits related to the 2020 election also shows the extent of editorial control Fox employees—hosts, production teams, and even senior Fox leadership—exercise over the content and guests that appear on Fox's programming. Take, for example, Maria

55

Bartiromo, the first Fox host to air O'Leary's false claims about Plaintiffs.  Ms. Bartiromo was also one of the first Fox hosts to air lies about the 2020 election, when she hosted Sidney Powell on her show *Sunday Morning Futures* on November 8, 2020.

168.    Importantly, Ms. Bartiromo knew what Ms. Powell was going to say prior to this appearance.  That is because Ms. Bartiromo had privately interviewed Ms. Powell the day prior to Ms. Powell's appearance.  Ms. Powell had also sent Ms. Bartiromo an email detailing the election allegations and the supposed evidence that supported them.  Ms. Bartiromo later admitted Ms. Powell's evidence was inherently unreliable and "nonsense," but nevertheless she chose to air Ms. Powell and did not mention her skepticism on air during Ms. Powell's appearance.  Instead, she affirmed Ms. Powell and expressed credulity regarding her claims.

169.    The Powell episode shows that Ms. Bartiromo takes an active role in the content that airs on her shows and has, at least in one instance, prior knowledge regarding her guests' statements before her guests appear on her show.  Upon information and belief, Ms. Bartiromo had similar foreknowledge prior to O'Leary's appearance on *Mornings with Maria* on May 11.

170.    Indeed, the parallels between Ms. Powell's appearance on Ms. Bartiromo's show and O'Leary's appearance are striking.  Most notably, immediately after O'Leary aired his false and unsubstantiated claim regarding Plaintiffs' purported connections to China, Ms. Bartiromo did not ask O'Leary for the evidence supporting his claims.  Instead, she likened O'Leary's allegations to similar claims Fox had aired regarding allegations that unrelated entities opposed to data centers had ties to China and the CCP.

171.    Beyond show hosts such as Ms. Bartiromo, production teams and even senior editorial leadership at Fox make content decisions.  Indeed, between November 2020 and March

2021, the relevant time period in the election suits, Fox held editorial meetings twice a day, one in the morning and one in the afternoon." Those meetings were attended by senior editorial leadership" including Suzanne Scott (who was and is the Chief Executive Officer of Fox News Media), Jay Wallace (who was and is the President and Executive Editor of Fox News Media), and Meade Cooper (who was and is the Executive Vice President for Primetime Programming), among others. At the morning meetings, the senior editorial group would provide updates on planned programming and interviews, and, in the afternoon meeting, they would discuss breaking news.

172.    Editorial and production staff for each show also had their own meetings, and, sometimes, they would receive guidance from the executive-level staff. As Meade Cooper put it: "Clearly, I reject the notion that the hosts don't have bosses exercising judgment."[31]

173.    Thus, as set forth above, Fox had ample reason to doubt the veracity of O'Leary's claims. Instead, Fox's hosts, members of its production teams, and senior editorial leadership, chose to platform O'Leary knowing that his claims were false or recklessly disregarding their falsity.

### F.  Plaintiffs Have Suffered Enormous Harm.

174.    That Plaintiffs have been harmed by O'Leary's malicious, defamatory attacks and Fox's perpetuation thereof is beyond dispute. Because O'Leary and Fox aired false accusations that Plaintiffs engaged in criminal conduct and conduct that is incompatible with the competent

---

[31] *US Dominion, Inc. et al. v. Fox News Network, LLC*; *US Dominion, Inc.  et al. v. Fox Corporation*, Nos. N21-C-03257-EMD; N21C-11-082-EMD, Decision of Summary Judgment, (Del. Sup. Ct. Mar. 31, 2023), at 9, n.61, available at https://courts.delaware.gov/Opinions/Download.aspx?id=345820.

and ethical exercise of lawful business, Defendants committed defamation per se and damages are presumed.

175. And the magnitude of the reputational harm and other damages Plaintiffs have suffered—and continue to suffer—is enormous. This is in large part due to the staggering breadth of O'Leary and Fox's massive global communications networks, each of which reaches many millions of viewers, listeners, and followers across the world each day.

