Justin T. Toth (Utah Bar No. 8438)
Whitney Hulet Krogue (Utah Bar No. 15184)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, UT 84111
Telephone: 801.532.1500
Facsimile: 801.532.7543
jtoth@rqn.com
wkrogue@rqn.com

Thomas G. Hentoff (*Pro Hac Vice*)
Stephen J. Fuzesi (*Pro Hac Vice*)
Nicholas G. Gamse (*Pro Hac Vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC 20024
Telephone: 202.434.5000
thentoff@wc.com
sfuzesi@wc.com
ngamse@wc.com

*Attorneys for Defendant Fox News Network, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**CENTRAL DIVISION**

ALLIANCE FOR A BETTER UTAH, INC.; ELEVATE STRATEGIES, LLC; JOSHUA S. KANTER; and GABRIELLE S. FINLAYSON,

Plaintiffs,

v.

KEVIN O'LEARY and FOX NEWS NETWORK, LLC,

Defendants.

**DEFENDANT FOX NEWS NETWORK, LLC'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Case No. 2:26-cv-00664-TC-CMR

District Court Judge Tena Campbell
Magistrate Judge Cecilia M. Romero

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 2

LEGAL STANDARD ........ 6

ARGUMENT ........ 7

I. THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE ACTUAL MALICE. ........ 7

A. The Actual Malice Standard Applies. ........ 7

B. The Complaint Alleges No Facts Suggesting that Fox Published O'Leary's Statements with Actual Malice. ........ 12

II. THE COMPLAINT FAILS TO ESTABLISH DEFAMATORY MEANING. ........ 17

A. Fox's Coverage of the Ongoing Controversy Was Not Defamatory. ........ 17

B. Because the Statements at Issue Are Not Defamatory Per Se, the Complaint Must Be Dismissed. ........ 22

III. THE COMPLAINT FAILS TO STATE A CLAIM FOR OTHER REASONS. ........ 26

A. Plaintiff Kanter Has No Claim for Statements That Do Not Concern Him ........ 27

B. O'Leary's Statements on "Mornings with Maria" Are Protected Opinions. ........ 28

CONCLUSION ........ 30

# TABLE OF AUTHORITIES

## CASES

*AdvanFort Co. v. Mar. Exec., LLC*, 2015 WL 4603090 (E.D. Va. July 28, 2015) ........................13

*AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*,
903 F.2d 1000 (4th Cir. 1990) ........................27

*Allred v. Cook*, 590 P.2d 318 (Utah 1979)........................22, 23

*Am. Conservative Union v. Inst. for Legis. Analysis*,
2025 WL 510236 (E.D. Va. Feb. 13, 2025)........................25, 26

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................6, 7, 14

*Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180 (4th Cir. 1998) ........................29, 30

*Biro v. Condé Nast*, 807 F.3d 541 (2d Cir. 2015)........................13

*Blankenship v. NBCUniversal, LLC*, 60 F.4th 744 (4th Cir. 2023) ........................14

*Campbell v. Pa. Sch. Bds. Ass'n*, 336 F. Supp. 3d 482 (E.D. Pa. 2018),
*aff'd on other grounds*, 972 F.3d 213 (3d Cir. 2020) ........................10

*Church of Scientology Int'l v. Daniels*, 992 F.2d 1329 (4th Cir. 1993)........................17

*Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*, 312 F.3d 1292 (10th Cir. 2002).........26

*Cox v. Hatch*, 761 P.2d 556 (Utah 1988)........................18

*Croce v. N.Y. Times Co.*, 930 F.3d 787 (6th Cir. 2019)........................19, 21

*Cuervo v. Sorenson*, 112 F.4th 1307 (10th Cir. 2024)........................3

*Davidson v. Baird*, 438 P.3d 928 (Utah Ct. App. 2019) ........................10

*Diamond Ranch Acad., Inc. v. Filer*, 2016 WL 633351 (D. Utah Feb. 17, 2016)........................8

*Epps v. Fox News Network, LLC*, 2026 WL 1266101 (D. Del. May 8, 2026),
*appeal filed*, No. 26-2129 (3d Cir. May 12, 2026) ........................13

*Fairfax v. CBS Corp.*, 2 F.4th 286 (4th Cir. 2021) ........................13

*Fiacco v. Sigma Alpha Epsilon Fraternity*, 484 F. Supp. 2d 158 (D. Me. 2007),
*aff'd*, 528 F.3d 94 (1st Cir. 2008) ........................10

*Fielding v. GBM Benefits, Inc.*, 2026 UT App 138 ........................18

*Freedlander v. Edens Broad., Inc.*, 734 F. Supp. 221 (E.D. Va. 1990), *aff'd*, 923 F.2d 848 (4th Cir. 1991) .......... 11

*Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 148 F.4th 1202 (10th Cir. 2025), *cert. denied*, 146 S. Ct. 1786 (2026) .......... 7

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) .......... 7, 8, 15

*Goral v. Kulys*, 21 N.E.3d 64 (Ill. App. Ct. 2014) .......... 24

*Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6 (1970) .......... 18

*Gressett v. Contra Costa County*, 2013 WL 2156278 (N.D. Cal. May 17, 2013) .......... 15

*Hancock v. Variyam*, 400 S.W.3d 59 (Tex. 2013) .......... 25

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989) .......... 12, 15, 16

*Herring Networks, Inc. v. Maddow*, 8 F.4th 1148 (9th Cir. 2021) .......... 29

*Hogan v. Winder*, 762 F.3d 1096 (10th Cir. 2014) .......... 18

*Hourani v. PsyberSolutions LLC*, 690 F. App'x 1 (D.C. Cir. 2017) .......... 3, 4

*In re Church of Jesus Christ of Latter-Day Saints Tithing Litig.*, --- F.4th ---, 2026 WL 2561896 (10th Cir. 2026) .......... 4

*Int'l Ass'n of United Mine Workers Union v. United Mine Workers of Am.*, 2006 WL 1183245 (D. Utah May 1, 2006) .......... 19, 22

*Jacob v. Bezzant*, 212 P.3d 535 (Utah 2009) .......... 19

*Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv.'s Servs., Inc.*, 175 F.3d 848 (10th Cir. 1990) .......... 29

*John Bean Technologies Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274 (D. Utah 2020) .......... 23

*Keisel v. Westbrook*, 542 P.3d 536 (Utah Ct. App. 2023) .......... 27, 29

*Lester v. ConocoPhillips & WoodGroup PSN, Inc.*, 2021 WL 308222 (D. Utah Jan. 28, 2021) .......... 24, 25, 26

*LeTip World Franchise LLC v. Long Island Soc. Media Grp. LLC*, 2025 WL 1447234 (D. Ariz. May 20, 2025) .......... 25

*Lichfield v. Kubler*, 2025 WL 2772468 (D. Utah Sept. 29, 2025), *aff'd*, 183 F.4th 1248 (10th Cir. 2026) .......... 23

*Lichfield v. Kubler*, 183 F.4th 1248 (10th Cir. 2026) ....................5, 18, 28, 30

*Little v. Breland*, 93 F.3d 755 (11th Cir. 1996) ....................10

*Mai v. Elsaden*, 2025 WL 1447158 (D. Colo. May 20, 2025)....................13

*Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072 (3d Cir. 1985)....................11

*Mast v. Overson*, 971 P.2d 928 (Utah Ct. App. 1998)....................19, 20, 22

*Mathews v. McCown*, 575 P.3d 1114 (Utah 2025) ....................8, 19

*McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352 (3d Cir. 2020)....................29

*Mejia v. Telemundo Mid-Atl. LLC*, 440 F. Supp. 3d 495 (D. Md. 2020)....................16

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016) ....................8, 16

*Moldea v. N.Y. Times Co.*, 22 F.3d 310 (D.C. Cir. 1994)....................29

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*,
951 F.3d 952 (8th Cir. 2020) ....................17

*Neurodiagnostic Consultants, LLC v. Villalobos*,
2019 WL 4892220 (Tex. Ct. App. Oct. 4, 2019)....................25

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964).................... *passim*

*Nichols v. Daily Rep. Co.*, 83 P. 573 (Utah 1905) ....................26

*Nunes v. CNN, Inc.*, 520 F. Supp. 3d 549 (S.D.N.Y. 2021),
*aff'd*, 31 F.4th 135 (2d Cir. 2022)....................26

*Nunes v. Rushton*, 299 F. Supp. 3d 1216 (D. Utah 2018)....................23, 27

*Parsi v. Daioleslam*, 595 F. Supp. 2d 99 (D.D.C. 2009) ....................10

*Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610 (7th Cir. 2013) ....................14

*Porter v. Staples the Off. Superstore*, 521 F. Supp. 3d 1154 (D. Utah 2021)....................26

*Price v. Viking Penguin, Inc.*, 881 F.2d 1426 (8th Cir. 1989) ....................13

*Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262 (10th Cir. 2000) ....................22, 24

