# Exhibit 10

David R. Irvine (Utah Bar No. 1621)
Attorney and Counselor at Law
P. O. Box 1533
Bountiful, Utah 84011
Telephone: (801) 949-6693
E-Mail: drirvine@aol.com

Alan L. Smith (Utah Bar No. 2988)
Attorney and Counselor at Law
1169 East 4020 South
Salt Lake City, Utah 84124
Telephone: (801) 822-6076
E-Mail: alanakaed@aol.com

Attorneys for Plaintiffs

IN THE THIRD JUDICIAL DISTRICT COURT

IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ALLIANCE FOR A BETTER UTAH, INC., a Utah non-profit corporation, and JANE DOES 1-5, individuals,<br><br>Plaintiffs,<br><br>v.<br><br>MILITARY INSTALLATION DEVELOPMENT AUTHORITY, an independent entity, STUART ADAMS, an individual, JERRY STEVENSON, an individual, and the BOX ELDER COUNTY COMMISSION, a body politic,<br><br>Defendants. | **COMPLAINT**<br><br>Civil No. _____<br><br>Judge: ________ |

Plaintiffs, Alliance for a Better Utah, Inc. ("ABU"), and Jane Does 1-5 ("Does"), for causes of action against defendants Military Installation Development Authority ("MIDA"), Stuart Adams ("Adams"), Jerry Stevenson ("Stevenson"), and the Box Elder County

Commission ("Commission"), complain and alleges as follow.

**JURISDICTION AND VENUE**

1. This Court has subject-matter jurisdiction over the causes of action set forth in this complaint pursuant to Utah Code, §§ 78A-5-102(1), 78A-5-102(2)(a), and 78A-5-102(3)(g), and Utah R. Civ. Pro. 57, 65A, and 65B.

2. This Court has personal jurisdiction over each of the defendants named in the complaint pursuant to Utah R. Civ. Pro. 4.

3. Venue properly is laid in this Court pursuant to Utah Code, §§ 78B-3a-201(1)(a) and 78B-3a-203(3) because causes of action in the complaint arose in Salt Lake County, Utah.

**THE PARTIES**

4. ABU is a non-profit corporation, organized and headquartered in Salt Lake City, and concerned with the quality of life, good government, fidelity to constitutional principles, and citizen rights in the state of Utah. For many years, ABU has been actively engaged, through a variety of means, including public discussion, citizen petitions, and court actions, in furtherance of those goals.

(a) Pursuant to the criteria set forth in Utah cases such as *Gregory v. Shurtliff*, ABU has qualified for and still is qualified to be a so-called public interest plaintiff in court actions in the state of Utah.

(b) ABU has paid taxes to the state of Utah for many years and, in light of this fact, also has taxpayer standing in this case.

(c) ABU's supporters reside throughout the state of Utah and in Box Elder County. ABU's supporters in Box Elder County are personal stakeholders in and concerned about the

impact of the Stratos Project Area Plan which is the subject of this complaint, and especially the impact of that Plan on their quality of life through such factors as air quality, water scarcity, and other aspects of public health, safety, and welfare.

4a. Does reside in Box Elder County. They are active participants in the Box Elder Accountability Referendum ("BEAR") which is seeking referenda-related relief in connection with the Stratos Project Area Plan now being put forward by MIDA and the Commission. Does are concerned with and will be impacted dramatically by the Stratos Project Area Plan in relation to their quality of life, economic circumstances, health, safety, and welfare. Does pay property taxes in Box Elder County, Utah, and income tax in the state of Utah. They wish to remain anonymous, fearing political and economic reprisals, but, if ordered by the Court, will be appear and be listed under their true names as plaintiffs in an amended complaint.

5. MIDA was created pursuant to Utah's "Military Installation Development Authority Act," Utah Code, §§ 63H-1-101, *et seq*. As such, it is:

(a) "an independent, nonprofit, separate body corporate politic, with perpetual succession and statewide jurisdiction, whose purpose is to facilitate the development of land within a project area or on military land associated with a project area;"

(b) a political subdivision of the state of Utah, and

(c) a public corporation (for all purposes) and an independent entity (for some purposes) as defined in Utah Code, §§ 63E-1-101, *et seq*., and Utah Code, §§ 63E-1-102, *et seq.*

6. At all times relevant to this complaint, Adams has been a member of the board of directors of MIDA and the president of the Utah State Senate.

