D. Loren Washburn (10993)
Clifford B. Parkinson (13327)
Andrew R. Choate (13615)
**PARKINSON BENSON POTTER**
2750 Rasmussen Road, Ste. H-107
Park City, Utah 84098
Telephone: (415) 534-7970
Email: loren@pbp.law
cliff@pbp.law
andy@pbp.law

Jeffrey A. Neiman (*Pro Hac Vice* forthcoming)
Brandon Floch (*Pro Hac Vice* forthcoming)
Jordan Esteban (*Pro Hac Vice* forthcoming)
**NEIMAN MAYS FLOCH & ALMEIDA, PLLC**
550 S. Andrews Avenue, Ste. 720
Fort Lauderdale, Florida 33301
Telephone: (954) 462-1200
Email: jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com
jesteban@nmfalawfirm.com

*Attorneys for Defendant Kevin O'Leary*

---

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ALLIANCE FOR A BETTER UTAH, INC.; ELEVATE STRATEGIES, LLC; JOSHUA S. KANTER; and GABRIELLE S. FINLAYSON,<br><br>Plaintiffs,<br><br>v.<br><br>KEVIN O'LEARY and FOX NEWS NETWORK, LLC,<br><br>Defendants. | **DEFENDANT KEVIN O'LEARY'S MOTION TO DISMISS**<br><br>Case No. 2:26-cv-00664<br><br>District Court Judge Tena Campbell<br>Magistrate Judge Cecilia M. Romero |

# Table of Contents


INTRODUCTION .......... 1

BACKGROUND .......... 3

I. The Public Controversy Over the Project. .......... 3

II. Plaintiffs Entered That Controversy Before O'Leary Mentioned Them. .......... 4

III. O'Leary Defended the Project. .......... 5

IV. Plaintiffs Sue O'Leary and Fox. .......... 7

ARGUMENT .......... 7

I. COUNT I SHOULD BE DISMISSED BECAUSE THE COMPLAINT FAILS TO IDENTIFY THE PARTICULAR STATEMENTS THEY CONTEND ARE FALSE AND ACTIONABLE. .......... 7

II. PLAINTIFFS ARE LIMITED PURPOSE PUBLIC FIGURES AND THE COMPLAINT PLEADS NO SPECIFIC FACTS ESTABLISHING ACTUAL MALICE. .......... 11

A. The Plaintiffs are Limited Purpose Public Figures. .......... 12

B. The Complaint Fails to Plead Actual Malice .......... 16

III. THE STATEMENTS ARE NOT DEFAMATORY PER SE AND THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO PLEAD SPECIAL DAMAGES. .......... 21

IV. THE STATEMENTS ARE NOT SUSCEPTIBLE TO DEFAMATORY MEANING.24

## INTRODUCTION

This case arises out of a public, well-resourced political fight over a data center. In late April 2026, Kevin O'Leary announced plans to develop a data center campus in Box Elder County, Utah, the Stratos Project (the "Project"). The Project drew opposition with both national and local stakes: whether the United States can build the power and compute capacity to keep pace with China in the artificial intelligence race, and what a 40,000-acre campus requiring nine gigawatts of power would mean for Utah's water, air, electricity rates, and the Great Salt Lake.

Plaintiffs did not wander into that fight. They are organizations built to shape public fights of exactly this kind, and their principals lead those efforts. Both organizations deployed their capabilities against the Stratos Project weeks before O'Leary said a word about them: publishing posts opposing the Project as early as late April, telling citizens how to take action two days before the commission vote, attacking by video a board member who approved the Project, circulating a petition and press release demanding an ethics investigation of the sitting Senate President, and recruiting readers to join the fight.

O'Leary answered the Plaintiffs' opposition in the forum where these fights ordinarily happen: cable business and political opinion programming. He pressed an argument about who was financing the campaign against the Stratos Project, and he told his audiences where that argument came from. He labeled his conclusion as his own contention, and rather than avoid Plaintiffs, he called on them publicly to answer: "Open your books, let's talk about it." Rather than contacting O'Leary, Plaintiffs answered the next day by posting a video response.

The fight was a public argument between well-resourced adversaries over a matter of genuine local and national consequence, conducted in front of an audience that heard both sides.

Plaintiffs have now taken ten media appearances spanning weeks and cut them into isolated phrases, stripped of the questions that prompted them. Despite repeatedly republishing O'Leary's statements on their own social-media platforms—and even using those statements as a fundraising tool—Plaintiffs now sue O'Leary for defamation, claiming that the same statements damaged their reputations.[1] Count I, the only claim asserted against O'Leary, should be dismissed for four reasons.

First, the Complaint never identifies with particularity which statements Plaintiffs actually challenge. Count I aggregates all ten media appearances without identifying which statements are false and which are being challenged; it is asserted by all four Plaintiffs jointly against an undifferentiated collection of remarks, without pleading a statement of and concerning each particular Plaintiff; and it merges defamation and defamation per se into a single count, so O'Leary cannot tell, statement by statement, which theory Plaintiffs press or whether damages are presumed or must be proven.

Second, Plaintiffs are limited-purpose public figures with respect to the Stratos Project controversy, and the Complaint pleads no specific facts establishing actual malice. It offers a recital of the legal standard, a June 25 correction made six weeks after the first challenged appearance, and a series of allegations attacking the adequacy of O'Leary's sources. None of that speaks to

---

[1] https://www.facebook.com/reel/1307156044843224 (last visited June 22, 2026) (video of Alliance and Elevate representatives selling hats and discussing the allegedly defamatory statements) (link no longer available); https://x.com/youranonnews/status/2054911659483750695?s=43 (last visited June 22, 2026) (video of Finlayson republishing the allegedly defamatory content, fundraising off of it, laughing at it, and saying the matter is so "unserious"); https://secure.actblue.com/donate/uns_hat (last visited June 22, 2026) (link no longer available) (selling hats by using O'Leary's face, noting they "might need lawyers" and republishing some of the alleged defamatory claims).

what O'Leary subjectively believed when he spoke, which is the only thing actual malice measures.

Third, the statements are not defamatory per se. They charge no crime with any of the precision Utah law demands, and they impute nothing peculiarly incompatible with Plaintiffs' professions. Plaintiffs were therefore required to plead special damages with particularity under Rule 9(g), and they pleaded only generalized reputational harm.

Finally, many of the challenged statements are independently nonactionable. Read in the full context of each appearance, on opinion programming, in the middle of an eight-week political fight in which both sides accused the other of wrongdoing, no reasonable viewer would take them as factual reports. They are argument and rhetorical hyperbole qualified as O'Leary spoke them.

For these reasons, Count I should be dismissed.