176. O'Leary, widely recognized for his role as an investor on *Shark Tank*, commands a media reach spanning both broadcast television and a substantial personal social media following. *Shark Tank* itself continues to draw a large national audience, with Season 17 episodes averaging between 1.4 and 1.9 million same-day viewers in 2025. Beyond *Shark Tank*, O'Leary has built one of the largest individual followings among business commentators on social media. For instance, on LinkedIn alone, O'Leary has more than 3.7 million followers, where he has been ranked among the platform's most-followed influencers. According to O'Leary, he maintains a social media audience of more than 12 million followers.

177. Fox, for its part, has one of the largest audiences of any news organization in the United States. With respect to traditional television, the network dominates the cable news landscape. According to Nielsen ratings reported by Fox, the network averaged between approximately 2.4 million and 3.1 million viewers during weekday primetime throughout much of 2025, while averaging roughly 1.4 to 1.6 million viewers across the total broadcast day. Fox News and Fox Business are distributed to more than 60 million television households across the United States. Viewership for each of the individual Fox programs on which O'Leary appeared is described *supra*.

178.    Fox also maintains one of the largest digital news audiences in the country through Fox News Digital.  In the first quarter of 2026, Fox News Digital averaged approximately 187 million unique visitors per month to its various platforms.  During May 2025, as an example, Fox reported approximately 3.8 billion minutes consumed across its digital platforms, while generating approximately 1.8 billion multiplatform digital views.  According to Fox Corporation, the network also generated more than one billion YouTube video views during the first quarter of 2025.  The company also reported that Fox exceeded one billion social video views during individual months in 2025 across platforms including TikTok, Facebook, Instagram, and X.  Thus, Fox maintains a huge follower and viewership base, with millions of followers across Facebook, X, YouTube, Instagram, and TikTok, as do many individual Fox personalities.

179.    The awesome reach of Defendants' media presence made it inevitable that their smear campaign against Plaintiffs would be seen by many millions of people.  But the gravity of O'Leary's accusations made the smear campaign newsworthy in and of itself, causing his claims that Plaintiffs were proxies for the Chinese government to spread like wildfire.

180.    O'Leary's defamatory statements, amplified by Fox, have been repeated, discussed, and/or endorsed by numerous media outlets, including the Washington Post, the Wall Street Journal, CNN, NBC News, ABC4 Utah, Fox13, the Salt Lake Tribune, the New York Post, The Hill, Yahoo Finance, BusinessInsider, Mother Jones, HuffPost, MSN, Fast Company, and many others, both nationally and internationally.  This widespread secondary coverage has propelled O'Leary's falsehoods to every corner of the country and beyond.

181.    The effect of this widespread coverage is even more pronounced given the relatively small size of Plaintiffs' local media market.  In Plaintiffs' community in Utah, O'Leary's

falsehoods have been inescapable, especially as they have been circulated, discussed, and/or endorsed by prominent figures in the Utah community.

182.    For example, elected leaders in Utah began parroting Defendants' falsehoods. Todd Weiler, a Utah lawmaker who is the Utah State Senate Parliamentarian posted on X on June 6, 2026, stating: "You can hate Kevin O'Leary, Stratus, and the data center – but still ask yourself why alliance for a better Utah is being partially funded with Chinese money. #utpol."  On June 30, 2026, after O'Leary posted his retraction, Weiler sheepishly said, "Oops. I was duped.  Sorry everyone."

183.    Meanwhile, both Representative Candice Pierucci, the Majority Whip in the Utah State House, and Representative Kristen Chevrier reposted a tweet by Alexis Ence—a podcast host who is affiliated with State Senator John Johnson's podcast, *Politicit*—with an image of O'Leary next to an image of Ms. Finlayson with a text overlay stating "KEVIN O'LEARY CLAIMS UTAH GROUP WORKS FOR CHINA."[32]  The text of Ence's tweet asked, "Where's the media on this?" and stated "Transparency goes both ways" before drawing more baseless connections between Ms. Finlayson, as well as her family, and the Chinese government.

184.    A member of Utah's congressional delegation amplified O'Leary's claims as well. United States Senator Mike Lee reposted a clip of O'Leary's exchange with the unidentified reporter—identified above as "O'Leary's Seventh Attack"—and wrote a thread of tweets walking his followers through O'Leary's purported evidence, which was later debunked by O'Leary himself.

---

[32] @alexisence, X (May 17, 2026), https://x.com/alexisence/status/2056038870870024321.