*Rent Stabilization Ass'n v. McKee*, 236 A.D.3d 413 (N.Y. App. Div. 2025)....................9, 10

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005 (N.D. Cal. 2017) ....................16

*Revell v. Hoffman*, 309 F.3d 1228 (10th Cir. 2002)........................................................... *passim*

*SCO Grp., Inc. v. Novell, Inc.*, 692 F. Supp. 2d 1287 (D. Utah 2010) ..........................................9

*Shanley v. Hutchings*, 716 F. Supp. 3d 1179 (D. Utah 2024).......................................................25

*Southbark, Inc. v. Mobile Cnty. Comm'n*, 974 F. Supp. 2d 1372 (S.D. Ala. 2013).......................10

*Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028 (10th Cir. 2013)...........16, 22

*St. Amant v. Thompson*, 390 U.S. 727 (1968).................................................................................12

*Stolz v. KSFM 102 FM*, 35 Cal. Rptr. 2d 740 (Cal. Ct. App. 1994) ............................................11

*Sunwest Bank v. Gannett Co.*, 2026 WL 1243328 (D. Utah May 6, 2026) .................................19

*Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231 (D.C. Cir. 2021)........................................13, 16

*Talley v. Time, Inc.*, 923 F.3d 878 (10th Cir. 2019)...........................................................14, 15

*Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522 (6th Cir. 2014).........................9

*Tingey v. Midwest Off., Inc.*, 2023 WL 8602841 (D. Utah Dec. 12, 2023) ..................................13

*Total Quality Sys., Inc. v. Univ. Synaptics Corp.*,
2024 WL 2396979 (D. Utah May 23, 2024).................................................................................18

*Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431 (5th Cir. 1987) ...................................10, 11

*Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018)........................................................................3, 14

*Utah State Farm Bureau Fed'n v. Nat'l Farmers Union Serv. Corp.*,
198 F.2d 20 (10th Cir. 1952) .........................................................................................................25

*Wayment v. Clear Channel Broad., Inc.*, 116 P.3d 271 (Utah 2005) .............................................8

*West v. Thomson Newspapers*, 872 P.2d 999 (Utah 1994) ................................................. *passim*

*Westmont Mirador, LLC v. Miller*, 362 P.3d 919 (Utah Ct. App. 2014) ......................................22

*Westmont Residential LLC v. Buttars*, 340 P.3d 183 (Utah Ct. App. 2014)...........................23, 28

*Wilder v. Cody County Chamber of Com.*, 868 P.2d 211 (Wyo. 1994).......................................25

*World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132 (10th Cir. 2006)...........8, 9

**RULES**

Federal Rule of Civil Procedure 9(g)...........................................................................................26

Federal Rule of Civil Procedure 12(b)(6) ....................................................................................1

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 573.........................................................................................24

Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 16.2.1 (5th ed. 2017 & supp. 2020)..........................................................7

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Fox News Network, LLC ("Fox") moves to dismiss the claim asserted against it by Plaintiffs Alliance for a Better Utah ("Alliance") and Joshua Kanter.

## INTRODUCTION

This lawsuit seeks to hold Fox liable for comments made by a guest appearing on live television amid coverage of the contentious debate over data-center construction in Utah. The single count for defamation against Fox, asserted by two of the four plaintiffs in this case, fails as a matter of law for multiple independent reasons. It should be dismissed with prejudice.

Like other news organizations, Fox has covered the rise of data centers across the country, including the planned Box Elder County project that has sparked controversy in this State. As part of that coverage, investor Kevin O'Leary, the lead proponent of the Box Elder County project, made live appearances on Fox in May during which he expressed his views and reacted to backlash against his plans. He also appeared on other television networks, as the Complaint recognizes, including NBC and CNN. During those appearances, O'Leary questioned the funding sources of some of the project's opponents, including Alliance, asserting that it looked like they received support from Chinese interests. None of the plaintiffs contacted Fox or O'Leary to challenge these assertions or request a correction until weeks after O'Leary's last at-issue appearance on Fox. Once they finally did so, O'Leary posted a statement explaining that he had no evidence that the plaintiffs are funded by China or the Chinese Communist Party. Fox then aired corrections on each of its programs at issue.

Alliance and its founder, Kanter (together, "Alliance Plaintiffs"), now sue not only O'Leary, but also Fox. (The other two plaintiffs sue only O'Leary.) But statements O'Leary made about the Utah data-center controversy while being interviewed on live television simply do not

support a cause of action against Fox. The Complaint must be dismissed for the failure to state a claim for the following independent reasons:

*First*, because the Alliance Plaintiffs are limited-purpose public figures, they must establish actual malice on the part of Fox. Actual malice is based on a defendant's subjective state of mind; the plaintiff must establish that at the time the defendant made the statements at issue, the defendant had knowledge of falsity or reckless disregard for the truth. The Complaint fails to surmount that exacting requirement. These were O'Leary's comments, and his state of mind is not imputed to Fox. Nothing asserted in the Complaint plausibly demonstrates actual malice on the part of Fox in interviewing O'Leary during its coverage of the data-center controversy.

*Second*, the Complaint fails to demonstrate defamatory meaning. And it fails to do so in two distinct ways. To begin, it is not defamatory for Fox to air newsworthy allegations made by another person in the midst of a public affairs debate. In addition, the underlying statements by O'Leary do not rise to the level of defamation "per se" under Utah law. As a result, the Alliance Plaintiffs cannot maintain a claim without pleading special damages, which they fail to do.

*Third*, additional aspects of the claim fail for other reasons, as well. The statements at issue from O'Leary's first appearance are nonactionable assertions of opinion. Other statements cannot support Kanter's claim because he is not identified in them. As a result, his claim fails at the threshold because those statements were not directed at him personally.

In short, for all of these reasons, the claim against Fox should be dismissed with prejudice.

## BACKGROUND

### A. Controversy Surrounding the Box Elder County Project.

O'Leary is an investor and television personality, known as "Mr. Wonderful" on the popular show "Shark Tank," and is a "regular" guest "on television discussing business topics." Compl. ¶ 13. O'Leary recently unveiled a plan to build a "massive" data center in Box Elder

County—a plan that has drawn "intense scrutiny from local Utahns." *Id.* ¶¶ 49, 52. Some residents have expressed "grave concerns" about the effects of the project on the area's water supply and other resources. *Id.* ¶ 52. The result has been a continuation, in Utah, of the nationwide "contentious debate" over data-center development. *Id.* ¶¶ 37, 49, 52.

Indeed, whether and where to build such data centers has emerged as a "flashpoint in the public debate over AI," *id.* ¶ 37, with strong emotions on both sides. As the Complaint recognizes, Fox has covered that debate across the country—from West Virginia to North Carolina, Georgia, Florida, and Missouri. *Id.* ¶¶ 41-48. Fox has featured the perspectives of both sides of the debate, including giving voice to "the legitimate reasons local community members might question or oppose the construction of a data center in their area on numerous occasions." *Id.* ¶ 41.

**B. Public Figure Status of Alliance for a Better Utah and Joshua Kanter.**

Alliance is a nonprofit formed in 2011 with the mission "to drive a public narrative" on a range of issues from ethics to public health and environmental policy, including through "paid, earned, and digital media efforts." *Id.* ¶ 34. The Complaint pleads that Alliance's high-profile status means that it is "one of the most trusted organizations by communities across Utah." *Id.* Kanter founded Alliance, formerly served as its board chair, and remains a member of its board. *Id.* ¶ 11. His "advocacy work on behalf of the residents of Utah," including via Alliance, has been prominent enough to be recognized in his community. *Id.* ¶¶ 28-29.

In the case of the proposed Box Elder County project, Alliance advocated multiple times on the controversy before O'Leary made the remarks at issue here.[1] On April 28, for example,

[1] While the Complaint attempts to downplay the public comments, they are all incorporated by reference in the Complaint. *See* Compl. ¶¶ 53-56; *Cuervo v. Sorenson*, 112 F.4th 1307, 1312 (10th Cir. 2024) (court may consider documents attached to the complaint, incorporated by reference in the complaint, or "central to [the] complaint and indisputably authentic"). In addition, even if not referenced in the Complaint, a court may properly consider such materials with respect to a plaintiff's public-figure status on a motion to dismiss. *See, e.g.*, *Turner v. Wells*, 879 F.3d 1254, 1272 n.5 (11th Cir. 2018); *Hourani v. PsyberSolutions*

Alliance took to social media, posting a clip of O'Leary to both Instagram and Facebook and reacting to his views. Exs. 1-2. The posts garnered thousands of "likes" and comments. *See id.* Alliance followed up on May 2, calling on citizens to join a protest and highlighting a series of ways that Utahns could oppose O'Leary's project—from filing a water rights protest application, to attending a county commission meeting. Ex. 3. That Instagram post alone generated more than 6,000 "likes" and more than 1,500 reposts. *See id.*

Days later, Alliance issued a press release calling for an investigation into State Senate President Stuart Adams, who chairs the Military Installation Development Authority ("MIDA") board with jurisdiction over the Box Elder County project. Ex. 4. Alliance alleged "a conflict of interest between his position as chair of the MIDA board and campaign donations to his PAC he recently received." *Id.* Alliance specifically linked this issue to the data-center controversy, calling out that the donations occurred "seven days after a major MIDA approval of a 40,000 square foot data center in Box Elder County." *Id.* Alliance accused Senator Adams of abusing "his position of power for personal gain," alleging he was "collecting donations from the project he oversees." *Id.* Alliance echoed these allegations in posts to Instagram, Facebook, and X, as well. *See* Exs. 5-7. The Instagram post alone generated more than 12,000 "likes." *See* Ex. 5.