7. At all times relevant to this complaint, Stevenson has been a member of the board of

directors of MIDA and a member of the Utah House of Representatives.

8. The Commission is the legislative body for Box Elder County in the state of Utah pursuant to Utah Code, § 17-64-101(4).

**GENERAL ALLEGATIONS**

Plaintiffs' background, general allegations in this complaint are as follows:

**MIDA's Purpose and Powers**

9. MIDA is empowered to facilitate land development within a so-called project area. A comprehensive statement of MIDA's powers is set forth in Utah Code, §§ 63H-1-101, *et seq.,* a copy of which is attached hereto as Exhibit A and incorporated by this reference herein. Among other powers, MIDA may:

(a) enter into a development agreement with a developer of land within a so-called project area;

(b) exercise exclusive police power within a project area to the same extent as though [MIDA] were a municipality, including the collection of regulatory fees;

(c) levy a variety of taxes and receive directly the payments of those taxes, which taxes include a municipal energy tax, a MIDA energy tax, a MIDA accommodations tax, a telecommunications tax, a transient room tax, and a resort communities tax;

(d) receive directly the payment of property tax allocations (up to 75 percent of the property taxes levied on real property within a so-called project area for periods of up to 25 years) from county governments;

(e) accept financial assistance from outside sources;

(f) borrow money;

(g) issue bonds;

(h) enter into agreements with other political subdivisions or private contractors to provide municipal services within a so-called project area;

(i) develop public infrastructure and improvements;

(j) loan money (from a special fund which, unlike other such funds, is controlled by MIDA rather than the Utah Division of Finance) to private parties for the development of infrastructure and improvements (the special fund is created by an appropriation from the state legislature but monies in the fund are appropriated and disbursed by MIDA's loan committee – consisting of 4 members of the MIDA board of directors, including Adams and Stevenson -- without legislative approval).

10. MIDA's powers, under this statutory grant, with certain exceptions, may be exercised through subsidiary entities, improvement districts, infrastructure districts, and the like. These entities and their boards of directors are created and populated through the MIDA board of directors.

11. MIDA and land in a so-called project area are not subject to the land use laws respecting counties found at Utah Code, title 17, chapter 79 (although in some instances a county's consent may be required in this regard).

12. MIDA and land in a so-called project area are not subject to ordinances or regulations of a county, including those relating to land use, health, business license, or franchise (although in certain instances a county's consent may be required in this regard).

13. Once a so-called project area is created by MIDA, then, whenever within that area the county's consent formerly may have been required for any reason, that power of consent is held

and exercised by MIDA, not the County (although in some instances a county's consent may be required in this regard).

14. Because MIDA is governed by the Independent Entities Act, found at Utah Code, §§ 63E-1-101, *et seq.*, so-called project areas or assets within those areas are subject to the privatization provisions of that statute.

14a. Prior to April 24, 2026, MIDA had exercised its aforesaid powers to propose and approve at least 6 so-called project areas. These include the Utah National Guard Project Area, the Mountain Veteran Program Project Area, the Dugway Proving Ground Project Area, the Utah Data Center Project Area, the Military Recreation Facility Project Area, and the Falcon Hill Project Area. When the Stratos Project Area is included, these developments involve tens of thousands of acres spread over multiple counties in the state of Utah. According to documentation on the MIDA website, developments in these project areas have been financed in part through the issuance of bonds in an aggregate amount exceeding $1,151,400,000.

**MIDA's Powers Are Exercised Through A Board of Directors**

15. MIDA's powers are exercised through a board of directors (the "Board").

16. The Board is comprised of 8 directors, only 7 of whom are entitled to vote.

17. One of the Board's directors is appointed by the president of the Senate of the Utah legislature.

18. One of the Board's directors is appointed by the Speaker of the House of Representatives of the Utah legislature.

19. Five of the Board's directors are appointed by the governor of the state of Utah pursuant to certain statutory criteria and conditions.