## BACKGROUND

### I. THE PUBLIC CONTROVERSY OVER THE PROJECT.

O'Leary, who has spent his career investing in a multitude of American businesses, announced in late April 2026 his planned development of a data center campus in Box Elder County, Utah. Compl. ¶¶ 1, 49. On April 27, on Fox and Friends, he explained that data centers are necessary for the United States to keep pace with China in the artificial intelligence race. *Id.* ¶ 50. He acknowledged that "people don't like data centers for good reason," because tapping one to the grid drives up costs for "their church, the community, and the residents," and answered that objection by explaining that the Project would not draw from the grid at all but would run on a natural gas pipeline and contribute energy back to the community. *Id.* He made the same case on Varney & Co. the same day. *Id.* ¶ 51.

In response to the announcement about the project, Plaintiffs allege some Utah residents raised concerns about the Project's impact on water, air, and the Great Salt Lake ecosystem. *Id.* ¶ 52. Plaintiffs allege nearly 4,000 public comments reached the county before the County Commissioners' May 4 vote on the Project. *Id.* The commissioners approved the Project. *Id.* ¶ 62. Speaker Mike Schultz called for independent environmental studies; Governor Cox signed an executive order establishing a statewide framework for large data center projects; Senate President Adams demanded a reduction in the Project's footprint; and both candidates in the June 1 congressional primary debate raised the Project's effect on Utah's water. *Id.* ¶¶ 64–68.

## II. PLAINTIFFS ENTERED THAT CONTROVERSY BEFORE O'LEARY MENTIONED THEM.

Plaintiffs are organizations and their founders, built to shape public fights of exactly this kind. Plaintiffs allege that the Alliance for a Better Utah (the "Alliance") exists to "drive a public narrative that empowers Utah's electorate and holds public officials accountable," which it pursues "through paid, earned, and digital media efforts" and through an annual report card that "grades every Utah lawmaker." *Id.* ¶ 34. Elevate Strategies, LLC ("Elevate") is a political consultancy that has "trained and advised more than 100 candidates." *Id.* ¶ 35. Kanter founded the Alliance and sits on its Board; Finlayson founded Elevate and is a member of the firm. *Id.* ¶¶ 10–12, 58.

Both organizations were in the fight weeks before May 11. Beginning in late April 2026, the Alliance published posts "voicing their concerns about O'Leary's data center project and calling for transparency . . . and accountability around the process by which it would be approved." *Id.* ¶ 53. On April 28 it reposted a clip of O'Leary and stated that Utah's "most powerful politicians . . . cannot be trusted." *Id.* On May 2, it identified "[s]ome ways that [citizens could] take action on the newly announced data center." *Id.* ¶ 54. On May 7 it posted a video attacking a board

member who had approved the Project for "making unpopular, detrimental decisions with no public input or transparency," and it "sporadically reposted content from individuals opposing the project." *Id.* It also circulated a petition and press release demanding an ethics investigation into the sitting Senate President, who chaired the authority that approved the Project, over funds his committee had accepted from companies with business before that board. *Id.* ¶ 55. And on June 3, the Alliance joined a lawsuit challenging "the creation, composition, and constitutionality of MIDA, the authority that initially approved O'Leary's data center project." *Id.* ¶ 60.

Elevate and Finlayson did the same. Finlayson appeared in a May 1 video on Elevate's Instagram account "discussing the project and O'Leary's role in it." *Id.* ¶ 56. On May 7, Elevate published an article endorsing the Alliance's demand for an ethics investigation into the sitting Senate President and criticizing "several Utah politicians for their role in fast-tracking O'Leary's data center project." Later that day, Elevate published another post explaining "who approved [the data center project,] how it got fast tracked, and how [people could] join the fight." *Id.*

## III. O'LEARY DEFENDED THE PROJECT.

On May 11, in the middle of that fight, O'Leary appeared on Mornings with Maria and said the campaign against the Project included various opposition groups including the Party for Socialism and Liberation and the Plaintiffs. *Id.* ¶ 73. In fact, during that appearance, the two discussed how one of the opposition groups – the Party for Socialism and Liberation – was funded by "Neville Singham … a political activist [that] has ties to the Communist Party of China." Ex. 1.[2] Maria noted that O'Leary's argument was that "the [CCP] is trying to bust up plans for data

[2] Exhibits 1–10 are transcripts prepared by O'Leary of the videos incorporated by reference into the Complaint.

center buildouts in the US, because if Neville Roy Singham is behind some of those people, the critics argue that he's basically aligned with the CCP." *Id.*

O'Leary also noted that he was making an argument about who was behind the opposition to the Stratos Project: "So these are proxies for the Chinese government, is my argument. And if they're not, because I want them to be able to defend their name, Taylor, Josh, and Gabby, come out, come out wherever you are. Let's audit your books and let's show the people of Utah you actually care about them." *Id.*

Over the next three weeks he pressed the point on Fox, NBC, CNN, a podcast, a radio program, and his own social media accounts. Compl. ¶¶ 85, 91, 95, 102, 107, 115, 122, 127, 132. He called the money behind the campaign "foreign dark money," the people behind it "nefarious foreigners" and "bad dudes," and said the Alliance "should rename this thing 'Alliance for a Better China in Utah.'" *Id.* ¶¶ 96, 108, 116, 129.

Within hours of the May 4 approval, O'Leary was allegedly told that unfamiliar IP addresses were "spiking" across his social media accounts. *Id.* ¶ 86. He allegedly hired data scientists and "forensic digital auditors" to find the source. *Id.* ¶¶ 86, 91, 133. They pulled the Alliance's public IRS Form 990 filings for the preceding twenty-four months and traced its funding through intermediary entities to what he believed was "foreign money." *Id.* ¶ 116. O'Leary also noted that Neville Roy Singham (who, according to him, was likely behind funding for other opposition groups), "shares offices with the CCP" and was "under investigation by multiple branches of the government." *Id.* ¶ 123.

O'Leary then named his sources and told his audience they were public records: "these are IRS 990 filings"; "[h]ere are the facts from the IRS." *Id.* ¶¶ 91, 97, 116. He published the

underlying analysis in an Investigative Report he made public, *id.* ¶¶ 92, 97, 101, and held the supporting chart up to the camera on live television, *id.* ¶¶ 103, 109, 124. He raised the matter with regulators. *Id.* ¶¶ 102, 123, 125. And rather than avoid Plaintiffs, he called on them publicly to answer: "Open your books, let's talk about it." *Id.* ¶ 116.