185.   The gravity of O'Leary's false accusations combined with Fox's affirmation thereof and Defendants' massive reach ensured that the vast majority of Plaintiffs' personal and professional networks have watched, heard, and/or read about O'Leary's false claims about them, leading to a myriad of reputation, economic, and emotional harms, which are ongoing and compounding.

186.   Because Plaintiffs' line of work is heavily reliant on their credibility and reputations as community-oriented and grassroots-driven organizations and individuals, Defendants' conduct has taken a significant toll on their reputations and livelihoods.  Plaintiffs' organizational and professional missions include promoting transparency and unveiling conflicts of interest. O'Leary's malicious attacks that Plaintiffs were concealing funding and direction from the Chinese government and Fox's dissemination of these claims quickly became ubiquitous fodder for ridicule and scorn in the political circles that are the locus of Plaintiffs' work.

187.   As a direct result of Defendants' conduct, Plaintiff Alliance for a Better Utah has suffered severe reputational damage to its organizational mission and credibility, as well as significant economic harm from costs incurred in responding to Defendants' conduct, including O'Leary's prolonged public harassment and the diversion of organizational resources from its core advocacy work.  The Alliance's critical fundraising efforts have also been impacted, as would-be donors have been led to believe that the Alliance may not have pressing financial needs if they are being funded by foreign entities.  Upon information and belief, even would-be donors that do not believe O'Leary's falsehoods are chilled from donating to the Alliance for fear of being associated with an entity that has been accused of operating on behalf of a foreign adversary and engaging in criminal conduct.

188.    As a direct result of Defendants' conduct, Plaintiff Elevate Strategies has suffered severe reputational damage and significant economic harm, including lost profits as a result of the loss of current and prospective clients, who have terminated or declined to enter into business relationships with Elevate Strategies because of the false accusations that the firm operates as an agent of the Chinese government.  These pecuniary losses are ongoing and continue to compound.

189.    As a direct result of Defendants' conduct, Plaintiff Joshua Kanter has suffered severe reputational harm affecting both his personal standing and his commercial enterprises, including leafplanner, Inc. and his work as an attorney and family office advisor.  Business partners and clients have raised the allegations with Mr. Kanter.  And, upon information and belief, concerns that he is engaged in criminal activity, the attendant risks of doing business with him, and/or the negative publicity that the accusations have brought, have resulted and/or will result in lost business, lost income, lost profits, and lost employment and other economic opportunities.

190.    As a direct result of Defendants' conduct, Plaintiff Gabrielle Finlayson has suffered severe reputational harm affecting both her personal standing and the business of Elevate Strategies.  Ms. Finlayson has suffered devastating professional consequences as current and prospective clients question whether she is engaged in criminal activity.  In Ms. Finlayson's profession as a political consultant, the mere allegation that she is engaged in criminal conduct on behalf of a foreign government is enough to be blacklisted by would-be clients and employers who would seek avoid association with such scandalous circumstances.  And the black cloud of suspicion that will forever be associated with Ms. Finlayson, along with the fear of questions that members of the public and donors may continue to raise about those who associate with Ms. Finlayson, will lead clients and employers who never believed Defendants' lies to hesitate or

62

refrain before doing business with her.  That is especially likely given the nature of Elevate and Ms. Finlayson's line of work: competitive political campaigns, where candidates cannot afford to have negative attention directed at their own consultants.  As to Ms. Finlayson, Defendants' defamatory conduct therefore has likewise resulted and/or will result in lost business, lost profits, lost income, and lost employment and other economic opportunities.

191.    Mr. Kanter and Ms. Finlayson have each suffered, and continue to suffer, substantial emotional distress and trauma arising from the public vilification and relentless personal attacks directed at them on national television and across social media over the course of several consecutive weeks.  Plaintiffs and their family members now fear for their physical safety as a result of O'Leary and Fox's conduct, which has caused members of O'Leary's large social media following, as well as followers of those who circulated O'Leary's defamatory attacks locally, to harass Plaintiffs.  Moreover, Plaintiffs now live in fear that they will become the targets of baseless criminal investigations by the federal government.  This fear is far from unfounded: O'Leary stated several times, including on Fox, that he has referred the matter to federal law enforcement, including an unnamed "special agent," and because members of the current Presidential administration have begun to echo O'Leary's false claims and demanding investigations.