Alliance then followed up with further posts to Instagram and Facebook, reacting to video showing a State Senator serving on the MIDA board knocking a phone out of a reporter's hand when he tried to ask about O'Leary's Box Elder County project and arguing that the State Senator's conduct was a "clear sign" that he was "feeling some of the consequences that come with making unpopular, detrimental decisions with no public input or transparency." Exs. 8-9. The Instagram

---

*LLC*, 690 F. App'x 1, 3 (D.C. Cir. 2017) (per curiam) (unpublished); *see also In re Church of Jesus Christ of Latter-Day Saints Tithing Litig.*, --- F.4th ---, 2026 WL 2561896, at *5 (10th Cir. 2026) (district court properly took judicial notice of articles as "evidence of the information in the public realm").

post was "liked" more than 23,000 times and generated more than 3,500 comments, while the Facebook post was "liked" thousands more times with more than 1,600 comments. *See id.*

The next month, Alliance filed suit against MIDA, Senator Adams, and others, suing to stop O'Leary's Box Elder County project from proceeding. Compl. ¶ 60; Ex. 10. Alliance emphasized its role in public debate in the State, noting that it has been "actively engaged, through a variety of means, including public discussion, citizen petitions, and court actions." Ex. 10 ¶ 4.

**C. O'Leary's Appearances on Fox and Other Networks.**

"[I]n the midst of the debate about the data center project," O'Leary appeared on Fox Business Network and Fox News Channel and discussed his position on the project and his response to the opposition to it. *See* Compl. ¶ 73. The Complaint identifies five such appearances between May 11 and 24—on "Mornings with Maria" (Fox Business), "Saturday in America" (Fox News), "The Big Money Show" (Fox Business), "The Bottom Line" (Fox Business), and "The Big Weekend Show" (Fox News). Compl. ¶¶ 73, 95, 102, 107, 115.[2] All took place after Alliance's public comments about the data-center project.

During those live appearances, the Fox hosts emphasized that O'Leary was a central player in the controversy. "It's a debate, there's a lot of different sides in this," noted a host on "The Big Money Show," for example, explaining that O'Leary was appearing to "give us your side of the story and make the case." Ex. 13 at 15:5-11. During "Mornings with Maria," host Maria Bartiromo asked O'Leary about criticism that his data center is "going to disrupt the environment."

[2] Exhibits 11-15 to this Motion are transcripts of the Fox segments at issue, and Exhibits 16-20 are videos of the segments as they appeared on air. A court may properly consider these on a motion to dismiss. *Supra* n.1; *Lichfield v. Kubler*, 183 F.4th 1248, 1258 (10th Cir. 2026) (treating complaint as incorporating miniseries at issue in libel case and noting that "[t]o the extent that any of the Amended Complaint's allegations are in tension with the record video, the video will govern"). Exhibits 1, 4, and 7 to the Complaint, which are clips from "Mornings with Maria," "Saturday in America," and "The Big Weekend Show," respectively, feature additional graphics from social media that did not appear on Fox's shows.

Ex. 11 at 7:7-8. On "Saturday in America," host Kayleigh McEnany asked O'Leary "what was going on" with "a lot of protesters" opposing his data center. Ex. 12 at 4:9-10. One of O'Leary's opinions was that his project was important for U.S. competition with China over AI development. In that context, at issue here are O'Leary's comments in which he questioned the source of Alliance's funding, expressing his view that it received backing from Chinese interests.

O'Leary also appeared on CNN, NBC, The Tucker Carlson Show, and Cuomo Mornings in the same time period. *See* Compl. ¶¶ 85, 91, 127, 132. The Alliance Plaintiffs sue O'Leary over substantially similar comments made on those networks and shows but have not sued the other networks or shows themselves. *See id.*

**D. Corrections and Lawsuit.**

Weeks after O'Leary's last appearance on Fox at issue here, counsel for plaintiffs sent a retraction demand letter to O'Leary and Fox on June 5. *See* Compl. ¶ 146. In response, O'Leary issued a statement clarifying that he does not have evidence that any plaintiff is funded by Chinese interests, and Fox then aired corrections and issued apologies on each of the programs at issue here. *See id.* ¶¶ 147-48. Nonetheless, plaintiffs brought this lawsuit. The Alliance Plaintiffs assert a single count of defamation against Fox, alleging that the network libeled them when it "published O'Leary's false and defamatory statements." *Id.* ¶ 207.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court need not "accept as true a legal conclusion couched as a factual allegation." *Id.* There instead must be "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, "[w]here a complaint

pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.*; *accord, e.g.*, *Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 148 F.4th 1202, 1210 (10th Cir. 2025), *cert. denied*, 146 S. Ct. 1786 (2026).

These rules have particular resonance in defamation cases because "unlike in most litigation, in a libel suit the central event—the communication about which suit has been brought—is ordinarily before the judge at the pleading stage. He or she may assess it upon a motion to dismiss, firsthand and in context." Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 16.2.1 (5th ed. 2017 & supp. 2020) (collecting cases); *see also, e.g.*, *West v. Thomson Newspapers*, 872 P.2d 999, 1015 n.27 (Utah 1994) ("Summary procedures afford the press the breathing space necessary to ensure that the prospect of litigating defamation claims will not foster self-censorship.").

## ARGUMENT

## I. THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE ACTUAL MALICE.

The constitutional actual malice standard established in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), applies here because the Alliance Plaintiffs are limited-purpose public figures. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). But they fail to plead facts sufficient to meet that demanding test. As a result, the Complaint must be dismissed.

### A. The Actual Malice Standard Applies.

The Alliance Plaintiffs qualify as limited-purpose public figures with respect to the allegedly defamatory statements at issue—Alliance itself because of its public advocacy on the data-center controversy, and Kanter as a founder and leader of the organization participating in that debate. Accordingly, the actual malice standard governs this case.

Limited-purpose public figures are those who "voluntarily inject[]" themselves into a particular public controversy or "engage the public's attention in an attempt to influence its outcome," and thus must meet the actual malice standard for statements made about them within the context of that controversy. *Gertz*, 418 U.S. at 351-52. Whether a plaintiff is a public figure "is a question of law" that may be determined "at the motion to dismiss stage." *Mathews v. McCown*, 575 P.3d 1114, 1146 n.22 (Utah 2025); *accord, e.g.*, *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

Utah has adopted a "two-part test" for identifying limited-purpose public figures, assessing (1) whether there is a "specific public controversy related to the defamatory remarks"; and (2) the "type and extent of the plaintiff's participation in that public controversy." *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1136-37 (10th Cir. 2006) (citing *Wayment v. Clear Channel Broad., Inc.*, 116 P.3d 271, 283 (Utah 2005)). "When examining the extent of the plaintiff's participation, the courts look at whether the party voluntarily injected itself into the controversy in order to influence the resolution of the issues involved." *Diamond Ranch Acad., Inc. v. Filer*, 2016 WL 633351, at *16 (D. Utah Feb. 17, 2016).

The first prong is met here. The Complaint expressly alleges that O'Leary's statements came "in the midst of the debate" about his data-center project, which "drew intense scrutiny from local Utahns," and that the project in turn came "against the backdrop of [a] contentious debate" regarding data-center development both in Utah and nationwide, itself a "flashpoint in the public debate over AI." Compl. ¶¶ 37, 49, 52, 73. In short, there was a "specific public controversy related to the defamatory remarks." *World Wide*, 450 F.3d at 1137.

As for the second prong, the Complaint acknowledges that Alliance's very "mission" is "to drive a public narrative" on a range of public issues and that, by its own description, Alliance is

"one of the most trusted organizations" in the state. Compl. ¶ 34. As noted above, before any of O'Leary's allegedly defamatory statements, Alliance had already used its public profile to take a side in the data-center debate and attempt to influence its outcome—issuing statements criticizing the environmental impacts, instructing residents on how to pressure lawmakers, and circulating a petition calling for an ethics investigation into the President of the Utah Senate over donations that Alliance linked to the data-center project. *Id.* ¶¶ 53-55; *supra* pp. 3-5. Alliance spoke out regarding the controversy in press releases, on its website, and on social media, where its posts were featured on multiple platforms and garnered tens of thousands of "likes" and thousands of comments. *Supra* pp. 3-5. Some of Alliance's statements directly engaged with (and offered rebuttal to) O'Leary's own advocacy in support of the project. Alliance then sued to stop the project. *Supra* p. 5.