20. At all times relevant to this complaint, Adams was the Board director appointed by the president of the Senate of the Utah legislature and Stevenson was the Board director appointed by the Speaker of the House of Representatives of the Utah legislature.

21. At all times relevant to this complaint, 4 of the Board directors were appointed by the governor of the state of Utah, but, on information and belief, one or more of those appointments did not meet the criteria or satisfy the conditions set forth in the MIDA statute.

22. At all times relevant to this complaint, there was a vacancy for 1 of the Board's voting directors.

22a. Each member of the MIDA Board is subject to removal at any time with or without cause by the official who appointed the member in the first place.

**Proposal and Approval of MIDA's Stratos Project Area Plan**

23. MIDA, through its Board, is empowered to propose and confirm a so-called project area plan for a so-called project area.

24. Proposed project areas which include unincorporated land within a county's boundaries cannot become project areas absent consent from the legislative body for the relevant county.

25. If, however, counties, through the appropriate legislative body, give that consent, such consent, pursuant to the MIDA statutory scheme, becomes irrevocable.

26. Proposed project areas, such as those noted above, cannot become project areas absent consent from the landowners within the project area.

27. Proposed project areas cannot become project areas without Board findings, among other items, that a proposed project area plan is feasible and that is will enhance the public's

health, safety, and welfare.

28. In the forepart of 2026, MIDA proposed a plan for a project area which included no less than 40,000 acres of unincorporated land within Box Elder County. This was called the "Stratos Project Area Plan." A copy of that Plan is attached hereto as Exhibit B and incorporated by reference herein.

29. At a public hearing held April 24, 2026, at the State Capitol Building in Salt Lake City, Utah, MIDA's Board approved the Stratos Project Area Plan. The Board directors ostensibly able to vote and in attendance at that meeting were Adams, Stevenson, Gage Froerer, Mark Shepherd, Mike Ostermiller, and Gary Harter. The vote in favor was unanimous.

30. At the April 24, 2026, public hearing, inadequate evidence was submitted to show that legally effective, valid, and enforceable landowner consents were given to the Stratos Project Area Plan as required by the MIDA statute.

31. At the April 24, 2026, public hearing, inadequate evidence was submitted in support of the statutorily required findings (including, without limitation, a feasibility finding and a public health finding) as mandated by the MIDA statute.

32. On May 4, 2026, the Commission, which is Box Elder County's lawmaking body, by Resolution 26-11, gave its consent to the Stratos Project Area Plan. But the Commission members, since voting that approval, in public statements, have maintained that the consent given was involuntary, rather than voluntary. A copy of Resolution 26-11 is attached hereto as Exhibit C and incorporated by reference herein.

33. On May 4, 2026, the Commission also enacted Resolution 26-12 which adopted a form of Interlocal Agreement. The Interlocal Agreement, among other things, provides for the

creation of a special commission, comprised of non-elected members, who are appointed by the MIDA Board. This special commission is given lawmaking power in relation to the public health, safety, and welfare within the Stratos Project Area. A copy of Resolution 26-12 is attached hereto as Exhibit D and incorporated by reference herein. Here, also, Commission members, since voting this approval, in public statements, have maintained that their approval of the Interlocal Agreement was not entirely voluntary or a matter of free will and personal choice.

## CAUSES OF ACTION

Each of the foregoing allegations, to the extent necessary, is incorporated by reference into the following claims.

## CLAIM NUMBER ONE – UNCONSTITUTIONAL ABRIDGEMENT OF DIRECT DEMOCRACY RIGHTS OF BOX ELDER COUNTY CITIZENS

34. Utah Constitution, Art. I, § 2, provides that, "[a]ll political power is inherent in the people; and all free governments are founded on their authority for their equal protection and benefit, and they have the right to alter or reform their government as the public welfare may require."

35. This right of popular sovereignty, as a fundamental principle of self-determination, is embodied and implemented to a partial extent in Utah Constitution, Art. VI, § 1, which vests Utah citizens with legislative power and authorizes their exercise of that power by means of initiatives and referenda.