Some of the funding networks O'Leary named were already "being investigated…by Congress," *id.* ¶ 108, and on June 3, Jake Tapper noted on air that the Chairman of the House Ways and Means Committee was investigating whether "Chinese money" was "funding some of these NGOs" opposing the Project, *id.* ¶ 132. Where O'Leary characterized what the filings meant, he hedged: the money "appears tied to Chinese linked funding channels," *id.* ¶ 100, and the funding networks "appear linked to Chinese backed interests," *id.* ¶ 135. His aim was to "[l]et the people in Utah vote" and "give them the true information." *Id.* ¶ 118.

### IV. PLAINTIFFS SUE O'LEARY AND FOX.

Despite being engaged in a political battle with O'Leary throughout May 2026, Plaintiffs did not contact him until June 5. Compl. ¶ 146. After O'Leary issued a correction, Plaintiffs then sued O'Leary and Fox for defamation. *Id.* ¶ 147.

## ARGUMENT

### I. COUNT I SHOULD BE DISMISSED BECAUSE THE COMPLAINT FAILS TO IDENTIFY THE PARTICULAR STATEMENTS THEY CONTEND ARE FALSE AND ACTIONABLE.

Count I should be dismissed because the Complaint fails to identify with precision which statements Plaintiffs contend are actionable. Instead, Count I sweeps together ten separate media appearances, numerous social-media posts, four different Plaintiffs, and different statements made over several weeks, and then declares the entire collection actionable. Under the relevant law, a

plaintiff must identify the alleged defamatory statements more precisely, and the Complaint against O'Leary should be dismissed for this reason.

The prototypical example of a shotgun pleading is a count that "incorporates by reference the entirety of its predecessors." *J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1075 (D. Colo. 2021). Courts condemn the practice because "the shotgun pleader foists off one of the pleading lawyer's critical tasks — sifting a mountain of facts down to a handful of those that are relevant to a given claim — onto the reader." *Haynes v. Allstate Fire & Cas. Ins.*, 2020 WL 816043, at *7 (D. Colo. Feb. 18, 2020) (internal quotation and citation omitted).

The pleading standard is heightened in a defamation complaint which must "provide sufficient notice of the communications complained of to allow [the defendant] to defend itself," and fails where it "does not identify with necessary specificity who made the statements and to whom the statements were made." *Bushnell Corp. v. ITT Corp.*, 973 F. Supp. 1276, 1287 (D. Kan. 1997). Such claims demand "greater factual detail and specificity," and a plaintiff must "plead precisely the statements about which [he or she] complain[s]." *Torrez v. City of Farmington*, 2004 WL 7338044, at *8 (D.N.M. Sept. 8, 2004). "[E]ach allegedly defamatory publication constitutes a separate and independent cause of relief," so a complaint that fails to set forth "which statements [the plaintiff] intended to pursue as independent causes of action . . . resembles a shotgun pleading." *Coomer v. Make Your Life Epic LLC*, 780 F. Supp. 3d 1129, 1134, 1138 n.2 (D. Colo. 2025).

In short, defamation must be "pled specifically" because a defendant is "entitled to knowledge of the precise language challenged as defamatory." *Eagle Air Med Corp. v. Sentinel Air Medical Alliance, LLC*, 2019 WL 6879252, at *2-3 (D. Utah) (Campbell, J.) (citations

omitted). This is the only method that allows the Court to conduct the "context-driven assessment" it must undertake on a motion to dismiss to independently determine if each statement is susceptible to a defamatory meaning. *Total Quality Sys., Inc. v. Universal Synaptics Corp.*, 2024 WL 2396979, at *15 (D. Utah May 23, 2024). Courts routinely dismiss defamation claims for failure to identify the specific defamatory statements at issue. *See id.* (dismissing defamation claim where court was left to "guess which statements" plaintiff claimed were allegedly defamatory); *Eagle Air Med Corp.*, 2019 WL 6879252, at *4 (barring plaintiff from proceeding to trial on various allegedly defamatory statements not included in complaint); *Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 800 (D. Utah 1988) (dismissing defamation count where complaint failed to identify specific statements).

Count I suffers from significant specificity pleading defects.

First, it realleges "each and every allegation set forth in the preceding paragraphs," sweeping into the claim against O'Leary a substantial body of allegations directed only at his co-defendant, Fox. *See, e.g.*, Compl. ¶¶ 98, 104, 117, 119, 152–174, 195. None of those allegations bear on O'Leary's alleged actionable statements or liability to these Plaintiffs.

Second, Count I should be dismissed because instead of identifying with particularity the allegedly defamatory statements it appears to identify an open-ended universe of statements. Count I identifies the allegedly defamatory statements "as described herein, including but not limited to the statements during the ten media appearances identified in paragraphs 73 through 135," which are not confined to O'Leary's remarks. *Id.* ¶ 196. By Count I's own terms, it reserves an open-ended universe of statements Plaintiffs have never identified, from unspecified appearances, posts, and captions, and holds them in reserve for a later stage of the case.

O'Leary cannot defend against statements Plaintiffs have not identified because he cannot test the falsity, context, or protected character of words that have not been specifically identified. The ten media appearances themselves are not a substitute for identification. They were made across many weeks to different hosts on different programs, and the Complaint's own summary of them runs more than sixty paragraphs of quotation, paraphrase, characterization, screenshot description, and commentary. Which sentences within that mass are the allegedly false statements of fact, as opposed to the surrounding narrative, Plaintiffs never say. Whether a given statement is one of fact or protected expression, whether it is substantially true, and whether it is capable of the meaning Plaintiffs ascribe to it are all questions that can be answered only statement by statement. Plaintiffs cannot reserve an unidentified set of statements now and define their claim later. Each statement on which they intend to proceed must be identified in the pleading, by its words or words to that effect, so that O'Leary can answer it.

The aggregation defect is compounded by another defect. Count I is asserted by all four Plaintiffs jointly, as a single claim, against the entire undifferentiated collection of statements. Compl. ¶¶ 195–205. But a defamatory statement is actionable only by a plaintiff it concerns, and the statements the Complaint does identify do not each refer to all four Plaintiffs. The identified statements vary: some name the Alliance only (Compl. ¶¶ 91, 116, 133); others refer to no Plaintiff at all, addressing instead foreign dark money and the people in Utah who are accepting it, conduct occurring all over America, and unnamed marchers (*id.* ¶¶ 116, 118).

In *Weatherhead v. Globe International, Inc.*, the court affirmed dismissal under Rule 12(b)(6) where multiple plaintiffs sued over statements that did not particularly identify them, holding that if "the statement concerns a group sufficiently large that it cannot reasonably be

understood to apply to plaintiff particularly, it is not actionable in the absence of content or circumstances reasonably specifying the plaintiff individually." 832 F.2d 1226, 1228 (10th Cir. 1987). The Complaint never does the necessary work of identifying, for each Plaintiff, a particular statement of and concerning that Plaintiff.