192.    In an attempt to clear their names, Plaintiffs had to, and continue to, devote significant time, attention, and energy—both personal time and staff time—into responding to each of the current and prospective clients, donors, vendors, elected leaders, colleagues, acquaintances, family, friends, and reporters that raise Defendants' false accusations.  They have attempted to do so while balancing their professional responsibilities and reputations during primary election

season—one of the busiest times for them professionally.  These necessary mitigation efforts divert resources away from Plaintiffs' ability to focus on their own work and other responsibilities.

193.  All these harms are ongoing and compounding.  Neither O'Leary's admission that he possesses no evidence tying Plaintiffs to China nor Fox's reporting thereof has brought O'Leary's smear campaign to an end or mitigated the damage the Defendants have caused.  Upon information and belief, clips of every one of O'Leary's ten separate attacks on Plaintiffs continue to appear and circulate online.  Several remain accessible on Fox-controlled platforms, while others remain posted on the accounts of other networks.  And though O'Leary recently deleted his social media posts that contained clips of his defamatory attacks, most remain in circulation on social media after having been clipped and reposted by social media users and news commentators.  Moreover, O'Leary's "clarification" post was by no means a retraction—it was posted only on a subset of O'Leary's social media accounts, it was not made in the same form and fora as O'Leary's defamatory statements were originally made, and it has not been published by other networks on which O'Leary made his false claims about the Plaintiffs.  And, upon information and belief, O'Leary has not retracted any of the false claims about Plaintiffs that he shared with law enforcement.

194.  As of the time of this filing, anyone with an internet connection can access most, if not all, of O'Leary's media appearances during which he levied his malicious, defamatory attacks against Plaintiffs, including several of the segments, which remain available on Fox-controlled platforms.  O'Leary's smear campaign—and Fox's perpetuation thereof—is therefore ongoing; and with it, Plaintiffs' harms continue to grow.

## COUNT I: Defamation and Defamation Per Se

### All Plaintiffs Against Defendant Kevin O'Leary

195.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

196.    Defendant Kevin O'Leary made false and defamatory statements of and concerning Plaintiffs as described herein, including but not limited to the statements during the ten media appearances identified in paragraphs 73 through 135 above, as well as social media posts in which O'Leary posted clips of those appearances.

197.    O'Leary's statements are statements of fact, or implied false and defamatory facts, and were not protected opinion.  O'Leary repeatedly characterized his accusations as "irrefutable," based on documentary evidence—including IRS Form 990 filings and IP data—and something he was not "suggesting" but rather stating as established fact.  A reasonable person hearing these statements would understand them to convey factual assertions, not mere opinion.

198.    O'Leary's statements are false.  Plaintiffs are not agents of the Chinese government, do not receive funding from the Chinese government or the CCP, and have not violated federal law.

199.    O'Leary's statements are defamatory because calling a nonprofit organization, a political consulting firm, and individuals who work in local community advocacy and politics "cells" of the Chinese Communist Party, funded by China, and acting at the behest of the Chinese government necessarily will subject these organizations and individuals to hatred, contempt, or ridicule.

200.    O'Leary statements are also defamatory per se.  The statements charge Plaintiffs with serious crimes—specifically, acting as unregistered agents of a foreign government (22 U.S.C. §§ 612, 618(a); 18 U.S.C. § 951) and money laundering (18 U.S.C. §§ 1956, 1957), among others.  The statements also tend to injure Plaintiffs in their trades, businesses, and professions because they portray Defendants as foreign agents or criminals, thereby tending to cause clients, business partners, donors, and others to terminate or avoid business relationships with Plaintiffs. Thus the statements are actionable even without proof of actual injury.

201.    Even if the statements were not themselves false, O'Leary intentionally and knowingly created the false, misleading, and defamatory impression that Plaintiffs were foreign agents and/or criminals.

202.    O'Leary published the statements to millions of third parties through national television broadcasts, social media posts, and other media.  O'Leary also published the statements to members of federal law enforcement.

203.    O'Leary acted with actual malice—that is, with knowledge of the falsity of his statements or with reckless disregard for their truth or falsity.

204.    As a direct and proximate result of O'Leary's defamatory statements, Plaintiffs have suffered damages including severe injury to reputation, emotional distress, and economic damages in the form of lost business opportunities and clients.

205.    Because O'Leary acted with malice, spite, ill will, and wanton and/or reckless disregard for Plaintiffs' rights, Plaintiffs are entitled to punitive damages.