Alliance is a paradigmatic public figure with respect to the issues on which it advocates, including data-center development in Utah. Its "mission" is to "take an active role" in controversies over issues related to its policy goals, and it made repeated "public comments" regarding the data-center debate in Utah. *World Wide*, 450 F.3d at 1137; *see also SCO Grp., Inc. v. Novell, Inc.*, 692 F. Supp. 2d 1287, 1296 (D. Utah 2010) (plaintiff "made a number of public statements, through press releases and other means," in order to "influence the resolution of" relevant controversy); *Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 530-31 (6th Cir. 2014) (law school used its website and other "channels of effective communication" to "publicly respond[]" to controversy, "expressly rebut" opposing viewpoints).

Indeed, courts have consistently agreed with the commonsense proposition that lobbyists and advocacy groups are limited-purpose public figures. *See, e.g.*, *Rent Stabilization Ass'n v. McKee*, 236 A.D.3d 413, 413-14 (N.Y. App. Div. 2025) (organization that "lobbies for changes in

laws and regulations"); *Campbell v. Pa. Sch. Bds. Ass'n*, 336 F. Supp. 3d 482, 497-98 (E.D. Pa. 2018) (nonprofit association of public school boards), *aff'd on other grounds*, 972 F.3d 213 (3d Cir. 2020); *Southbark, Inc. v. Mobile Cnty. Comm'n*, 974 F. Supp. 2d 1372, 1382 (S.D. Ala. 2013) (relying on complaint's allegations about animal-rescue organization's "mission" and "propensity for speaking out"); *Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 105-06 (D.D.C. 2009) (organization that "advances the interests of the Iranian American Community").

The same result holds for Kanter, the founder, former board chair, and current board member of Alliance who was referenced in the at-issue statements only in connection with his leadership of Alliance. As Utah courts have recognized, plaintiffs who become "involved in a controversy" thanks to their voluntary actions—here, founding and continuing to serve on the board of a prominent advocacy organization—are limited-purpose public figures, whether or not they personally "participated in the public debate." *Davidson v. Baird*, 438 P.3d 928, 941 (Utah Ct. App. 2019). Kanter's "choice to assume the position of leadership" at "an organization involving public scrutiny[] shows a voluntary decision to place himself in a situation where there was a likelihood of public controversy." *Little v. Breland*, 93 F.3d 755, 758 (11th Cir. 1996). This is especially so where Kanter took on a role in an advocacy organization "whose success depends in large part on publicity." *Id.*

Having founded Alliance and "voluntarily accepted" his position as a board member, the "nature of the position thrust" Kanter into the same public controversies as the organization itself. *Fiacco v. Sigma Alpha Epsilon Fraternity*, 484 F. Supp. 2d 158, 172 (D. Me. 2007), *aff'd*, 528 F.3d 94 (1st Cir. 2008). As courts have recognized, he "cannot erase his public-figure status by limiting public comment and maintaining a low public profile" while wading into public debates under the mantle of an advocacy organization. *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d

431, 435-36 (5th Cir. 1987) (executive with "minimal involvement in [company's] day-to-day operations" whose "name did not appear very frequently in the press" was public figure); *see also, e.g.*, *Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072, 1086 (3d Cir. 1985) (despite "no evidence that [plaintiff's] conduct was intended to attract attention … [i]t may be sufficient that [he] engaged in a course of conduct that was bound to attract attention and comment"); *Freedlander v. Edens Broad., Inc.*, 734 F. Supp. 221, 230 (E.D. Va. 1990) (plaintiff who "voluntarily engaged in" conduct "that inevitably invited attention and comment" was limited-purpose public figure even though he did not engage personally with the media and even "may not have had access to the media"), *aff'd*, 923 F.2d 848 (4th Cir. 1991).

Moreover, Kanter was not "accused of purely personal wrongful conduct." *Stolz v. KSFM 102 FM*, 35 Cal. Rptr. 2d 740, 746 (Cal. Ct. App. 1994). Rather, "the [allegedly] offensive speech related directly to the operation and management of" Alliance. *Id.*; *see, e.g.*, Compl. ¶¶ 97 (O'Leary referencing "Josh Kanter, whoever they are who run" Alliance), 116 (O'Leary referencing Alliance, "run by … Kanter"). Thus, "at least with respect to matters directly related to the operation and management of" Alliance, Kanter is a limited-purpose public figure just as much as Alliance is. *Stolz*, 35 Cal. Rptr. 2d at 746 (radio station and its owner).

Finally, while not necessary to show that Kanter qualifies as a limited-purpose public figure here, the public record demonstrates that he has personally been an outspoken advocate on public issues. Alliance's website prominently identifies Kanter as "our Founder" who "came to the realization that there was a missing voice in Utah's political landscape." Ex. 21. And Kanter has repeatedly acted as spokesperson for Alliance in news articles and interviews and penned op-eds in Utah newspapers regarding policy issues.[3]

[3] *See, e.g.*, *ABU Overview: 2025*, Better Utah (July 27, 2026), https://tinyurl.com/3ymz9mvv (Alliance video promoting its work and featuring Kanter); Josh Kanter & Jonathan Ruga, *What if the Inmates Saved*

In sum, the Alliance Plaintiffs are both limited-purpose public figures and must therefore show that Fox acted with actual malice.

### B. The Complaint Alleges No Facts Suggesting that Fox Published O'Leary's Statements with Actual Malice.

The actual malice standard requires the Alliance Plaintiffs to plead facts sufficient to show that Fox published O'Leary's statements with "knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *N.Y. Times*, 376 U.S. at 279-80. "Reckless disregard" in the defamation context is not negligence-plus; rather, it requires a plaintiff to show that the defendant published with "a high degree of awareness of probable falsity." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (cleaned up). That is, the Complaint must contain well-pleaded facts indicating that Fox *knew* that O'Leary's statements were untrue at the time it published them or, at the least, "*in fact entertained serious doubts* as to the truth" of the statements and published them anyway. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added). Actual malice is "not measured by whether a reasonably prudent [person] would have published, or would have investigated before publishing." *Id.* Instead, "[t]his inquiry is a *subjective* one—there must be sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of probable falsity." *Revell v. Hoffman*, 309 F.3d 1228, 1233 (10th Cir. 2002) (cleaned up). Further, actual malice is not measured by a news organization's alleged collective knowledge, but rather on the state of mind of the specific "persons … having responsibility for the publication." *N.Y. Times*, 376 U.S. at 287.

---

*the Asylum?*, Salt Lake Trib. (Oct. 9, 2023), Ex. 22 (op-ed identifying Kanter as Alliance's "chairman"); Josh Kanter & Chase Thomas, *Amendment A Would Give Legislature Too Much Power*, Salt Lake Trib. (Oct. 26, 2022), Ex. 23 (op-ed identifying Kanter as Alliance's "founder and board chair"); Bob Evans, *3 Questions with Bob Evans: Josh Kanter, Founder of Alliance for a Better Utah*, Fox 13 Salt Lake City (Dec. 24, 2018), https://tinyurl.com/4cdt2p6j. The Court may take judicial notice of this public activity. *See supra* n.1.

This is a "famously daunting" standard that few plaintiffs can ever meet. *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021). Applying that stringent test, courts nationwide routinely dismiss complaints for failing to adequately plead actual malice. *See, e.g.*, *id.*; *Epps v. Fox News Network, LLC*, 2026 WL 1266101, at *8-15 (D. Del. May 8, 2026) (applying Utah law), *appeal filed*, No. 26-2129 (3d Cir. May 12, 2026); *Mai v. Elsaden*, 2025 WL 1447158, at *3 (D. Colo. May 20, 2025); *Fairfax v. CBS Corp.*, 2 F.4th 286, 293-96 (4th Cir. 2021); *Biro v. Condé Nast*, 807 F.3d 541, 545-46 (2d Cir. 2015) (noting consensus among Circuit courts that "malice must be alleged plausibly" and affirming dismissal); *see also Tingey v. Midwest Off., Inc.*, 2023 WL 8602841, at *6 (D. Utah Dec. 12, 2023) (dismissing complaint where plaintiff "made only conclusory statements that [the defendant] knew the statements were false" but failed to make specific factual allegations showing actual malice).

The Alliance Plaintiffs fail to plausibly plead actual malice here. They premise their claim on Fox's publication of "O'Leary's false and defamatory statements"—not on any statements by a Fox employee. Compl. ¶ 207. And regardless of whether *O'Leary* allegedly knew his statements were false, his state of mind "cannot be imputed" to Fox because he was a guest, not a Fox employee. *See AdvanFort Co. v. Mar. Exec., LLC*, 2015 WL 4603090, at *7 (E.D. Va. July 28, 2015) (collecting cases); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1446 (8th Cir. 1989) ("If [the author] is not an employee of [the publisher], independent evidence of [the publisher's] culpability is required."). The Alliance Plaintiffs must establish that Fox itself acted with actual malice, as "actual malice must be proved separately as to *each defendant*." *Revell*, 309 F.3d at 1234 (emphasis added). The Alliance Plaintiffs' attempts to meet the standard as to Fox fail.