36. Moreover, when interpreting Art. I, § 2, and Art. VI, § 1, Utah's Constitution, at Art.

I, § 27, admonishes Utah's judiciary to have "[f]requent recurrence to fundamental principles [as this] is essential to the security of individual rights and the perpetuity of free government."

37. The Stratos Project Area Plan, and actions taken by MIDA and the Commission to enact the same, puts lawmaking power respecting questions of public health, safety, welfare, morals, taxation, zoning, land use, and the like, in relation to a significant swath of county territory in a non-elected MIDA Board and the Interlocal Agreement's special commission. At the same time, and in light of *Lord v. Salt Lake County Clerk,* this action "irrevocably" cuts off the rights which the citizens of Box Elder County heretofore have had to refer such laws to a popular referendum or the initiative process pursuant to Art. VI, § 1, or Art. I, § 2.

38. Art. VI, § 1, gives the Utah state legislature a limited power to regulate the means by which citizens may exercise their rights of direct democracy, but it does not and cannot authorize that body, by means of a statute such as the MIDA act, to extinguish those pre-existing rights entirely.

39. These rights are inherent and, thus, inalienable. They cannot be abridged by governmental entities such as legislatures, independent corporations, or county commissions. The citizens of Box Elder County have not waived these rights. And even the landowners who may have consented to the Stratos Project Area Plan did not waive these rights as part of that process. The relevant sections of the MIDA act, action taken by the MIDA Board, and the Commission's resolutions, whereby an attempt is being made to abridge these citizen rights, accordingly, should be declared unconstitutional and void.

**CLAIM NUMBER TWO –**

**UNCONSTITUTIONAL ABRIDGEMENT OF**

**REPRESENTATIVE DEMOCRACY RIGHTS**

**OF BOX ELDER COUNTY CITIZENS**

40. Utah Constitution, Art. I, § 2, provides that, "[a]ll political power is inherent in the people; and all free governments are founded on their authority for their equal protection and benefit, and they have the right to alter or reform their government as the public welfare may require."

41. This right of popular sovereignty, as a fundamental principle of self-determination, is underscored by additional provisions of the Utah Constitution which have application in this case. Art. I, § 25, provides that Utah citizens have retained rights other than those found in our constitution's so-called declaration or bill of rights. Art. I, § 27, further implies the existence of such retained, unenumerated rights by insisting upon "frequent recurrence to fundamental principles," as something "essential to the security of individual rights and the perpetuity of free government." Art. I, § 17, forbids any power, civil or military, from "interfer[ing] to prevent the free exercise of the right of suffrage[,]" which likewise is essential "freely and fairly" to select representatives in this process of self-government, and Art. XI, § 4, provides or at least implies that changes in the form of a county's government must be "subject to voter approval." Indeed, two hundred and fifty years ago, America's Continental Congress declared that people have the inalienable right to life, liberty, and the pursuit of happiness, and that "to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed."

42. The Stratos Project Area Plan, and actions taken by MIDA and the Commission to enact the same, put these constitutional requirements respecting representative democracy at nought. A huge swath of Box Elder County is turned over to private development, development which may have considerable impact on the quality of life of every citizen in Northern Utah, particularly as it may reduce further the water level of the Great Salt Lake. It may affect air quality, water availability, and have other environmental impacts. It may increase population density, urban crime, and tax burdens. The constitutional means by which the county's citizens always have addressed these concerns -- through the election of county officials from county-related districts, ensuring that those officials, like the citizens they represent, will be burdened with the same laws enacted for the public health, safety, and welfare – are set aside. Under MIDA, officials who do not live locally, who are not elected by local citizens, and who, therefore, are not accountable to those constituents, will be in charge.

43. In short, the MIDA statute – as applied in this case -- portends a substantial invasion of the rights of Box Elder County residents to life, liberty, and the pursuit of happiness without ensuring that those rights are protected by the consent of the governed through fundamental principles of representative democracy found in Utah's Constitution. The application of the MIDA act, through enactments of the MIDA Board and Resolutions of the Commission, in derogation of the citizenry's rights of self-determination, as described above, therefore, should be declared unconstitutional, null, and void.