Finally, Count I merges two distinct theories. It is captioned Defamation and Defamation Per Se and asserts both as to every statement and every Plaintiff. Compl. ¶¶ 195–205. The two theories are not interchangeable: defamation per se presumes damages, while ordinary defamation requires proof of actual harm. *See Miller v. Safe Home Sec., Inc.*, 2026 WL 2614543, at *5 (D. Utah Aug. 14, 2026). Because Count I never separates them, O'Leary cannot determine, statement by statement, which theory Plaintiffs press, and therefore cannot determine whether damages are presumed or must be proven for any given statement. The Complaint must be more specific to allow O'Leary to assess what he must investigate, what defenses he must raise, and what discovery he must take.

Plaintiffs must identify, for each statement on which they intend to proceed, the words they contend are false, the Plaintiff whom those words concern, and the theory of recovery attached to them. Because Count I does none of this with the necessary particularity, it should be dismissed.

## II. PLAINTIFFS ARE LIMITED PURPOSE PUBLIC FIGURES AND THE COMPLAINT PLEADS NO SPECIFIC FACTS ESTABLISHING ACTUAL MALICE.

Count I fails for a reason independent of its pleading defects. Plaintiffs are limited-purpose public figures with respect to the controversy over the Project, so they must plead and prove that O'Leary spoke with actual malice. The Complaint does not clear the "famously daunting" actual malice standard that few plaintiffs can ever meet. *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231,

240 (D.C. Cir. 2021) (citation omitted). The Complaint offers a verbatim recital of the actual malice legal standard, a June 25 correction made six weeks after the first challenged appearance, and a series of allegations attacking the adequacy of O'Leary's sources. None of that speaks to what O'Leary subjectively believed when he spoke. Because the Complaint fails to adequately plead actual malice, Count I must be dismissed.

### A. THE PLAINTIFFS ARE LIMITED PURPOSE PUBLIC FIGURES.

A defamation plaintiff's status determines the degree of fault he or she must plead. A private plaintiff may recover on a showing of negligence, but one who has become a public figure for purposes of a controversy at issue must prove by clear and convincing evidence that the defendant spoke with actual malice. *World Wide Ass'n of Specialty Programs (WWASP) v. Pure, Inc.*, 450 F.3d 1132, 1136 (10th Cir. 2006).

A limited-purpose public figure is one who "voluntarily injects himself . . . into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). Whether a plaintiff occupies that status is a question of law for the Court and one the Court may resolve on the pleadings. *WWASP*, 450 F.3d at 1137.

Utah applies a two-part test: the Court isolates the public controversy to which the remarks relate, then asks whether "the type and extent of the plaintiff's participation" shows he "thrust [himself] to the forefront" of it "in order to influence the resolution of the issues involved." *Id.*

Under the two-step test, each Plaintiff is a limited purpose public figure.

**The controversy.** Step one is satisfied by the Complaint itself. Plaintiffs devote twelve paragraphs to the national fight over data-center siting, alleging that the issue is a flashpoint in the public debate over artificial intelligence and that seventy percent of Americans would oppose a

data center in their community. Compl. ¶¶ 37–48. They allege that the issue has "brought together unlikely coalitions from across the political spectrum." *Id.* ¶ 40. Locally, they plead the public dispute is over a 40,000-acre campus in Box Elder County requiring nine gigawatts of power (*id.* ¶¶ 49, 52); that "nearly 4,000 public comments were submitted to the county" before the May 4 vote (*id.* ¶ 52); a contested commission approval (*id.* ¶ 62); and the subsequent engagement of the Speaker of the Utah House, two state legislators, the Governor, the Senate President, and both candidates in a congressional primary debate (*id.* ¶¶ 64–68). That is a real dispute whose outcome affects an identifiable segment of the public in an appreciable way, and it is the dispute to which every challenged statement relates.

**Alliance and Elevate**. Step two is resolved by Plaintiffs' description of themselves. The Alliance exists to conduct public campaigns of exactly this kind: its mission is to "drive a public narrative that empowers Utah's electorate and holds public officials accountable," which it pursues "through paid, earned, and digital media efforts" and through an annual report card that "grades every Utah lawmaker." *Id.* ¶ 34. Elevate is a full-service political consultancy that has "trained and advised more than 100 candidates" and provides strategic messaging, voter outreach, media, and campaign management. *Id.* ¶ 35. In *World Wide*, the Tenth Circuit held an organization was a limited-purpose public figure because "World Wide's mission as a marketing company is to take an active role in this debate by both promoting its members' programs and defending those programs that are marred by scandal," and because its principals had given dozens of media interviews on the subject. 450 F.3d at 1137. Plaintiffs are advocacy organizations whose stated business is shaping public outcomes; they fit that framework more comfortably than the marketing company in *World Wide*.

Both organizations deployed those capabilities against the Stratos Project before O'Leary said a word about them. Beginning in late April 2026, Alliance and Elevate published posts "voicing their concerns about O'Leary's data center project and calling for transparency about the project's impacts and accountability around the process by which it would be approved," including a late April repost stating that Utah's most powerful politicians cannot be trusted. Compl. ¶ 53. On May 2, two days before the commission vote, Alliance identified "[s]ome ways that [citizens could] take action on the newly announced data center." *Id.* ¶ 54. On May 7, Alliance published a video accusing a MIDA board member who had approved the Project of "making unpopular, detrimental decisions with no public input or transparency," and it reposted opposition content throughout the period. *Id.* It also circulated a petition and press release demanding an ethics investigation of the sitting Senate President who chaired the authority that approved the Stratos Project. *Id.* ¶ 55. Elevate did the same: on May 7 it published an article endorsing that ethics petition and criticizing Utah politicians for fast-tracking the Stratos Project, together with a post explaining who approved the Project and "how [people could] join the fight," followed by similar content on May 8. *Id.* ¶ 56. Organizing, publicizing, petitioning, and recruiting are not incidental commentary; they are participation undertaken to influence the resolution of the controversy. Plaintiffs' post-May 11 conduct confirms the depth of that commitment: on June 3 the Alliance joined a lawsuit challenging "the creation, composition, and constitutionality of MIDA, the authority that initially approved O'Leary's data center project." *Id.* ¶ 60.