**COUNT II: Defamation and Defamation Per Se**

**Plaintiffs Alliance for a Better Utah, Inc. and Joshua S, Kanter Against Defendant Fox News Network, LLC**

206.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

207.    Defendant Fox News Network, LLC published false and defamatory statements of and concerning Plaintiffs Alliance for a Better Utah, Inc. and Joshua Kanter when it published O'Leary's false and defamatory statements on the following broadcasts: (1) *Mornings with Maria* on May 11, 2026; (2) *Saturday in America* on May 16, 2026; (3) *The Big Money Show* on May 20, 2026; (4) *The Bottom Line* on May 20, 2026; and (5) *The Big Weekend Show* on May 24, 2026. Fox also published O'Leary's false and defamatory when it shared clips of O'Leary's appearance on these shows on its websites, social media platforms, and other digital and subscription services. Through these mechanisms, Fox published the statements to millions of people.

208.    The statements published by Fox are statements of fact, or implied false and defamatory facts, and were not protected opinion. In each of his appearances on these shows, O'Leary characterized his statements as supported by evidence and, on at least one occasion, characterized the statements as "irrefutable." A reasonable person hearing these statements would understand them to convey factual assertions, not mere opinion.

209.    The statements published by Fox are false. The Alliance for a Better Utah and Mr. Kanter are not agents of the Chinese government, and do not receive funding from the Chinese government or the CCP.

210.    The statements published by Fox are defamatory because calling a nonprofit organization and an individual who works in local community advocacy and politics "cells" of the

67

Chinese Communist Party, funded by China, and acting at the behest of the Chinese government necessarily will subject these organizations and individuals to hatred, contempt, or ridicule.

211. The statements published by Fox are also defamatory per se. The statements charge the Alliance and Mr. Kanter with serious crimes—specifically, acting as unregistered agents of a foreign government (22 U.S.C. §§ 612, 618(a); 18 U.S.C. § 951) and money laundering (18 U.S.C. §§ 1956, 1957). The statements also tend to injure the Alliance and Mr. Kanter in their trades, businesses, and professions because they portray Defendants as foreign agents or criminals, thereby tending to cause clients, business partners, donors, and others to terminate or avoid business relationships with the Alliance and Mr. Kanter. Therefore, the statements are actionable even without proof of actual injury.

212. Even if the statements published by Fox were not themselves false, Fox intentionally and knowingly created the false, misleading, and defamatory impression that the Alliance and Mr. Kanter were foreign agents and/or criminals.

213. Fox published the statements with actual malice—that is, with knowledge of the falsity of his statements or with reckless disregard for their truth or falsity.

214. As a direct and proximate result of Fox's conduct in publishing the defamatory statements, Plaintiffs have suffered damages including severe injury to reputation, emotional distress, and economic damages in the form of lost business opportunities and clients..

215. Because Fox acted with malice, spite, ill will, and wanton and/or reckless disregard for the Alliance and Mr. Kanter's rights, the Alliance and Mr. Kanter are entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, and award the following relief:

i.    Compensatory damages in an amount to be determined at trial, including for reputational harm, emotional distress, and such special damages as lost business, lost income, lost profits, and lost employment and other economic opportunities;

ii.    Punitive and exemplary damages in an amount sufficient to punish Defendants and deter future misconduct;

iii.    Pre- and post-judgment interest as permitted by law;

iv.    Costs of suit, including reasonable attorney's fees to the extent permitted by law; and

v.    Such other and further relief as this Court deems appropriate, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED this 15th day of July, 2026.


Respectfully submitted,

Matthew J. Platkin*
Angela Cai*
Ravi Ramanathan*
Aaron E. Haier*
Conor Bradley*
**PLATKIN LLP**
413 Washington Ave.
Unit 174
Belleville, NJ 07109
Phone: (973) 561-1951
Email: mplatkin@platkinllp.com

69

*/s/ David R. Irvine*
David R. Irvine (Utah Bar No. 1621)
Attorney and Counselor at Law
P.O. Box 1533
Bountiful, Utah 84011
Telephone: (801) 949-6693
Email: drirvine@aol.com

*/s/ Alan L. Smith*
Alan L. Smith (Utah Bar No. 2988)
Attorney and Counselor at Law
1169 East 4020 South
Salt Lake City, Utah 84124
Telephone: (801) 822-6076
Email: alanakaed@aol.com

*Attorneys for Plaintiffs*

*\*pro hac vice application forthcoming*