To begin, the Alliance Plaintiffs suggest that the hosts of the Fox shows on which O'Leary appeared *should have* recognized in the moment—on live television—that O'Leary's unscripted

comments were untrue and somehow instantly corrected them. Compl. ¶¶ 75, 98, 104, 110, 117, 119. But, for one, a failure to correct is not a cognizable theory of actual malice. Indeed, a news organization's failure to correct an alleged error does not establish actual malice even when an error is *affirmatively* brought to its attention. *See, e.g.*, *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013) ("[A]ctual malice cannot be inferred from a publisher's failure to retract a statement once it learns it to be false."); *see also Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 764 n.10 (4th Cir. 2023) (anchor's "failure to correct the record" in response to comments made on the air "does not establish that she acted with actual malice"). This is reason alone to reject the Alliance Plaintiffs' theory.

Moreover, the theory fundamentally misapprehends the actual malice test. The Complaint pleads no facts from which to conclude that any of the hosts actually disbelieved O'Leary at the time he made his comments. *See, e.g.*, *Turner*, 879 F.3d at 1273 ("This is a subjective test, focusing on whether the defendant *actually entertained serious doubts* as to the veracity of the published account, or was highly aware that the account was probably false.") (emphasis added). Although the Alliance Plaintiffs allege that O'Leary's statements were "inherent[ly] unreliab[le]," Compl. ¶ 153, such a "label" is not a factual allegation that must be accepted as true at the pleading stage, *Iqbal*, 556 U.S. at 687. More to the point, the "inherent improbability" of a speaker's statement is not enough to show that a publisher harbored subjective doubts. *Revell*, 309 F.3d at 1233. And even if a reasonably prudent host would have queried O'Leary's claims or recognized them as false, as the Alliance Plaintiffs appear to suggest, Compl. ¶ 75, this too is not enough to plausibly allege actual malice. "Actual malice is not a negligence or gross negligence standard" and instead "rests entirely on an evaluation of the publisher's state of mind." *Talley v. Time, Inc.*, 923 F.3d 878, 895-96 (10th Cir. 2019) (cleaned up).

If anything, the Complaint pleads facts undermining any suggestion of actual malice. The Complaint emphasizes that O'Leary was a high-profile investor who had a track record of appearing "on television discussing business topics," including "frequently" appearing on Fox. Compl. ¶ 13. And the Alliance Plaintiffs' own theory is that O'Leary presented his comments as being "unequivocal," *id.* ¶ 4, and reflecting "irrefutable fact," *see, e.g.*, *id.* ¶ 98, including citing specific evidence during some of the appearances, *see, e.g.*, *id.* ¶¶ 97, 103. In short, the Complaint's own allegations are that O'Leary was a trusted guest who explained that he had factual support for his statements. *See Gressett v. Contra Costa County*, 2013 WL 2156278, at *32 (N.D. Cal. May 17, 2013) (dismissing complaint where the alleged facts "cut[] against a finding of malice" and instead "suggest[ed] [defendant's] subjective belief in the truth of [the] allegations").

The Alliance Plaintiffs additionally allege that Fox should have investigated the truth of O'Leary's statements before inviting him to appear on air following his first appearance. *See* Compl. ¶ 164-65. But, again, actual malice is not negligence. Regardless of whether Fox had the "institutional capacity to verify O'Leary's claims" or to "inspect [his] documents," Compl. ¶ 164-66, "[t]he mere failure to investigate cannot establish reckless disregard for the truth." *Revell*, 309 F.3d at 1233 (quoting *Gertz*, 418 U.S. at 332); *see also Talley*, 923 F.3d at 896 ("A plaintiff does not create a jury question of actual malice by showing that a publisher failed to investigate before publishing."). Even an "extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers" is insufficient to show the requisite state of mind. *Harte-Hanks*, 491 U.S. at 664.

To be sure, the Complaint asserts that Fox had "reason to doubt" the veracity of O'Leary's claims because it was on notice of "legitimate local concerns surrounding data centers," having hosted other guests who expressed that point of view. Compl. ¶¶ 153-55. Yet the existence of

legitimate opposition hardly forecloses the possibility that people or entities supporting foreign interests could *also* be involved. Indeed, that Fox presented multiple perspectives on data centers "undermine[s] … claims of [actual] malice," suggesting that Fox merely sought to give viewers the opportunity to "weigh for themselves" the debate. *Michel*, 816 F.3d at 703. Inviting a central player in an ongoing controversy for interviews, while also hosting other speakers with different viewpoints, is good journalism, not actual malice.

The Alliance Plaintiffs also observe that some of O'Leary's appearances on Fox came after they denied O'Leary's allegations. Compl. ¶¶ 5, 78-82, 159. Notably, however, they do not allege that *anyone* at Fox knew about or read the denials—let alone those individuals *specifically responsible* for O'Leary's appearances, as required for the actual malice test.[4] None of the plaintiffs contacted Fox to seek a correction until weeks after O'Leary's final at-issue appearance. *Id.* ¶ 146. Denials that remained unknown could not inform anyone's "subjective" state of mind. *Revell*, 309 F.3d at 1233. Further, in any event, "[t]he press need not accept denials"—after all, "denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1043-44 (10th Cir. 2013) (cleaned up); *accord Harte-Hanks*, 491 U.S. at 691 n.37; *Tah*, 991 F.3d at 242.[5]

---

[4] *See N.Y. Times*, 376 U.S. at 287; *see also, e.g.*, *Mejia v. Telemundo Mid-Atl. LLC*, 440 F. Supp. 3d 495, 502 (D. Md. 2020) (granting motion to dismiss because plaintiff had not "brought home" knowledge of falsity to the "individual in charge of Defendant's [allegedly defamatory] banners"); *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1018-19 (N.D. Cal. 2017) (complaint failed to allege that "the speaker itself held the requisite state of mind").

[5] Even if the Alliance Plaintiffs' denials *were* somehow relevant to the actual malice inquiry, they plainly cannot inform Fox's state of mind as to O'Leary's first appearance, which came before any of plaintiffs' denials. *See* Compl. ¶¶ 73, 78.

In fact, the Complaint recognizes that other news organizations, including CNN and NBC, also invited O'Leary to appear on their programs after the denials and, indeed, after each of O'Leary's appearances on Fox. *See* Compl. ¶¶ 127, 132. He then made similar comments on those networks. *Id.*; *see Church of Scientology Int'l v. Daniels*, 992 F.2d 1329, 1334 (4th Cir. 1993) (concluding that "the volume of published commentary" consistent with the defendant's statements made it "impossible to conclude that [the defendant] entertained serious doubts").

Far from publishing O'Leary's statements with actual malice, Fox corrected them once the Alliance Plaintiffs belatedly sent a correction demand. *See* Compl. ¶¶ 146-48. Fox aired a correction and issued an apology on each of the five programs at issue, stating that Fox was "aware of no evidence that [Plaintiffs] are funded by or acting at the direction of or in coordination with Chinese interests in opposing Kevin O'Leary's project." *Id.* Fox's "readiness to … retract[]" on learning of O'Leary's lack of support only further "weighs against [actual] 'malice.'" *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 959 (8th Cir. 2020) (cleaned up).

Because the Alliance Plaintiffs plead no facts demonstrating that Fox acted with actual malice, the Court should dismiss the Complaint.

## II. THE COMPLAINT FAILS TO ESTABLISH DEFAMATORY MEANING.

The Complaint additionally must be dismissed because the Alliance Plaintiffs cannot establish defamatory meaning for two independent reasons. *First*, Fox's news coverage of allegations made in the course of this ongoing controversy was not defamatory as a matter of law. *Second*, even if considered defamatory, O'Leary's statements do not rise to the level of defamation per se. As a result, the Alliance Plaintiffs must plead special damages, which they fail to do.

### A. Fox's Coverage of the Ongoing Controversy Was Not Defamatory.

Fox's publication of O'Leary's comments during coverage of the data-center debate was not defamatory as a matter of law. "Whether a statement is capable of sustaining a defamatory

meaning is a question of law." *West*, 872 P.2d at 1008. A plaintiff "receives no deference when he states that the [statements] are capable of defamatory meaning—those are legal conclusions, not factual allegations." *Lichfield*, 183 F.4th at 1258. And "[i]t is well-established by Utah courts" that defamatory meaning is "appropriate for resolution on a Rule 12(b)(6) [m]otion." *Total Quality Sys., Inc. v. Univ. Synaptics Corp.*, 2024 WL 2396979, at *15 (D. Utah May 23, 2024); *see also, e.g.*, *Fielding v. GBM Benefits, Inc.*, 2026 UT App 138, ¶ 24 (affirming dismissal).