**CLAIM NUMBER THREE –**

**UNCONSTITUTIONAL AND UNLAWFUL COMPOSITION OF MIDA'S BOARD**

44. Adams and Stevenson were appointed as directors on MIDA's Board in violation of

Utah Constitution, Art. VI, § 6, which forbids plural office holding by legislators in the state of Utah, and Utah Constitution, Art. V, which requires a separation of powers in relation to governmental functions in the state of Utah. One purpose – among others – which is served by these constitutional mandates is to prevent conflicts of interest. Adams and Stevenson, by working simultaneously on MIDA's Board and in the state legislature, are serving multiple masters with distinct, often clashing, interests.

45. All directors on MIDA's Board may have been appointed (and may be removable) in violation of the executive power provisions found in Utah Constitution, Art. VII, and/or the separation of powers provisions found in Utah Constitution, Art. V.

46. The 3 directors of MIDA's Board who were appointed pursuant to Utah Code, § 63H-1-302(2)(b), may not be qualified to serve as directors in light of the conditions set forth in Utah Code, § 63H-1-302(4)(d).

47. Service of unconstitutional directors or unlawful directors on the MIDA Board poisons Board deliberations, making any resulting vote and actions taken in relation to such vote illegal, null, and void.

48. Voting by unconstitutional directors or unlawful directors on the MIDA Board invalidates any such vote, making any resulting vote and actions taken in relation to such vote illegal, null, and void.

49. In view of the above, the Court should declare that the vote taken by the MIDA Board to approve the Stratos Project Area Plan is illegal, invalid, null, and void.

50. The Court, exercising its powers to issue extraordinary writs or injunctions should remove all unconstitutional and unlawful Directors from the MIDA Board or cause MIDA to

reconstitute that Board so that the composition of the Board is both constitutional and in compliance with the aforementioned statutory provisions.

**CLAIM NUMBER FOUR –**

**VIOLATION OF UTAH CONSTITUTION, ART. I, § 23**

51. The Commission, using its lawmaking power, enacted a resolution which turned Box Elder County's regulatory jurisdiction in relation to a huge swath of county territory over to MIDA, and, pursuant to the MIDA act, this transfer was irrevocable. The Commission's transfer was a transfer of a franchise, privilege, or immunity within the meaning of Utah Constitution, Art. I, § 23. If irrevocable, this transfer is unconstitutional pursuant to Art. I, § 23.

**CLAIM NUMBER FIVE –**

**VIOLATION OF UTAH CONSTITUTION, ART. XI, § 4**

52. Utah Constitution, Art. XI, § 4, requires the Utah state legislature to provide by statute for optional forms of county government, but the selection of any such optional form must be subject to some kind of voter approval. The actions taken by the Board and the Commission in relation to the Stratos Project Area are tantamount to a change in the form of government in Box Elder County. A huge swath of county territory has been placed under the jurisdiction of a different political subdivision for the state of Utah, MIDA, as well as the special commission established pursuant to the Interlocal Agreement. Decisions respecting the regulation of that territory – decisions affecting issues of public health, safety, welfare, morals, taxation, zoning, land use, and the like – now are to be made by unelected officials or persons who live outside county lines. These decisions may have significant impacts on the quality of life for the entire county. There has been no voter approval for this change in the form of

government. The actions taken by the Board and the Commission therefore should be declared unconstitutional, null, and void.

**CLAIM NUMBER SIX –**

**VIOLATION OF UTAH CONSTITUTION, ART. VI, § 28**

53. Utah Constitution, Art. VI, § 28, provides that "[t]he Legislature shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, to levy taxes, to select a capitol site, or to perform any municipal functions."

54. Both MIDA and the special commission established under the Interlocal Agreement may be special commissions which have been created and will be operated in violation of the letter and spirit of Utah Constitution, Art. VI, § 28. To that extent, they should be declared unconstitutional, null, and void. In all events, actions taken by the Board and the Commission in this case, on April 24 and May 4, 2026, including the establishment of a special commission by Interlocal Agreement, have violated the letter and spirit of Utah Constitution, Art. VI, § 28, and those actions therefore should be declared unconstitutional, null, and void.