**Ms. Finlayson.** Finlayson founded Elevate and is a member of the firm. *Id.* ¶¶ 10, 12. On May 1, ten days before the first challenged statement, she personally appeared in a video on Elevate's Instagram account "discussing the project and O'Leary's role in it." *Id.* ¶ 56. She thus

did precisely what the *World Wide* principals did: she used the organization's media channels to advance its position in the controversy. 450 F.3d at 1137. That the Complaint characterizes this as a single appearance (Compl. ¶ 59) changes nothing. The second step of the test asks about the "type and extent" of participation measured against the object of influencing the outcome, not about a threshold volume of appearances. 450 F.3d at 1136–37. And after May 11, Finlayson appeared in a video denying the alleged defamatory claims and, with others from Elevate, made several further media appearances. Compl. ¶¶ 81–82.

Further, individual plaintiffs, like Finlayson, who become "involved in a controversy" by taking some proactive actions are limited-purpose public figures, whether or not they actively "participated in the public debate." *Davidson v. Baird*, 438 P.3d 928, 941 (Utah Ct. App. 2019). By choosing a leadership role and inserting herself into the Stratos Project conversation, Finlayson voluntarily exposed herself to likely public controversy and scrutiny. *Little v. Breland*, 93 F.3d 755, 758 (11th Cir. 1996). In short, Finlayson was the brain-child of Elevate and thus a limited-purpose public figure. *Carr v. Forbes, Inc.*, 259 F.3d 273, 280-281 (4th Cir. 2001) (company's "brain-child," who as president was "solely in charge of the company's activities," selected its projects and teams, and managed them "at least behind the scenes," was a limited-purpose public figure as to the projects he directed).

**Mr. Kanter.** Kanter founded the Alliance, served as Chair of its Board, and remains a member of that Board. Compl. ¶¶ 11, 29. Kanter built an organization whose declared purpose is to drive public narratives and grade lawmakers, (*id.* at ¶ 34), he governs it from its board, and the statements at issue concern the very subject his position controls: who funds the Alliance (*id.* ¶¶ 91, 100, 116, 123, 129–135). Having founded and continuing to govern an organization that

demands financial transparency from public officials, Kanter voluntarily assumed a position that invites public comment on his own organization's funding. *See Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 435-36 (5th Cir. 1987) (executive with "minimal involvement" in a business was still limited public figure because of his role in organization that was involved in a public controversy).

### B. The Complaint Fails to Plead Actual Malice

Actual malice is subjective and requires proof of a "mental element." *Talley v. Time, Inc.*, 923 F.3d 878, 895 (10th Cir. 2019). It means the speaker had "knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964); *WWASP*, 450 F.3d at 1136. Reckless disregard "requires more than a departure from reasonably prudent conduct"; the standard is subjective and requires evidence that the speaker "actually had a 'high degree of awareness of . . . probable falsity,'" *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667, 688 (1989), or in fact entertained "serious doubts as to the truth of [his] statement," *id.* at 667.

While actual malice can be inferred through "circumstantial evidence," proving it is a "heavy burden" and pleading "actual malice is a more onerous task as well." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 277-278 (S.D.N.Y. 2013). It is "purposefully" a difficult standard to meet to "protect against self-censorship and thus adequately implement First Amendment policies." *Id.* at 277.

The Complaint's own allegations and the appearances it relies on show that O'Leary reasoned his way to the China connection from observed facts rather than publishing a statement he knew to be false. The appearances incorporated by reference into the Complaint show that

O'Leary's team identified "the Party for Socialism and Liberation" and "the People's Dispatch" among the accounts "spitting out bad stuff on Utah." Ex. 5. He described the first of those groups as one whose main funder "shares offices with the [CCP]." Ex. 2. Only then did he turn to the Utah organizations, and he did so on the basis of a resemblance he said he observed between their content and the content he attributed to those groups: he asked whether Plaintiffs were "working with the Party for Socialism and Liberation and the Peoples Dispatch" because "the content looks almost identical." Ex. 1. He characterized the Utah groups the same way, as "Taking the content from the [CCP], repurposing it, and jamming it down the throats of people in Utah." Ex. 2. And he labeled the resulting conclusion as his own contention, stating that "these are proxies for the Chinese government, is my argument." Ex. 1. He moved from an observed similarity between Plaintiffs' content and content he attributed to a CCP-linked source to the inference that the two are connected, and he presented that step as his "argument," thereby drawing a conclusion, not publishing a known falsehood. *BYD Co. Ltd. v. All. for Am. Mfg.*, 554 F. Supp. 3d 1, 9 (D.D.C. 2021), *aff'd*, 21-7099, 2022 WL 1463866 (D.C. Cir. May 10, 2022) (complaint pleaded "no nonconclusory facts alleging the [defendant] knew what it was reporting was false or questioned its truth").

O'Leary's reliance on public records and an alleged investigation confirms the absence of subjective doubt when he made the allegedly defamatory statements. He told his audiences that he "put my auditors on top of them and looked at their IRS filings, 990s" (Ex. 7), that his conclusions rested on "the IRS Form 990s, which are public." Ex. 8. He directed his listeners to those same records (Ex. 7); he invited Plaintiffs to rebut him from their own books, "Open your books. Let's talk about it." (Ex. 7); and he claimed that he turned his material over to various regulators (Ex.

9). That conduct defeats a malice theory. The mere "failure to investigate cannot establish reckless disregard for the truth." *Revell v. Hoffman*, 309 F.3d 1228, 1233 (10th Cir. 2002); *see also Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1239–40 (N.D. Cal. 2014) ("general allegations that a defendant should have known or should have investigated the truth of his or her statements do not adequately plead actual malice"; and "it is not possible to establish malice on the basis that a defendant ignored publicly known information"); *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 144 (D.D.C. 2017) ("even where the defendants acted on the basis of a biased source and incomplete information, it was not enough to demonstrate they realized that their statement was false or that they subjectively entertained serious doubts as to the truth of their statement.") (cleaned up). Nor does it matter whether the filings ultimately proved what O'Leary believed they proved, because "what matters is not whether the endnotes actually support the claims in [the] Report but whether the [defendant] thought they did." *BYD Co.*, 554 F. Supp. 3d at 10.

At most, Plaintiffs point to circumstantial evidence to allege actual malice, but that circumstantial evidence does not support a finding of actual malice as explained below.

**Failure to investigate further is not malice.** Plaintiffs allege that O'Leary's investigation was "wholly reliant on IRS Form 990 filings, which are publicly available" (Compl. ¶ 141), and that "none of Alliance for a Better Utah's Form 990 filings reference China" (*id.* ¶ 140). Those allegations attack the sufficiency of his sources, not his belief in what they showed. The "mere failure to investigate cannot establish reckless disregard for the truth," and a plaintiff cannot substitute the inherent improbability of a statement for concrete evidence of the speaker's subjective doubt. *Revell*, 309 F.3d at 1233. Nor does Plaintiffs' theory that O'Leary spoke because he resented their criticism (Compl. ¶ 143) fill the gap: "A publisher's motive in publishing a story

cannot, by itself, provide a sufficient basis for finding actual malice." *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1043 (10th Cir. 2013).