A statement is not actionable "simply because it is nettlesome or embarrassing to a plaintiff, or even because it makes a false statement about the plaintiff." *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988). Instead, to rise to the level of defamation, the statement must "have damaged [plaintiffs'] reputations or subjected them to 'public hatred, contempt[,] or ridicule.'" *Id.* at 562. Statements should not be considered in isolation—"defamatory meaning is a matter of context." *Hogan v. Winder*, 762 F.3d 1096, 1106 (10th Cir. 2014). "If the context makes clear a reasonable reader would not accept the statements at face value," for example, "the statements do not cause damage to the plaintiff's reputation and are therefore not defamatory." *Id.* For that reason, the Tenth Circuit held that stating an employee was fired for "performance issues" was not defamatory when context showed that "the reason for [the] termination [wa]s the subject of an ongoing, obviously nasty, employment dispute." *Id.* at 1107. Likewise, a filmmaker's remark that a plaintiff "seems to get away with murder" was not defamatory as matter of law because reasonable viewers would "understand it to be exaggerated rhetoric intended to spark … debate" over a public controversy. *Lichfield*, 183 F.4th at 1261 (cleaned up); *see also Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13-14 (1970) (reporting "blackmail" allegations made in "heated … debates about controversial issues" not defamatory).

Utah state courts have come to similar conclusions, finding statements made during contentious debates to lack defamatory meaning. *See Jacob v. Bezzant*, 212 P.3d 535, 546 (Utah 2009) (election notice describing plaintiff's statements as false and misleading "came within a heated political campaign" and did not convey a defamatory meaning); *West*, 872 P.2d at 1009 (statement accusing mayor of "manipulat[ing] the press" was not defamatory when viewed in context of "heated political battle"); *Mast v. Overson*, 971 P.2d 928, 932-33 (Utah Ct. App. 1998) (statements accusing plaintiff of lying not defamatory when "published in the context of a political debate on a public issue" because "the audience was … not apt to take them at face value").[6]

In addition, news organizations frequently report on allegations made by stakeholders at the center of public controversies. By reporting on these allegations, journalists do not automatically adopt the allegations as their own. Rather, in context, a reasonable reader understands such reporting to "present[] newsworthy allegations made by others, with appropriate qualifying language." *Croce v. N.Y. Times Co.*, 930 F.3d 787, 791, 795 (6th Cir. 2019) (article detailing "various allegations against and criticism of" plaintiff was not capable of defamatory meaning). There is no defamatory meaning attributable to the news organization's coverage of the remarks. *See id.* at 796; *Int'l Ass'n of United Mine Workers Union v. United Mine Workers of Am.*, 2006 WL 1183245, at *6 (D. Utah May 1, 2006) (statements lacked defamatory meaning where newspaper was merely reporting "perspective" of church official on labor dispute).

Here the claim against Fox is premised on its mere airing of underlying comments made by a participant "in the midst of the debate about the data center project." Compl. ¶ 73. The claim

---

[6] While statements during public debate are not automatically "immunize[d]," the existence of a public controversy is a contextual factor that courts consider in determining whether a statement is capable of defamatory meaning. *Mathews*, 575 P.3d at 1131-33; *accord Sunwest Bank v. Gannett Co.*, 2026 WL 1243328, at *4-5 (D. Utah May 6, 2026).

fails because Fox's publication of those remarks, uttered on live television in the course of its coverage of the ongoing controversy, is not itself capable of defamatory meaning.

No reasonable viewer could miss that O'Leary appeared on Fox to present his own perspective in on an ongoing controversy, one in which Alliance—a public advocacy group—was on the other side. The Fox hosts expressly framed their interviews of O'Leary as "installment[s] in the continuing heated debate." *Mast*, 971 P.2d at 933. For example, on "The Big Money Show," anchor Brian Brenberg introduced the segment by noting that many data-center projects had been blocked due to public opposition and previewing, "[w]e shall debate that topic with a guy who's right at the center of it right now." Ex. 13 at 2:21-23; *see also* Ex. 14 (The Bottom Line) at 9:7-10 (data centers are the topic of "big debate"). The visuals accompanying each segment provided additional context. As O'Leary spoke on "Saturday in America," for instance, video of protests against his project appeared onscreen, giving a visual juxtaposition of the two sides of the debate. *See* Ex. 17 at 2:15-3:39. Graphics accompanying O'Leary's appearances also set the scene for his comments. *See* Ex. 18 (The Big Money Show) at 5:17 (displaying graphics: "Data Center Debate"); Ex. 19 (The Bottom Line) at 4:58 (displaying graphics: "Data Centers Divide Communities"); Ex. 20 (The Big Weekend Show) at 1:41 (displaying graphics: "Data Center Takeover: Growing Concerns About the Amount of A.I. Data Centers").

Further, O'Leary was not introduced as a neutral observer. There was no doubt that O'Leary, a veteran of "Shark Tank," was offering a pugnacious retort to opponents of his project. In fact, Fox anchors explicitly emphasized his role as the developer of a project arousing fierce debate. *See, e.g.*, Ex. 12 (Saturday in America) at 4:7-8 ("In Utah, you're opening an AI data center"); Ex. 14 (The Bottom Line) at 7:10-11 ("[Y]ou're a data center guy. You're building like the biggest one in Utah"); Ex. 15 (The Big Weekend Show) at 3:10-12 ("O'Leary … is currently

building one of the largest data centers in the planet in Utah"). And the hosts made clear that O'Leary was providing *his* point of view. *See, e.g.*, Ex. 11 (Mornings with Maria) at 11:3 ("what *you're suggesting* here …." (emphasis added)); Ex. 12 (Saturday in America) at 5:24-6:2 ("China is … infiltrating our society, and now *you think* funding protestors against an American entrepreneur?" (emphasis added)); Ex. 13 (The Big Money Show) at 15:10-11 ("you're good to come here and give us *your side of the story* and *make the case*" (emphases added)).

Fox anchors also highlighted opposition to data centers—the other side of the debate. *See Croce*, 930 F.3d at 795 (qualifying language regarding allegations, "mixed portrayal" of individuals making the allegations supported challenged statements' lack of defamatory meaning). The introduction to O'Leary's appearance on "The Big Weekend Show" featured an overview of the backlash to data centers and a montage of comments by residents opposing projects in their communities. Ex. 15 at 2:2-3:8. The anchors asked O'Leary to respond to those concerns. *Id.* at 3:22-4:6, 8:4-7 (Joey Jones stating that he knows many opponents who "are not being spoken to or for by China," and Tomi Lahren asking O'Leary, "[w]hat do you say to them?"). Each other segment also included acknowledgments of the other side of this debate. *See* Ex. 11 (Mornings with Maria) at 7:7-8 ("Critics say it's going to disrupt the environment and raise electricity costs."); Ex. 12 (Saturday in America) at 4:9-10 (noting "there's a lot of protestors" over O'Leary's project); Ex. 13 (The Big Money Show) at 7:24-8:2, 11:19-20 (noting portion of "the American population that just says, I'm not sold on what the tech world is pushing" and asking "have we thought about 10 years from now how we're changing rural communities?"); Ex. 14 (The Bottom Line) at 7:7-8 (noting "[t]here's some real homegrown opposition" to O'Leary's project).

In this context, there is no defamatory meaning attributable to Fox. A reasonable viewer would understand Fox's airing of O'Leary's comments in context: as coverage on live television

of a central player's views in a contentious debate. A reasonable viewer would not only take O'Leary's comments "with a grain of salt," *Mast*, 971 P.2d at 932, but would also understand them as part of the hyperbolic "charge and countercharge" that accompany acrimonious public debate, *Bensinger*, 713 F.3d at 1043-44. Moreover, a reasonable viewer would recognize that these were expressions of O'Leary's own views—not those of the network. *Int'l Ass'n of United Mine Workers Union*, 2006 WL 1183245, at *6 (no defamatory meaning where articles made clear that a church official, "not the [newspaper], had taken a position on the labor dispute"). In these circumstances, Fox's publication of O'Leary's remarks does not support a defamation claim.

**B. Because the Statements at Issue Are Not Defamatory Per Se, the Complaint Must Be Dismissed.**

Even if Fox's coverage could be considered defamatory, O'Leary's comments were not defamatory *per se*. The Alliance Plaintiffs were thus required to plead special damages. Because the Complaint fails to do so, it must be dismissed.

"In order to constitute defamation per se, the words used must fit within one of a handful of well-established categories." *Westmont Mirador, LLC v. Miller*, 362 P.3d 919, 920-21 (Utah Ct. App. 2014). There are four such categories: "(1) charge of criminal conduct, (2) charge of a loathsome disease, (3) charge of conduct that is incompatible with the exercise of a lawful business, trade, profession, or office[,] and (4) charge of the unchastity of a woman." *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1276 (10th Cir. 2000) (quoting *Allred v. Cook*, 590 P.2d 318, 320 (Utah 1979)). The Complaint alleges that the at-issue statements fall under the first and third of these categories. The Alliance Plaintiffs assert that O'Leary's statements accused them of "serious crimes" and would "tend to injure" them in their professions. Compl. ¶ 211. But the statements do not meet the requirements of either category.