**CLAIM NUMBER SEVEN –**

**VIOLATION OF UTAH CONSTITUTION, ART. VI, § 29**

54. Utah Constitution, Art. VI, § 29, provides that, "Neither the State nor any county, city, town, school district, or other political subdivision of the State may lend its credit . . . in aid of any private individual or corporate enterprise or undertaking."

55. This comprehensive constitutional injunction against *any* state-related financial accommodation in aid of *any* private party, by further constitutional edict found at Art. I, § 26, is

intended to be "mandatory and prohibitory[.]"

56. The MIDA act and the Stratos Project Area Plan provide for the use of public credit in aid of private development.

57. These provisions run afoul of the mandatory constitutional prohibitions found in Utah Constitution, Art. VI, § 29.

**CLAIM NUMBER EIGHT –**

**NON-COMPLIANCE WITH MIDA ACT**

58. The Stratos Project Area Plan should be struck down for failure to comply with the MIDA act.

59. Utah Code, § 63H-1-401, sets forth various requirements which must be satisfied in order to propose and enact a project area plan which is valid, effective, and enforceable. These requirements entail the making of certain findings, including, without limitation, that the proposed plan is feasible, and that it will be beneficial to the public's health, safety, and welfare. In order to approve a proposed plan, there also must be findings that consents from designated landowners and an affected county's legislative body have been obtained.

60. It does not appear that substantial evidence (or arguably any proper evidence of any kind) which would support the requisite findings – such as the required finding respecting health considerations -- was introduced at the public hearing wherein the MIDA Board approved the Stratos Project Area Plan.

61. On information and belief, plaintiffs allege that any consents obtained from affected landowners may not have been valid consents, obtained through appropriate disclosures and by appropriate means.

62. On information and belief, plaintiffs allege that the consent obtained from the Commission may not have been a valid consent because members of the Commission reportedly have stated that their consent was non-volitional and involuntary.

62a. Approval of the Stratos Project Area Plan by the MIDA Board, for all of the foregoing reasons, and in light of other allegations in this complaint, was arbitrary, capricious, illegal, and unsupported by the required substantial evidence in support of findings required by the MIDA act itself.

62b. Reinforcing the allegation made in paragraph 62a above, the Stratos Project Area Plan, as described at the April 24 hearing of the MIDA Board, was not detailed enough to allow for the presentation of evidence and the making of findings as required by the MIDA act.

**CLAIM NUMBER NINE –**

**BREACH OF FIDUCIARY DUTY,**

**TAKING OF CORPORATE OPPORTUNITY**

63. Shortly after MIDA approved the Stratos Project Area Plan on April 24, 2026, Adams – through the shell of a PAC controlled only by Adams -- received $135,000 in funds from individuals or businesses which support MIDA for financial reasons.

64. This support and the related distribution of funds was a business opportunity which belonged, if it belonged anywhere at all, to MIDA.

65. Adams, as a director on the Board of MIDA (and, indeed, as chair of that Board), had a fiduciary duty to MIDA. As a fiduciary, Adams should not have received a benefit individually from these individuals or businesses, but, rather, should have made sure that MIDA or taxpayers for the state of Utah, had first grabs on those monies.

66. It does not appear from the record of Board proceedings for MIDA that Adams followed proper corporate procedures in ensuring that MIDA was given that so-called first right of refusal in relation to these monies.

67. Moreover, in all events, Adams, as a fiduciary, should not be allowed to profit at the expense of the beneficiary of his trust, MIDA. Adams is not entitled to receive benefits personally when those benefits become available and arise as the result of the fiducial office which he holds in MIDA.

68. Adams's breach of fiduciary duties in this respect should be corrected with a court order requiring him to disgorge these funds, remitting them to an appropriate party.

**CLAIM NUMBER TEN –**

**VIOLATION OF UTAH CONSTITUTION, ART. VI, §§ 9 and 6**

69. Shortly after MIDA approved the Stratos Project Area Plan on April 24, 2026, Adams – through the shell of a PAC controlled only by Adams – received $135,000 in funds from individuals or businesses which support MIDA for financial reasons.