**There is no purposeful avoidance.** Plaintiffs' fallback is that O'Leary "never contacted any of the Plaintiffs to verify his claims." Compl. ¶ 142. Where a defendant investigated before publishing, that theory fails. *Revell*, 309 F.3d at 1233–34 ("[W]e have no evidence that Hoffman purposefully avoided the truth. On the contrary, Hoffman did conduct an investigation prior to publishing."). The Complaint pleads the opposite of avoidance. It alleges that O'Leary retained forensic auditors and data scientists (Compl. ¶¶ 73, 86, 91, 102, 108, 123, 133); grounded his statements in IRS Form 990 filings he repeatedly identified as public records (*id.* ¶¶ 91, 96, 97, 100, 116, 123, 133); published his analysis in a report available to anyone who wanted to read it (*id.* ¶ 101); displayed the supporting chart on live television (*id.* ¶¶ 103, 109, 124); turned his materials over to regulators (*id.* ¶¶ 102, 123, 125); pointed to an ongoing congressional inquiry into various funding networks (*id.* ¶¶ 108, 132); and publicly invited Plaintiffs to answer, telling them to "Open your books, let's talk about it" (*id.* ¶ 116). O'Leary identified some of his sources, published some of them, noted that he was in discussions with some regulators, and demanded an audit of the subject's finances, thereby suggesting that he subjectively believed his statements were true.

**O'Leary's asserted awareness of Plaintiffs' denials adds nothing.** Plaintiffs stress that they promptly and publicly denied O'Leary's accusations, but the Complaint never plausibly alleges that O'Leary knew of those denials when he made the statements that followed. It asserts only, "[u]pon information and belief," that "Defendants were aware that Plaintiffs refuted O'Leary's false claims." Compl. ¶ 83. That conclusory averment identifies no fact showing any

denial reached O'Leary, much less that he read or credited one before he next spoke, and a plaintiff cannot manufacture a defendant's subjective knowledge from an "information and belief" label. The Complaint's other allegations cut the other way: it pleads that O'Leary "never contacted any of the Plaintiffs" (*id.* ¶ 142), and that Plaintiffs' first direct communication to him was the June 5 demand letter—sent after every challenged appearance. *Id.* ¶ 146. Denials a speaker never saw cannot bear on his state of mind at the time he spoke, which is the only thing actual malice measures. *Fairfax v. CBS Corp.*, 2 F.4th 286, 295 (4th Cir. 2021) (actual malice requires that "the defendant had a particular, subjective state of mind at the time the statements were made"). And even had O'Leary seen them, denials do not supply the missing element: "[a defendant] need not accept denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious [defendant] to the likelihood of error." *Spacecon Specialty Contractors, LLC*, 713 F.3d at 1044.

**The June 25 statement proves nothing about May.** Plaintiffs further allege that O'Leary's June 25 acknowledgment that he has no evidence tying Plaintiffs to China confirms "he knew that his statements were false or, at the very least, that he acted with reckless disregard to their falsity" from the outset. Compl. ¶ 150. A statement made on June 25 says nothing about what O'Leary believed throughout May. *See Fairfax*, 2 F.4th at 295 (defendant's "alleged post-publication conduct here is not probative of its state of mind at the time of publication"). Post-publication conduct does not supply the missing element. If a later correction established malice, every retraction would become an admission of liability and the incentive to correct the record would disappear.

In short, actual malice is not a mosaic pieced together from a defendant's aggressiveness, failure to investigate further, hostility toward his critics, and later change in position. It turns on a single subjective question: whether, at the time of publication, the defendant actually had a "high degree of awareness of . . . probable falsity." *Revell*, 309 F.3d at 1233. The Complaint pleads the opposite. By Plaintiffs' own allegations, O'Leary reached his conclusion after reviewing public IRS filings and relying on an investigation. Those allegations may support Plaintiffs' contention that his conclusion was wrong, overstated, or insufficiently supported; they do not plausibly show that he subjectively believed it was probably false. Because the Complaint fails to plead actual malice as to O'Leary, Count I should be dismissed.

## III. THE STATEMENTS ARE NOT DEFAMATORY PER SE AND THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO PLEAD SPECIAL DAMAGES.

Utah recognizes defamation per se in four categories only: statements that "charge criminal conduct; impute a loathsome disease; reflect on the fitness of the person to engage in his business, trade or profession or hold some office; or charge unchastity of a woman." *Mitchell v. Smith*, 2010 WL 5172906, at *6 (D. Utah Dec. 14, 2010); *Allred v. Cook*, 590 P.2d 318, 320 (Utah 1979). The words must, "on their face, and without the aid of intrinsic proof, be unmistakably recognized as injurious." *Jacob v. Bezzant*, 212 P.3d 535, 545 (Utah 2009); *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1233 (D. Utah 2018). And the rule is strict: "[t]he statement or charge in question must not be susceptible to any meaning other than one falling plainly and unambiguously within any of the four categories," so that "[i]f it is capable of two interpretations" it is not defamation per se. *Johnson v. Cmty. Nursing Servs.*, 985 F. Supp. 1321, 1327–28 (D. Utah 1997).

The Complaint alleges that the statements were defamatory per se under the first category (criminal conduct) and the third category (fitness in business). However, the statements do not fall into either category.

*First*, O'Leary never unambiguously accused any Plaintiff of violating any criminal law. Statements do not constitute defamation per se under the criminal prong category where a speaker uses hyperbolic language about misconduct, colloquial phrases suggesting a crime, or generalized allegations of unethical conduct. *Hogan v. Winder*, 762 F.3d 1096, 1108 (10th Cir. 2014) ("[A]ccusations of extortion are a familiar rhetorical device. We all know of colloquial or hyperbolic uses of the term. Although the term has a derogatory meaning when used either way, we cannot assume that the term always refers to a crime or similarly heinous conduct. Like with other words, context matters."); *John Bean Techs. Corp. v. BGSE Grp.*, 480 F. Supp. 3d 1274, 1323 (D. Utah 2020) (accusing someone of stealing although defamatory not specific enough in the criminal context to constitute defamation per se); *Allred*, 590 P.2d at 321 (statement that plaintiff had "twenty-seven charges against him" not defamatory per se because defendant did not "specify the substance of the charges.").