*First*, O'Leary's statements never accused the Alliance Plaintiffs of violating criminal laws. To constitute defamation per se, there must be an unambiguous and specific accusation of criminal conduct. Courts have consistently rejected, as a matter of law, claims like those here, where the defendant used colloquial or hyperbolic language as opposed to *explicitly* accusing a plaintiff of *unambiguous* criminal conduct. *See, e.g.*, *Westmont Residential LLC v. Buttars*, 340 P.3d 183, 188-89 (Utah Ct. App. 2014) (agreeing with trial court that "crooks" could refer to criminal conduct *or* "crooked behavior"); *John Bean Technologies Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1323 (D. Utah 2020) ("lying and stealing," although defamatory, "does not rise to the level of defamation per se"); *see also Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1231-32, 1234 (D. Utah 2018) ("No indication" that alleging "fraud," "hoax," and "scam" "imputed specific criminal conduct"). And Utah courts have long held that a statement that is "capable of two interpretations," only one of which alleges criminal conduct, is not defamatory per se. *Allred*, 590 P.2d at 321 (statement that plaintiff had "twenty-seven charges against him" not defamatory per se and affirming dismissal).

While the Complaint asserts that O'Leary's "statements charge the Alliance and Kanter with serious crimes"—citing the federal crimes of "money laundering" and "acting as an unregistered agent of a foreign government"—Compl. ¶ 211, the pleading fails to identify *any* statement aired by Fox that actually levels that accusation. At most, the Complaint identifies a few hyperbolic suggestions that authorities might ultimately investigate, without naming any offense. *See, e.g.*, Compl. ¶ 102 ("I gave it to the government. Good luck boys. Enjoy your new friends.").[7] In similar circumstances, courts have recognized that a statement that the speaker has

[7] Courts also routinely hold that such exaggerated, hyperbolic rhetoric is a nonactionable opinion, for similar reasons. *See, e.g.*, *Lichfield v. Kubler*, 2025 WL 2772468, at *6 (D. Utah Sept. 29, 2025) (collecting cases), *aff'd*, 183 F.4th 1248 (10th Cir. 2026).

alerted government authorities but "leaves the question of whether a crime was committed to" those authorities is not defamatory per se. *Goral v. Kulys*, 21 N.E.3d 64, 77-79 (Ill. App. Ct. 2014) (discussing cases where allegedly defamatory statements "conditioned the existence of any crime upon the outcome of an investigation by the authorities").

*Second*, the Complaint fails to identify any statement accusing the Alliance Plaintiffs of conduct that is incompatible with the exercise of their lawful professions. As to this category, both the Restatement (Second) of Torts and the Tenth Circuit are clear: "Disparagement of a general character, equally discreditable to all persons, is not enough unless the particular quality disparaged is of such a character that it is *peculiarly valuable in the plaintiff's business or profession*." Restatement § 573 cmt. (e) (emphasis added); *accord Haugen*, 222 F.3d at 1277. Thus, under the Restatement, it may be defamatory per se to accuse "a clergyman of drunkenness and other moral misconduct" but not to levy the same accusation at "a business man or tradesman"; and it may be defamatory per se to accuse a doctor of making "improper advances to his patients" but not to accuse the same doctor of "consort[ing] with harlots." Restatement § 573 cmts. (c), (e).

Courts interpreting Utah law therefore routinely reject, as a matter of law, defamation per se claims premised on statements that are "offensive to many" but not specifically "incompatible with" a plaintiff's particular profession. *Haugen*, 222 F.3d at 1277. The Tenth Circuit held, for example, that accusing a business of engaging in "Devil worship" and directing profits to the Church of Satan was not defamatory per se because, while offensive, the allegation was "equally discreditable to all" and did not "pertain to a quality that is peculiarly valuable in plaintiffs' professional activities." *Id.* at 1276-77; *see also, e.g.*, *Lester v. ConocoPhillips & WoodGroup PSN, Inc.*, 2021 WL 308222, at *2 (D. Utah Jan. 28, 2021) (saying employee had "a bad attitude"

not defamatory per se); *Shanley v. Hutchings*, 716 F. Supp. 3d 1179, 1198 (D. Utah 2024) (accusing author of "plagiarism" not defamatory per se).[8]

Here, the Complaint contends—in conclusory fashion—that the Alliance Plaintiffs suffered a professional injury when their reputations were allegedly besmirched among "clients, business partners, donors, and others." *See* Comp. ¶ 211. But the same could easily be said of the Restatement's allegedly drunken tradesman, *Haugen*'s allegedly Satan-worshipping business, or *Shanley*'s allegedly plagiarist author, all of whom depended on a good reputation with customers and other members of the public. The Complaint fails to establish that anything in the statements at issue here *uniquely* injured the Alliance Plaintiffs based on *their* professions. As the Texas Supreme Court recognized when rejecting a similar argument, "because all professions require reputations of some sort," the Complaint's proposed test would make "all statements defaming professionals … defamatory per se." *Hancock v. Variyam*, 400 S.W.3d 59, 67-68 (Tex. 2013).[9]

The allegations here are much like those at issue in *American Conservative Union v. Institute for Legislative Analysis*, 2025 WL 510236 (E.D. Va. Feb. 13, 2025). There, two nonprofit organizations who host the Conservative Political Action Conference alleged that statements

---

[8] Other courts applying the Restatement agree. *See, e.g.*, *Wilder v. Cody County Chamber of Com.*, 868 P.2d 211, 224 (Wyo. 1994) (calling former executive director of nonprofit "sneaky," "lazy," "good-for-nothing," "son-of-a-bitch" who might "steal" their work not defamatory per se); *Neurodiagnostic Consultants, LLC v. Villalobos*, 2019 WL 4892220, at *5 (Tex. Ct. App. Oct. 4, 2019) (unpublished) (accusing company of "illegal business practices" impugned company's "general characteristics" rather than any "peculiarly valuable" trait); *LeTip World Franchise LLC v. Long Island Soc. Media Grp. LLC*, 2025 WL 1447234, at *6 (D. Ariz. May 20, 2025) (calling business's logo "sexually suggestive" and "vulgar" not defamatory per se).

[9] *Utah State Farm Bureau Federation v. National Farmers Union Service Corp.*, which found "communist dominated" defamatory per se, does not change this conclusion. 198 F.2d 20, 23 (10th Cir. 1952). That case expressly based its holding on "the temper of the times"—that is, the height of the Cold War. *Id.* The ruling is at odds with later Utah decisions limiting defamation per se claims to the four clearly defined categories, and courts today reject similar arguments. *See, e.g.*, *Am. Conservative Union v. Inst. for Legis. Analysis*, 2025 WL 510236, at *12 (E.D. Va. Feb. 13, 2025) (collecting cases).

indicating they were "directly funded by Mark Zuckerberg, George Soros, and John Arnold," were defamatory per se. *Id.* at 1, *3, *12. The court granted a motion to dismiss, concluding that the plaintiffs failed to show the allegations were "necessarily hurtful" to their specific businesses. *Id.* at *12. The same conclusion is warranted here. The Complaint does not allege conduct that is *incompatible with* the Alliance Plaintiffs' professions.

Because none of the statements at issue fall into one of the categories of defamation per se, the Alliance Plaintiffs were required to plead "specific, actual, and non-speculative" special damages. *Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*, 312 F.3d 1292, 1297-99 (10th Cir. 2002) (affirming dismissal of complaint for failure to plead special damages); *see also Nichols v. Daily Rep. Co.*, 83 P. 573, 574 (Utah 1905) (unless defamatory per se, "special damages must be averred and proven"). Special damages are "the loss of something having economic or pecuniary value," *Porter v. Staples the Off. Superstore*, 521 F. Supp. 3d 1154, 1163 (D. Utah 2021), and must be pleaded with "considerable detail," *Lester*, 2021 WL 308222, at *3. Indeed, under Federal Rule of Civil Procedure 9(g), "if an item of special damage is claimed, it must be specifically stated." Fed. R. Civ. P. 9(g); *see, e.g.*, *Nunes v. CNN, Inc.*, 520 F. Supp. 3d 549, 560-61 (S.D.N.Y. 2021) (dismissing claim and collecting cases), *aff'd*, 31 F.4th 135 (2d Cir. 2022). The Complaint wholly fails to plead special damages here, much less with the specificity required under Rule 9(g). As a result, it must be dismissed.

## III. THE COMPLAINT FAILS TO STATE A CLAIM FOR OTHER REASONS.

Even if the Alliance Plaintiffs were able to overcome these case-dispositive arguments, their claim still must be substantially limited—with nearly all of Kanter's claim dismissed—for two reasons: *First*, many of the statements at issue do not even reference Kanter. He cannot base a claim on them. *Second*, O'Leary's comments during the first appearance at issue, on "Mornings with Maria," are protected opinion. Any claim based on that segment must be dismissed.