70. The United States Supreme Court has opined that payments of this sort, when given to a legislator such as Adams, are not bribes, but, rather, payments which facilitate access to and the lobbying of legislators.

71. Assuming that this friendlier, more sympathetic characterization of the payments to Adams is correct, then Adams received these monies so that he would give access and listen to whatever pitch was being made by these individuals and businesses. But giving access to and listening to individuals and businesses with policy concerns that they want to see fashioned into some kind of governmental action is part of a legislator's job. Hence, by taking these monies,

Adams in effect was receiving compensation for doing his job as a legislator.

72. Utah Constitution, Art. VI, § 9, provides that any compensation which legislators receive for doing legislative business first must be recommended, approved, and sanctioned by an independent citizens' commission. Legislators themselves, because of an obvious conflict of interest, cannot decide what they shall receive by way of compensation for doing their jobs. The legislative compensation commission established by Art. VI, § 9, did not recommend, approve, or sanction the monies which the aforementioned individuals and businesses, as noted above, gave to Adams.

72a. In addition to the constitutional prerequisite of commission approval under Art. VI, § 9, all compensation to a legislator must be paid by the state of Utah, and may not come from private parties. This state compensation provision, as an anti-corruption measure, ensures -- among other purposes to be served -- that legislators are not unduly influenced by special interests. By accepting monies from the aforementioned persons and businesses, Adams also violated this aspect of the mandatory provisions of Utah's Constitution respecting the payment of legislators for services which they render to constituents – giving access and listening – as legislators.

73. In all events, Adams, as a legislator, by virtue of Art. VI, § 6, cannot hold another office of trust in the state of Utah, and remuneration received in connection with any such additional office constitutes a separate and distinct violation of Art. VI, § 9.

74. Adams's receipt of these monies, accordingly, was unconstitutional and illegal, and he should be ordered by this Court to disgorge the same. In addition, Adams should be required to account for any other monies which he may have received in connection with his dual service

as a director on the Board of MIDA and as a member of the Utah State Legislature.

**RELIEF REQUESTED**

Having set forth their causes of action above, plaintiffs respectfully pray for the following relief:

a. A declaratory judgment that the MIDA act, actions taken by the MIDA Board and the County Commission placed at issue in this case are unconstitutional, rendering them invalid, ineffective, unenforceable, null, and void;

b. An injunction which permanently prevents MIDA or the Commission from going any further in their attempts to implement or otherwise administer the Stratos Project Area Plan;

c. A declaratory judgment that Adams and Stevenson are unconstitutional appointees to the Board;

d. Issuance of an extraordinary writ to remove Adams and Stevenson as directors from the Board;

e. A declaratory judgment that all other Board directors were appointed unconstitutionally and/or that 3 of them, as noted above, were appointed unlawfully;

f. Issuance of an extraordinary writ or injunction to remove any Board directors serving unconstitutionally or unlawfully from the Board or requiring MIDA to reconstitute the Board so that it is composed properly along lines which are both constitutional and statutorily compliant;

g. Orders requiring Adams to disgorge monies which he received in violation of his fiduciary duty as a director on the Board of MIDA or in violation of the provisions of Utah Constitution, Art. VI, § 9, as well as an order requiring Adams to render an accounting for any other funds which he may have received in contravention of these principles or provisions;

h. An award of attorney fees under the equity powers of this Court or pursuant to any applicable law, together with costs incurred in this action;

i. Any further relief which may be warranted under the facts and circumstances of this case.

Dated this 3rd day of June, 2026.

/ s / David R. Irvine____________________
David R. Irvine (Utah Bar No. 1621)
Attorney and Counselor at Law
Post Office Box 1533
Bountiful, Utah 84011
Telephone: (801) 949-6693
E-Mail: Drirvine@aol.com

/ s / Alan L. Smith______________________
Alan L. Smith (Utah Bar No. 2988)
Attorney and Counselor at Law
1169 East 4020 South
Salt Lake City, Utah 84124
Telephone: (801) 822-6076
E-Mail: alanakaed@aol.com

Attorneys for plaintiffs