Nowhere in the alleged statements did O'Leary accuse Plaintiffs of committing a crime. Plaintiffs attempt to bridge that gap by stitching together O'Leary's disparate statements and alleging that, taken collectively, those statements amount to accusations of various federal offenses. Compl. ¶ 200. But the statements themselves say otherwise: O'Leary did not identify any specific crime, much less state that Plaintiffs had committed one. At most, he called for governmental authorities to examine questions concerning Plaintiffs' funding and the opposition to the Stratos Project. *See, e.g.,* Compl. ¶¶ 91, 102. Because O'Leary did not expressly accuse

Plaintiffs of committing any crimes, none of his statements can give rise to a defamation per se claim.

*Second*, the Complaint fails to identify any statement accusing the Plaintiffs of conduct that is uniquely incompatible with their businesses. A statement is not defamation per se if the statement is "offensive to many" but not specifically incompatible with a plaintiff's particular business. *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1277 (10th Cir. 2000). For example, in *Miller*, the plaintiff alleged that the defendant committed defamation per se when it claimed that the plaintiff had a disciplinary action that limited his ability to operate as a CPA. *Miller*, 2026 WL 2614543, at *6. There, the court found that the statement was not the type of "charge" that was incompatible with the exercise of his lawful profession because the defendant did not accuse plaintiff of "unlawfully practicing as a CPA." *Id.* Therefore, that statement could not underlie a defamation per se claim. *Id.*

Here, the Complaint alleges only that Plaintiffs suffered professional injury when their reputations were harmed. Compl. ¶ 200. That does not state a per se claim. A statement is not defamatory per se in the business category unless it imputes conduct incompatible with a quality "peculiarly valuable in plaintiffs' professional activities"; disparagement that harms reputation generally does not suffice. *Haugen*, 222 F.3d at 1277. O'Leary's alleged accusations were not distinctively incompatible with running an advocacy nonprofit or a political consultancy any more than they would be with any other trade; as alleged, they are the sort of generalized charges that may injure a reputation in any line of work. The Complaint identifies nothing in the challenged statements that impugns a skill or trait uniquely essential to Plaintiffs' particular professions, as opposed to their standing generally. Because a rule treating every reputational harm as per se would

swallow the category, and would make every disparagement of a professional actionable without proof of damage, the statements do not give rise to a defamation per se claim under the third category.

And because Plaintiffs cannot establish defamation per se, they were required to plead special damages with particularity, which they have not done. *Diesel Power Source v. Crazy Carl's Turbos, Inc.*, 2017 WL 1131892, at *3 (D. Utah Mar. 24, 2017). Under Federal Rule of Civil Procedure 9(g), "[i]f an item of special damage is claimed, it must be specifically stated." *Miller*, 2026 WL 2614543, at *5. The Complaint does not come close. It alleges only that Plaintiffs suffered "severe injury to reputation, emotional distress, and economic damages in the form of lost business opportunities and clients." Compl. ¶ 204. This is the sort of generalized, unquantified assertion that pleads no identifiable transaction, client, contract, or sum, and therefore fails Rule 9(g). Because Plaintiffs neither state a per se claim nor plead special damages with the detail the Rule demands, Count I should be dismissed on this ground as well.

## IV. THE STATEMENTS ARE NOT SUSCEPTIBLE TO DEFAMATORY MEANING.

Further, even apart from Count I's threshold pleading defect—its failure to identify with precision which statements are actually challenged—many of the statements and media appearances Plaintiffs appear to place at issue are nonactionable because they would not be taken at face value by reasonable viewers.

In defamation cases, a court on a motion to dismiss "must determine at the threshold whether a publication might be considered defamatory by a reasonable person before the case may proceed to discovery and, ultimately, a jury trial." *Lichfield v. Kubler*, 183 F.4th 1248, 1258 (10th Cir. 2026) (internal quotations and citation omitted). A plaintiff "receives no deference when he

states that the contested portion of the [statement is] capable of defamatory meaning – those are legal conclusions, not factual allegations." *Id.*

The Tenth Circuit has recognized that there are several ways in which a statement might fail to be capable of a defamatory meaning: (1) a statement might be literally true; (2) a reasonable viewer may not accept the statement at face value; or (3) a statement may not impeach or impugn an individual's virtue or reputation. *Id.* at 1259. Courts must conduct a "context-driven assessment of the alleged defamatory statement and reach an independent conclusion about the statement's susceptibility to a defamatory interpretation." *Id.* at 1260 (quotations and citation omitted). In undertaking that analysis, a court "should examine: (1) the words themselves and their implications; (2) the entire article or message; (3) the events or disputes that gave rise to the article [or message]; and (4) the likely effect on the reasonable reader." *Id.* If, after undertaking that analysis, a court finds that a "reasonable reader would not accept the statements at face value, then the statements do not cause damage to the plaintiff's reputation and are therefore not defamatory." *Id.* at 1260 (cleaned up).

Courts are particularly reluctant to construe statements made in the course of heated public debate as conveying an actionable defamatory meaning. *See Jacob*, 212 P.3d at 546. While there is no hard-and-fast rule that speech made in the course of political or public debate can never be defamatory, the fact that statements were made during a heated political debate forms an "important part of the analysis" in determining whether those statements are susceptible to a defamatory meaning. *Sunwest Bank v. Gannett Co.*, 2026 WL 1243328, at *5 (D. Utah May 5, 2026).

Courts applying Utah law routinely subject defamation claims arising from heated political

disputes to "exacting" scrutiny. *West v. Thomson Newspapers*, 872 P.2d 999, 1019 (Utah 1994). Several cases help define the contours of that analysis.

In *Jacob*, a city resident anonymously purchased a newspaper advertisement asserting that two council candidates were barred from holding office. 212 P.3d at 538. The paper's editor responded with an "Urgent Election Notice" apologizing for having distributed "what we believe is false and misleading information," calling the flyer "a classic example of negative campaigning intended to hurt one candidate in order to favor another," and adding, "We believe it hurts the entire process." *Id.* at 538–539. The Utah Supreme Court held the notice nonactionable. The original advertisement, it reasoned, "was clearly motivated by a desire to persuade voters to reject the two men at the ballot box," and "[t]he content of the advertisement was unequivocally political." *Id.* at 545. The editor's reply "was no less political." *Id.* Statements traded in "a contentious campaign" were, the court concluded, "part of the healthy political exchange that is the foundation of our system of free speech and free elections." *Id.* at 546. The Utah Supreme Court thus found the statements not susceptible to a defamatory meaning. *Id.*

Similarly, in *Sunwest*, a newspaper made various statements about a bank's CEO who was the republican candidate for a senate seat. 2026 WL 1243328, at *1. As part of a larger discussion of the CEO's qualification for office, the newspaper made various statements about the plaintiff-bank including the following: (1) the plaintiff-bank did business with a bank associated with a Mexican drug cartel; (2) the plaintiff-bank did business with that same bank that had been linked to a bribery scheme; and (3) the CEO was "willing to do anything to enrich himself, even flying cash across the border for a bank suspected of working with criminal groups…" *Id.* at *1–2. The court found that the statements were not capable of "defamatory meaning" in context. *Id.* at *5.