**A. Plaintiff Kanter Has No Claim For Statements That Do Not Concern Him.**

A number of statements identified in the Complaint do not reference Kanter at all. At minimum, his claim against Fox may not proceed as to those statements.

A fundamental requirement of a defamation claim is for the plaintiff to establish "'that defendants published the statements *concerning him*.'" *Keisel v. Westbrook*, 542 P.3d 536, 548 (Utah Ct. App. 2023) (emphasis added) (quoting *West*, 872 P.2d at 1007-08); *accord N.Y. Times*, 376 U.S. at 288. If "no hearer could have reasonably understood [a defendant's] statement to be directed at" a plaintiff, the claim must be dismissed. *Keisel*, 542 P.3d at 548; *see also Nunes*, 299 F. Supp. 3d at 1233 (false statements "intended to intimidate" plaintiff were not actionable where they were "not about her").

Here, Kanter was never mentioned at all on two of the programs at issue, "The Big Money Show" and "The Bottom Line." *See* Compl. ¶¶ 102-03, 107-09. He cannot maintain a cause of action as to those programs, as there were no statements specifically directed at him on those shows. *Keisel*, 542 P.3d at 548; *Nunes*, 299 F. Supp. 3d at 1233. It is insufficient for purposes of this element that Alliance was named on those programs. Kanter's affiliation with the organization does not permit him to personally sue for defamation over statements about the organization. *See, e.g.*, *AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*, 903 F.2d 1000, 1005 (4th Cir. 1990) (affirming dismissal of claims by investors in a business that was allegedly defamed).

Similarly, even on the three shows where Kanter was referenced, his claims should be limited to (at most) the statements that named him. Although the Complaint alleges that O'Leary made several defamatory statements on "Saturday in America" and "The Big Weekend Show," *see* Compl. ¶¶ 95-97, 116, 118, only *two* statements—one on each—ever referenced Kanter, and those were not capable of a defamatory meaning. *See id.* ¶¶ 97 (calling Kanter somebody who

"run[s]" Alliance), 116 (same). Likewise, on "Mornings with Maria," only a few of O'Leary's statements referenced Kanter. *See* Ex. 11 at 8:24-9:1, 9:10-13, 10:1-4, 11:9-12.

The Court should dismiss any claim by Kanter as to "The Big Money Show" or "The Bottom Line" and as to any other statements that were not "concerning" him personally.

**B. O'Leary's Statements on "Mornings with Maria" Are Protected Opinions.**

Finally, the Complaint fails to state a claim as to either Alliance Plaintiff with respect to O'Leary's comments on "Mornings with Maria." His remarks—floating an "argument" that groups had ties to Chinese interests—are not actionable under either the First Amendment or Utah law. *See West*, 872 P.2d at 1013 ("[T]he Utah Constitution provides an independent source of protection for expressions of opinion."); *see also Lichfield*, 183 F.4th at 1259.[10]

Utah courts apply a non-exhaustive four-factor test to distinguish factual statements from nonactionable opinions: "(i) the common usage or meaning of the words used; (ii) whether the statement is capable of being objectively verified as true or false; (iii) the full context of the statement—for example, the entire article or column—in which the defamatory statement is made; and (iv) the broader setting in which the statement appears." *West*, 872 P.2d at 1018.

In particular, statements that constitute mere "rhetorical hyperbole" or "imaginative expression" are protected opinions and cannot form the basis of defamation liability. *Lichfield*, 183 F.4th at 1265 (cleaned up) (statement that plaintiff "abused" children in context of documentary on troubled-teen facility); *Westmont Residential*, 340 P.3d at 189 (description of plaintiffs as "crooks"). Such language is common in "debate on public issues," which "may well include vehement, caustic, and sometimes unpleasant sharp attacks." *N.Y. Times*, 376 U.S. at 270;

[10] Fox expressly reserves the right to later argue, should the Complaint survive this Motion, that O'Leary's statements on the other programs also are protected, nonactionable opinions.

*West*, 872 P.2d at 1013-14 (observing that Utah's constitution was drafted against a backdrop of "virulent exchanges on the editorial pages" of the state's top newspapers and explaining that "expressions of opinion are the mainstay of vigorous public debate").

Likewise, "[w]hen a speaker plainly expresses a subjective view, an interpretation, a theory, conjecture or surmise, rather than a claim to be in possession of objectively verifiable [false] facts, the statement is not actionable." *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998) (cleaned up); *see also Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv.'s Servs., Inc.*, 175 F.3d 848, 853 (10th Cir. 1990) (recognizing "speculative" and "indefinite language" as factors indicating a statement is protected opinion); *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 358-59 (3d Cir. 2020) (commentator's statements questioning plaintiff's motivations were "non-actionable speculations"); *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1157-58 (9th Cir. 2021) (description of television network as "paid Russian propaganda" was nonactionable "colorful commentary"); *see also Keisel*, 542 P.3d at 548-49 (opinions "'embody ideas, not facts'" (quoting *West*, 872 P.2d at 1014)).

Further, when speakers supply the factual bases of their stated conclusions, those conclusions are protected—whether subjective or not—under the doctrine of opinion based on disclosed facts. *See Jefferson Cnty. Sch. Dist. No. R-1*, 175 F.3d at 853 (noting statements "have been found to be protected by the First Amendment because their underlying factual premises have been fully disclosed"); *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 317 (D.C. Cir. 1994) ("Because the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation.").

O'Leary's comments on "Mornings with Maria" constituted his "theory, conjecture, or surmise," *Biospherics*, 151 F.3d at 186, combined with precisely the kind of nonactionable "rhetorical hyperbole" common in the realm of public debate, *Lichfield*, 183 F.4th at 1265. He also disclosed the basis for his opinion. O'Leary began by positing that it would be in China's interest to oppose his project: "Who would want to stop us from having compute power to develop AI. Which adversary would want that? There's only one: China." Ex. 11 at 7:16-19. He explained that Alliance's social media "look[ed] almost identical" to content from socialist organizations, leading him to question whether those groups were connected. *Id.* at 9:1-16 ("Who are you guys? … Are they working with the Party for Democratic Socialism and Liberation and the People's Dispatch?"). O'Leary then floated as "my argument" that there must be a tie to China, *id.* at 9:23-24, and invited the Alliance Plaintiffs to disprove that assertion, *id.* at 9:24-10:10. O'Leary ended with a flourish, "[t]hese two cells. I mean, it's the CCP at work here. There's no question about it." *Id.* at 11:16-17. On their face, these remarks are an expression of opinion.

The "full context" and "broader setting" of his comments only reinforce that conclusion. *West*, 872 P.2d at 1018. Invited to share his perspective on the ongoing controversy, O'Leary appeared onscreen in a "Utah National Security" hat, setting the stage for his colorful, at times bombastic, comments. Indeed, for all the reasons noted above, *see supra* pp. 20-21, there could be no mistaking that O'Leary was providing his strongly held personal views in response to the opposition to his project. Because the statements constituted protected opinion, any claim based on these remarks must be dismissed.

## CONCLUSION

For all of these reasons, the Complaint should be dismissed with prejudice.

DATED this 21st day of September, 2026.

WILLIAMS & CONNOLLY LLP

*/s/ Thomas G. Hentoff*

Thomas G. Hentoff (*Pro Hac Vice*)
Stephen J. Fuzesi (*Pro Hac Vice*)
Nicholas G. Gamse (*Pro Hac Vice*)
680 Maine Avenue S.W.
Washington, DC 20024
Telephone: 202.434.5000
thentoff@wc.com
sfuzesi@wc.com
ngamse@wc.com

RAY QUINNEY & NEBEKER P.C.

*/s/ Justin T. Toth*

Justin T. Toth (Utah Bar No. 8438)
Whitney Hulet Krogue (Utah Bar No. 15184)
36 South State Street, Suite 1400
Salt Lake City, UT 84111
Telephone: 801.532.1500
Facsimile: 801.532.7543
jtoth@rqn.com
wkrogue@rqn.com

*Attorneys for Defendant Fox News Network, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of September, 2026, I electronically filed the foregoing **DEFENDANT FOX NEWS NETWORK, LLC'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT** using the CM/ECF system of the District Court of the State of Utah, which sent notification of such filing to:

Angela Cai
Matthew J. Platkin
Ravi Ramanathan
Aaron E. Haier
Conor Bradley
Platkin LLP
413 Washington Ave.
Unit 174
Belleville, NJ 07109
acai@platkinllp.com
mplatkin@platkinllp.com
rramanathan@platkinllp.com
ahaier@platkinllp.com
cbradley@platkinllp.com

David R. Irvine
dirvine@aol.com

Alan L. Smith
alanakaed@aol.com

*Attorneys for Plaintiffs*

*/s/ Justin T. Toth*