Among other things, it reached that conclusion after finding that statements were part of an ongoing political debate as they were "political accusations by political actors," that the statements were made in a report that felt more "editorial" than "hard news," and that various cautionary phrases were used. *Id.*

Just as the statements in *Jacob* and *Sunwest* were not susceptible to a defamatory meaning, O'Leary's statements likewise should be held incapable of conveying one. Plaintiffs circulated a petition demanding an ethics investigation of a sitting Senate President over his political action committee's donors (Compl. ¶ 55), published a video accusing a member of the authority that approved the project of "making unpopular, detrimental decisions with no public input or transparency" (*id.* ¶ 54), told readers "how [they could] join the fight" (*id.* ¶ 56), and joined litigation attacking the "creation, composition, and constitutionality" of that authority (*id.* ¶ 60). That campaign was unequivocally political. O'Leary's response was no less political.

O'Leary made clear that he was advancing a contention and otherwise trading in hyperbole on a charged topic. He called it "my argument" (Compl. ¶ 77; Ex. 1), said the filings "appear" to show what he described (Compl. ¶¶ 100, 135), and demanded that Plaintiffs "[o]pen [their] books" and submit to an audit (*id.* ¶ 116). The rest was similarly argument: Plaintiffs were "cells inside of Utah" (*id.* ¶ 73), "proxies" (*id.* ¶ 77), and "bad dudes" (*id.* ¶ 108); the Alliance should "rename this thing 'Alliance for a Better China in Utah'"(*id.* ¶ 96); and the marchers were asked, "Are they from Cuba? Are they from China? Where'd this come from?" (*id.* ¶ 118). No viewer could reasonably take those statements at face value given the context in which they were uttered. *See Sunwest*, 2026 WL 1243328, at *5 (article "clearly frame[d] its statements as reporting on political accusations by political actors," signaling contentions advanced within a dispute rather than

findings rendered at the end of one).

And, the fact that the statements were made on cable news further shows none of the statements were susceptible to a defamatory meaning as a matter of law. *McDougal* provides useful background. 489 F. Supp. 3d 174 (S.D.N.Y. 2020). The plaintiff there sued over a cable news segment in which the host told viewers she had committed "extortion"; a word naming a felony, delivered without qualification, about a private individual, on a program watched by millions. *Id.* at 178–180. The court dismissed the claim because the setting controlled the meaning. *Id.* at 183–184. It explained that statements on commentary programming are measured against the "general tenor" of the show, which signals to the audience that the speaker is engaged in "exaggeration" and "non-literal commentary" *Id.* (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20–21 (1990)). Programming of that kind trades in "increasingly barbed" language; the viewer "arrive[s] with an appropriate amount of skepticism"; and the segment at issue did "not come as a sober factual report" but served instead to frame the debate that followed. *Id.* at 182–84. Accusations of that character are the "'rhetorical hyperbole' normally associated with politics and public discourse in the United States." *Id.* at 182 (citation omitted).

The features the court relied on in *McDougal* to find no defamatory meaning are present here and stronger in O'Leary's favor. *McDougal* involved a host addressing a controversy in which he had no personal stake; O'Leary appeared as the openly identified developer of the project under attack, defending it against a campaign aimed at stopping it. If a viewer should know to treat a host's commentary as argument, he should know it even better when the speaker has a stake in the outcome. The plaintiff in *McDougal* was a private individual; Plaintiffs here are an advocacy organization that grades every Utah lawmaker, a political consultancy that has trained more than

100 candidates, and their principals who lead those efforts. *See* Compl. ¶¶ 34–35. And the accusation in *McDougal* named a specific crime with fixed elements; O'Leary's words—"cells," "proxies," "bad dudes"—name none, and were qualified as he spoke them: the money "appears tied" (*id.* ¶ 100) and "appear[s] linked" (*id.* ¶ 135) to Chinese-backed interests, "these are proxies . . . is my argument" (*id.* ¶ 77; Ex. 1), and as to who was behind the campaign, "I don't know who's doing this" (Compl. ¶ 146). Just as the *McDougal* court found that a news host's claims of extortion were not susceptible of defamatory meaning because of the "barbed language" viewers come to expect on cable news programs, so too should this Court find that O'Leary's statements were not susceptible to a defamatory interpretation.

As the Utah Supreme Court noted, statements are "not defamatory simply because [they are] nettlesome or embarrassing to a plaintiff, or even because [they make] a false statement about the plaintiff … [Plaintiffs] must establish the statement[s] [were] more than sharp criticism." *West*, 872 P.2d at 1009. While O'Leary's statements may have been critical of Plaintiffs, they do not rise to the level of defamation and are not susceptible to a defamatory meaning when the statements are viewed together, in context.

DATED this 21st day of September, 2026.

**PARKINSON BENSON POTTER**

*/s/ D. Loren Washburn*
D. Loren Washburn
Clifford B. Parkinson
Andrew R. Choate

**NEIMAN MAYS FLOCH & ALMEIDA, PLLC**

*/s/ Jeffrey A. Neiman*
Jeffrey A. Neiman (*Pro Hac Vice*)
Brandon Floch (*Pro Hac Vice*)
Jordan Esteban (*Pro Hac Vice*)
*Attorneys for Defendant Kevin O'Leary*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was filed and served via the Court's ECF System on September 21, 2026 to:

Matthew J. Platkin
Angela Cai
Ravi Ramanthan
Aaron E. Haier
Conor Bradley
**Platkin LLP**
413 Washington Avenue, Unit 174
Belleville, New Jersey 07109
mplatkin@platkinllp.com
acai@platkinllp.com
rramanathan@platkinllp.com
ahaier@platkinllp.com
cbradley@platkinllp.com

David R. Irvine
Attorney and Counselor at Law
P.O. Box 1533
Bountiful, Utah 84011
drirvine@aol.com

Alan L. Smith
Attorney and Counselor at Law
1169 East 4020 South
Salt Lake City, Utah 84124
alanakaed@aol.com

*Attorneys for Plaintiffs*

Justin T. Toth
Whitney Hulet Krogue
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
jtoth@rqn.com
wkrogue@rqn.com

Thomas G. Hentoff
Stephen J. Fuzesi
Nicholas G. Gamse
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue S.W.
Washington, DC 20024
thentoff@wc.com
sfuzesi@wc.com
ngamse@wc.com

*Attorneys for Defendant Fox News Network, LLC*

*/s/ D. Loren Washburn*