Matthew J. Platkin*
Angela Cai*
Ravi Ramanathan*
Aaron E. Haier*
Conor Bradley*
**PLATKIN LLP**
One Gateway Center
Suite 1150
Newark, NJ 07102
(973) 561-1951
mplatkin@platkinllp.com

David R. Irvine
(Utah Bar No. 1621)
Attorney and Counselor
at Law
P.O. Box 1533
Bountiful, Utah 84011
(801) 949-6693
drirvine@aol.com

Alan L. Smith
(Utah Bar No. 2988)
Attorney and Counselor
at Law
1169 East 4020 South
Salt Lake City, Utah 84124
(801) 822-6076
alanakaed@aol.com

*Attorneys for Plaintiffs*
**admitted pro hac vice*

---

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| ALLIANCE FOR A BETTER UTAH, INC.; ELEVATE STRATEGIES, LLC; JOSHUA S. KANTER; and GABRIELLE S. FINLAYSON,<br><br>Plaintiffs,<br><br>v.<br><br>KEVIN O'LEARY and FOX NEWS NETWORK, LLC,<br><br>Defendants. | **PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>Case No. 2:26-cv-00664-TC-CMR<br><br>District Court Judge Tena Campbell<br>Magistrate Judge Cecilia M. Romero |

## TABLE OF CONTENTS


INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

LEGAL STANDARD ........ 9

ARGUMENT ........ 9

I. THE ACTUAL MALICE STANDARD DOES NOT APPLY. ........ 10

A. The Relevant Controversy Is Foreign Interference With The Stratos Project, Not The General Concern Over Data Center Construction. ........ 11

B. Even If the Relevant Controversy Was Data Center Construction, Plaintiffs Are Not Public Figures On That Issue. ........ 13

II. PLAINTIFFS HAVE PLAUSIBLY ALLEGED BOTH NEGLIGENCE AND ACTUAL MALICE. ........ 19

A. Plaintiffs Have Plausibly Alleged Negligence. ........ 20

B. Plaintiffs Have Plausibly Alleged Actual Malice. ........ 21

1. O'Leary Acted With Actual Malice. ........ 22

2. Fox Acted With Actual Malice. ........ 24

III. THE STATEMENTS WERE DEFAMATORY. ........ 28

A. The Statements Are Capable Of A Defamatory Meaning. ........ 28

B. The Defamatory Meaning Is Attributable To Fox. ........ 33

IV. THE STATEMENTS ARE DEFAMATION *PER SE*. ........ 36

A. The Statements Accused Plaintiffs Of Criminal Conduct. ........ 37

B. The Statements Impugned Plaintiffs' Business Reputations. ........ 40

C. Even if the Statements Are Not Defamation *Per Se*, Plaintiffs Have Plausibly Alleged Special Damages. ........ 42

V. DEFENDANTS' OTHER ARGUMENTS FOR DISMISSAL ARE MERITLESS. ........ 43

A. The Complaint Adequately Identifies The Basis For The Claims Against O'Leary......... 44

B. Every Statement Defamed All Of The Plaintiffs. ........................................................... 46

C. O'Leary's Statements On *Mornings with Maria* Were Not Opinions. ............................ 49

CONCLUSION........................................................................................................................ 50

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Apelbaum v. Bloom*,
No. 1:25-cv-00147, 2025 WL 1869578 (E.D. Va. July 7, 2025) .......... 42

*Baum v. Gillman*,
667 P.2d 41 (Utah 1983) .......... 37

*Bentley v. Bunton*,
94 S.W.3d 561 (Tex. 2002) .......... 30

*Biden v. Byrne*,
No. 2:23-cv-09430, 2025 WL 2427835 (C.D. Cal. July 18, 2025).......... 23

*Boisjoly v. Morton Thiokol, Inc.*,
706 F. Supp. 795 (D. Utah 1988) .......... 44

*Carr v. Forbes, Inc.*,
259 F.3d 273 (4th Cir. 2001) .......... 18

*Codex United, LLC v. Cryptech Sols. LLC*,
No. 1:20-cv-00036, 2021 WL 3815839 (D. Utah Jan. 19, 2021) .......... 46

*Cohn v. J.C. Penney Co.*,
537 P.2d 306 (Utah 1975) .......... 42

*Combs v. Burgess*,
No. 25-cv-650, 2026 WL 2620459 (S.D.N.Y. Sept. 4, 2026) .......... 23

*Coomer v. Donald J. Trump for President, Inc.*,
552 P.3d 562 (Colo. App. 2024).......... 30

*Coomer v. Make Your Life Epic LLC*,
780 F. Supp. 3d 1129 (D. Colo. 2025) .......... 32

*Cox v. Hatch*,
761 P.2d 556 (Utah 1988) .......... 28, 29

*Croce v. N.Y. Times Co.*,
930 F.3d 787 (6th Cir. 2019).......... 33, 36

*Davidson v. Baird*,
438 P.3d 928 (Utah Ct. App. 2019) .......... 18

*Deem v. Baron*,
No. 2:15-cv-00755, 2019 WL 959704 (Feb. 27, 2019 D. Utah) .......... 41

*Deseret Trust Co. v. Unique Inv. Corp.*,
No. 2:17-cv-00569, 2018 WL 8110959 (D. Utah Jul. 3, 2018) .......... 46

*Diamond Ranch Acad., Inc. v. Filer*,
117 F. Supp. 3d 1313 (D. Utah 2015) .......... 10

*Diamond Ranch Acad., Inc. v. Filer*,
No. 2:14-CV-751, 2016 WL 633351 (D. Utah Feb. 17, 2016) .......... 14

*Dixson v. Newsweek, Inc.*,
562 F.2d 626 (10th Cir. 1977) .......... 34

*Eagle Air Med. Corp. v. Sentinel Air Med. Alliance, LLC*,
No. 2:16-cv-00176, 2019 WL 6879252 (D. Utah Dec. 17, 2019) .......... 44

*Edwards v. Nat'l Audobon Soc'y, Inc.*,
556 F.2d 113 (2d Cir. 1977) .......... 34

*Elias v. Rolling Stone LLC*,
872 F.3d 97 (2d Cir. 2017) .......... 46

*Espinoza v. Hewlett-Packard Co.*,
No. 6000-VCP, 2011 WL 941464 (Del. Ch. Mar. 17, 2011) .......... 18

*Fiacco v. Sigma Alpha Epsilon Fraternity*,
484 F. Supp. 2d 158 (D. Me. 2007) .......... 18

*Flynn v. Cable News Network, Inc.*,
No. 21 Civ. 2587, 2021 WL 6290046 (S.D.N.Y. Oct. 22, 2021) .......... 15

*Freedlander v. Edens Broad., Inc.*,
734 F. Supp. 221 (E.D. Va. 1990) .......... 19

*Gaprindashvili v. Netflix, Inc.*,
No. 2:21-cv-07408, 2022 WL 363537 (C.D. Cal. Jan. 27, 2022) .......... 29

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) .......... passim

*Gilmore v. Jones*,
370 F. Supp. 3d 630 (W.D. Va. 2019) .................................................................. 24, 25

*Goldfarb v. Channel One Russia*,
663 F. Supp. 3d 280 (S.D.N.Y. 2023) ........................................................................ 24

*Grayson v. Ressler & Ressler*,
271 F. Supp. 3d 501 (S.D.N.Y. 2017) ........................................................................ 41

*Gross v. N.Y. Times Co.*,
82 N.Y.2d 146 (N.Y. 1993) ......................................................................................... 30, 31

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989)........................................................................................ 22, 24, 25, 26

*Hildebrandt v. Meredith Corp.*,
63 F. Supp. 3d 732 (E.D. Mich. 2014) ........................................................................ 23

*Hodges v. Gibson Prods. Co.*,
811 P.2d 151 (Utah 1991) ......................................................................................... 42, 43

*Hogan v. Herald Co.*,
84 A.D.2d 470 (N.Y. App. Div. 1982)......................................................................... 34

*Hogan v. Winder*,
762 F.3d 1096 (10th Cir. 2014) ........................................................................... 9, 40, 44

*Houlahan v. World Wide Ass'n of Specialty Progs. & Schs.*,
No. 04-cv-01161, 2006 WL 2844190 (D.D.C. Sept. 29, 2006) ..................................... 24

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979) .................................................................................................. 12, 15

*Int'l Ass'n of United Mine Workers Union v. United Mine Workers of Am.*,
No. 2:04-CV-00901, 2006 WL 1183245 (D. Utah May 1, 2006) ............................. 35, 36

*Jankovic v. Int'l Crisis Grp.*,
494 F.3d 1080 (D.C. Cir. 2007)................................................................................... 29

*John Bean Techs. Corp. v. B GSE Grp., LLC*,
480 F. Supp. 3d 1274 (D. Utah 2020) ......................................................................... 40

*Keisel v. Westbrook*,
542 P.3d 536 (Utah Ct. App. 2023) ............................................................................. 49

*Lewis v. Abramson*,
No. 22-cv-126, 2026 WL 2110989 (D.N.H. July 22, 2026) ................................................. 16

*Lichfield v. Kubler*,
183 F.4th 1248 (10th Cir. 2026)........................................................................................ 30

*Little v. Breland*,
93 F.3d 755 (11th Cir. 1996) ............................................................................................ 19

*Lohrenz v. Donnelly*,
350 F.3d 1272 (D.C. Cir. 2003)........................................................................................ 26

*Marcone v. Penthouse Int'l Mag. for Men*,
754 F.2d 1072 (3d Cir. 1985) ........................................................................................... 19

*Mark O v. Colvin*,
No. 1:22-cv-00173, 2025 WL 392735 (D. Utah Jan. 8, 2025) ............................................. 46

*Mason v. Am. Prospect, Inc.*,
No. 23-cv-2238, 2024 WL 4345855 (D.D.C. Sept. 30, 2024)............................................... 18

*Mathews v. McCown*,
575 P.3d 1114 (Utah 2025)........................................................................ 28, 30, 31, 40

*Mattel, Inc. v. MCA Records, Inc.*,
28 F. Supp. 2d 1120 (C.D. Cal. 1998)................................................................................ 16

*McCafferty v. Newsweek Media Group, Ltd.*,
955 F.3d 352 (3d Cir. 2020) ............................................................................................. 16

*McDougal v. Fox News Network, LLC*,
489 F. Supp. 3d 174 (S.D.N.Y. 2020) ............................................................................... 32

*McGeorge v. Cont'l Airlines, Inc.*,
871 F.2d 952 (10th Cir. 1989)........................................................................................... 44

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990)..................................................................................................... 49, 50

*Miller v. Glanz*,
948 F.2d 1562 (10th Cir.1991) ............................................................................................ 9

*Nelsen v. S. Poverty Law Ctr.*,
513 F. Supp. 3d 1101 (W.D. Mo. 2021) ............................................................................ 16

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
565 F.3d 683 (10th Cir. 2009) ........ 40

*Nunes v. Rushton*,
299 F. Supp. 3d 1216 (D. Utah 2018) ........ 37, 40

*Parsi v. Daioleslam*,
595 F. Supp. 2d 99 (D.D.C. 2009) ........ 49

*Pratt v. Nelson*,
164 P.3d 366 (Utah 2007) ........ 47, 48

*Rent Stabilization Ass'n of N.Y.C., Inc. v. McKee*,
236 A.D.3d 413 (N.Y. App. Div. 2025) ........ 16

*Revell v. Hoffman*,
309 F.3d 1228 (10th Cir. 2002) ........ 21

*Royal Pac. Ltd. v. Faith Elec. Manufacture Co.*,
322 F. Supp. 3d 1178 (D.N.M. 2018) ........ 44

*Salas v. Univ. of Utah Madsen Health Ctr.*,
No. 2:21-cv-00437, 2022 WL 170066 (D. Utah Jan. 19, 2022) ........ 45

*SCO Grp., Inc. v. Novell, Inc.*,
692 F. Supp. 2d 1287 (D. Utah 2010) ........ 14

*Seegmiller v. KSL, Inc.*,
626 P.2d 968 (Utah 1981) ........ 19, 20, 21

*Shanley v. Hutchings*,
716 F. Supp. 3d 1179 (D. Utah 2024) ........ 17, 20

*Skinner v. Switzer*,
562 U.S. 521 (2011) ........ 45

*Smartmatic USA Corp. v. Fox Corp.*,
No. 151136/2021, 2022 WL 685407 (N.Y. Sup. Ct. Mar. 8, 2022) ........ 33

*Smartmatic USA Corp. v. Newsmax Media, Inc.*,
No. N21C-11-028 EMD, 2023 WL 1525024 (Del. Super. Ct. Feb. 3, 2023) ........ 48

*Smith v. United States*,
561 F.3d 1090 (10th Cir. 2009) ........ 9

*Southbark, Inc. v. Mobile Cnty. Comm'n*,
974 F. Supp. 2d 1372 (S.D. Ala. 2013) .......... 17

*St. Amant v. Thompson*,
390 U.S. 727 (1968) .......... passim

*Stolz v. KSFM 102 FM*,
30 Cal. App. 4th 195 (Cal. Ct. App. 1994) .......... 19

*Tah v. Global Witness Publ'g, Inc.*,
413 F. Supp. 3d 1 (D.D.C. 2019) .......... 29

*Tal v. Hogan*,
453 F.3d 1244 (10th Cir. 2006) .......... 39

*Talley v. Time, Inc.*,
923 F.3d 878 (10th Cir. 2019) .......... 21

*Tang v. Guo*,
No. 17 Civ. 9031, 2019 WL 6169940 (S.D.N.Y. Nov. 20, 2019) .......... 49

*Thomas M. Cooley Law School v. Kurzon Strauss, LLP*,
759 F.3d 522 (6th Cir. 2014) .......... 14

*Time, Inc. v. Firestone*,
424 U.S. 448 (1976) .......... 12, 14, 15

*TLS Grp., S.A. v. NuCloud Global, Inc.*,
No. 2:15-cv-00533, 2016 WL 1562910 (D. Utah Apr. 18, 2016) .......... 43, 44

*TMJ Implants, Inc. v. Aetna, Inc.*,
498 F.3d 1175 (10th Cir. 2007) .......... 50

*Trotter v. Jack Anderson Enters., Inc.*,
818 F.2d 431 (5th Cir. 1987) .......... 18

*U.S. Dominion, Inc. v. Fox News Network, LLC*,
293 A.3d 1002 (Del. Super. Ct. 2023) .......... 32

*U.S. Dominion, Inc. v. Fox News Network, LLC*,
No. N21C-03-257 EMD, 2021 WL 5984265 (Del. Super. Ct. Dec. 16, 2021) .......... 31, 34

*U.S. Dominion, Inc. v. Powell*,
554 F. Supp. 3d 42 (D.D.C. 2021) .......... 23, 24, 31, 32

*Utah State Farm Bureau Fed'n v. Nat'l Farmers Union Serv. Corp.*,
198 F.2d 20 (10th Cir. 1952) ........ 41

*Waldbaum v. Fairchild Publ'ns, Inc.*,
627 F.2d 1287 (D.C. Cir. 1980) ........ 11, 18

*Wayment v. Clear Channel Broad., Inc.*,
116 P.3d 271 (Utah 2005) ........ passim

*Wells v. Liddy*,
186 F.3d 505 (4th Cir. 1999) ........ 14

*West v. Thomson Newspapers*,
872 P.2d 999 (Utah 1994) ........ 28, 46

*Westmont Residential LLC v. Buttars*,
340 P.3d 183 (Utah Ct. App. 2014) ........ 37, 40

*Wilkins v. Seraphin*,
No. 1:25-cv-01375, Slip Op. (W.D. Tex. May 22, 2026), Dkt. No. 17 ........ 49

*Wolston v. Reader's Digest Ass'n, Inc.*,
443 U.S. 157 (1979) ........ 17, 15, 19

*World Wide Ass'n of Specialty Progs. v. Pure, Inc.*,
450 F.3d 1132 (10th Cir. 2006) ........ 14

**Statutes**

18 U.S.C. § 951(a) ........ 38

18 U.S.C. § 1956(c)(7)(D) ........ 39

22 U.S.C. § 612(a) ........ 38

22 U.S.C. § 614(b) ........ 38

22 U.S.C. § 618(a)(1) ........ 38

**Rules**

Fed. R. Civ. P. 8 ........ 44

Fed. R. Civ. P. 9(b) ........ 43

Fed. R. Civ. P. 9(g) .......... 43

Fed. R. Civ. P. 12(b)(6) .......... 2, 9

Fed. R. Civ. P. 12(e) .......... 46

**Regulations**

15 C.F.R. § 791.4(a) .......... 29, 40

**Restatement Provisions**

Restatement (Second) of Torts § 571, cmt. c .......... 40

Restatement (Second) of Torts § 578 .......... 33

Restatement (Second) of Torts § 580B, cmt. g .......... 20

**Media Sources**

Marc Levy, *AI data centers took a beating in the midterm elections. A reckoning may be ahead for tech giants*, AP (Nov. 6, 2026), https://apnews.com/article/data-centers-artificial-intelligence-texas-tech-trump-63b33be8884d867d3ac831040d683a2c .......... 11

Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Chinese Entity and Officials Pursuant to Global Magnitsky Human Rights Accountability Act* (July 9, 2020), https://home.treasury.gov/news/press-releases/sm1055 .......... 40

Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Chinese Government Officials in Connection with Serious Human Rights Abuse in Xinjiang* (Mar. 22, 2021), https://home.treasury.gov/news/press-releases/jy0070 .......... 40

**Other Authorities**

Information, *United States v. Eileen Wang*, No. 2:26-cr-00186 (C.D. Cal. Apr. 1, 2026), Dkt. No. 1 .......... 39

Plea Agreement, *United States v. Yaoning Sun*, No. 2:24-cr-00777 (C.D. Cal. Oct. 3, 2025), Dkt. No. 26 .......... 39

Merriam-Webster, *Cell*, https://www.merriam-webster.com/dictionary/cell .......... 37

Merriam-Webster, *Proxy*, https://www.merriam-webster.com/dictionary/proxy .......... 37

## INTRODUCTION

On May 11, 2026, Utah residents Joshua Kanter and Gabrielle Finlayson received shocking news. Kevin O'Leary, a celebrity investor and a man whom neither Mr. Kanter nor Ms. Finlayson had ever met, had appeared on national television and accused them, and local organizations they founded, of being "cells" and "proxies" of the Chinese Communist Party ("CCP"). Neither Mr. Kanter, Ms. Finlayson, the Alliance for a Better Utah, Inc. ("ABU") (a nonprofit founded by Mr. Kanter) nor Elevate Strategies, LLC ("Elevate") (a political consulting firm founded by Ms. Finlayson) (together, "Plaintiffs") have ever had any ties to the Chinese government. But O'Leary nevertheless singled them out and began making false statements after he apparently identified ABU and Elevate as voices, among many thousands of other concerned Utahans, that had dared question the transparency and political process surrounding O'Leary's plan to build a wildly unpopular data center in their home state.

Unwittingly thrust into the national spotlight by deplorable accusations that instantly wreaked reputational havoc, Plaintiffs immediately made public statements explaining they were not, in fact, Chinese agents. O'Leary nevertheless uttered his lies at least ten times—five of them on Fox News Network, LLC ("Fox") programs, including the initial May 11 segment. These claims were disseminated to millions of viewers and followers. And O'Leary was unequivocal that the claims were not just his opinions, declaring there was "no question about it," that he had "irrefutable" proof, and that he was not "speculat[ing]." He added that he had already referred Plaintiffs to federal law enforcement and "contacts at the White House." Despite the inherent improbability of O'Leary's claims, his obvious bias, and Plaintiffs' efforts to set the record straight,

Fox repeatedly invited O'Leary on its shows to disseminate these falsehoods. Not once did it afford Plaintiffs the opportunity to defend themselves from these baseless attacks.

Only after Plaintiffs obtained counsel and sent Defendants a demand letter, thereby alerting them that litigation was imminent, did O'Leary and Fox issue a statement admitting they had "no evidence that the Alliance for a Better Utah, Elevate Strategies, Gabrielle Finlayson, . . . or Josh Kanter are funded by China or the Chinese Communist Party." This "apology" was far too little, too late: Defendants' malicious statements had already reached millions of people and Plaintiffs' hard-earned, sterling reputations were left in tatters.

Defendants' conduct is textbook defamation, the Complaint's allegations are more than sufficient to state a claim under Federal Rule of Civil Procedure 12(b)(6), and the motions to dismiss should be denied.

## FACTUAL BACKGROUND

In April 2026, O'Leary announced a plan to build a massive data center called "Stratos" in Box Elder County, Utah. Complaint, ¶¶1, 49 [hereinafter "Compl."], Dkt. No. 1. The plan was met with immediate backlash "from local Utahns calling for transparency around the impact the project would have on their community." Compl. ¶52. Rather than justify his project on the merits, O'Leary maliciously attacked those he perceived as opponents.

O'Leary and Fox defamed Plaintiffs for the first time on May 11. *See* Compl. ¶¶73-84. That day, O'Leary appeared on *Mornings with Maria*, a show hosted by Maria Bartiromo on the Fox Business channel, to discuss the backlash to his data center project. Compl. ¶73; *see also* Compl., Ex. 1. During this appearance, O'Leary explained that he and his "data scientists" had "dug in" to the "IP addresses" of those who were opposing his data center project on social media

and discovered "two [Chinese] cells inside of Utah." Fox's Mot. to Dismiss [hereinafter "Fox Mot."], Dkt. No. 39, Ex. 39-11, at 8:5-24; O'Leary's Mot. to Dismiss [hereinafter "O'Leary Mot."], Dkt. No. 41, Ex. 41-1, at 2.[1] He then identified the "cells" as ABU and Elevate, and called out Mr. Kanter and Ms. Finlayson by their full names. Fox Mot., Ex. 39-11, at 8:24-9:6; O'Leary Mot., Ex. 41-1, at 2. Ms. Bartiromo responded by amplifying these wild and false statements about Plaintiffs, explaining: "We've done stories on Neville Singham [another individual mentioned by O'Leary], and it's a U.S.-born tech entrepreneur, but he turned to be a political activist and has ties to the Communist Party of China. So, what you're suggesting here is that the CCP is trying to bust up plans for data center build-outs in the U.S." Fox Mot., Ex. 39-11, at 10:24-11:5; O'Leary Mot., Ex. 41-1, at 2. O'Leary finished by emphatically stating "[i]t's the CPP [sic] at work here. There's no question about it." Fox Mot., Ex. 39-11, at 11:16-17; O'Leary Mot., Ex. 41-1, at 3.

Plaintiffs were shocked to be thrust into the national spotlight, Compl. ¶3, not only because O'Leary's claims were outlandishly false but also because Plaintiffs were private figures who had only sporadically discussed the data center project's government approvals, if at all. Before O'Leary appeared on *Mornings with Maria*, Mr. Kanter had *never* publicly commented on the data center project. Compl. ¶58. Other Plaintiffs only discussed the project in relation to the topic of government transparency and accountability in the ordinary course of their work. Ms. Finlayson had only appeared in a single Elevate social media video discussing the data center project. Compl. ¶¶56, 59. Elevate had only posted about the data center project two other times on social media and published a Substack article which, among other things, "criticized several Utah politicians

[1] Plaintiffs attached videos of O'Leary's media appearances to the Complaint and quoted them extensively. For ease of reference, however, Plaintiffs cite to the transcripts of these appearances Defendants attached to their motions to dismiss.

for their role in fast-tracking O'Leary's data center project." Compl. ¶56. ABU's engagement was similarly limited to a few social media posts criticizing the lack of transparency surrounding the approval of the data center.[2] Compl. ¶¶53-54. It also initiated a petition calling for an ethics investigation into Utah Senate President J. Stuart Adams based on alleged conflicts of interest in his role as the chair of the Utah Military Installation Development Authority ("MIDA"), which had approved the data center project. Compl. ¶54-55.

After O'Leary's appearance on *Mornings with Maria*, Plaintiffs were forced to respond. ABU posted a statement on social media explaining that it is "a nonprofit that holds politicians accountable and advocates for progressive policies in Utah." Compl. ¶78. Elevate and Ms. Finlayson explained, via their Substack, that they did not have any "secret benefactor[s]" or receive funding from any "shadowy foreign government[s]." Compl. ¶¶79-80. Ms. Finlayson and others from Elevate also posted at least one video on YouTube and made other media appearances in which they denied O'Leary's claims that Elevate was a "cell" of the CCP. Compl. ¶¶81-82. These posts and statements remain publicly accessible and were widely shared when they first aired. Compl. ¶83. For his part, to date, Mr. Kanter has still never made any public comments about the data center project or O'Leary's accusations. Compl. ¶60.

Despite the forceful and public denials, O'Leary repeated his defamatory accusations *nine* more times and Fox aired the statements on *four* more occasions. On or about May 13, O'Leary

[2] Although the Court may take judicial notice of material incorporated by reference into the Complaint such as Plaintiffs' social media posts, to the extent Defendants attempt to incorporate information regarding the number of "likes" or views on these posts prior to May 11, that information is outside the scope of the Complaint and in any event not verifiable from the Exhibits attached to Fox's motion, which appear to comprise screenshots of the posts taken in August *after* this suit was filed.

appeared on *The Tucker Carlson Show* where he again stated that his team of "very good data scientists" had investigated IP addresses allegedly "spewing" misinformation about the data center project on social media. O'Leary Mot., Ex. 41-2, at 2-3. When Mr. Carlson tried to steer O'Leary back to legitimate policy questions about the data center, O'Leary told him that he did not "think" Mr. Carlson was grasping the "enormity of what's going on here." *Id.* at 3. O'Leary then explained that there were two "cells inside of Utah" working on behalf of the CCP: ABU and Elevate. *Id.*

On May 15, O'Leary went on the radio show *Cuomo Mornings* to repeat his allegations. Compl. ¶¶91-93; *see also* Compl., Ex. 3. This time he stated that he had "hired some forensic digital auditors, and [had] just got[ten] the[ir] report back." O'Leary Mot., Ex. 41-3, at 3. He continued: "There is something called, in Utah, the Alliance for a Better Utah, run by . . . Josh Kanter. So my team went back for the last 24 months and looked at every IRS filing, Form 990s, that would have funded this organization." *Id.* Based on the "report" from his "forensic digital auditors," O'Leary concluded "it's irrefutable . . . . [t]his thing in Utah is funded by the Chinese government." *Id.*

The next day, ABU again denied O'Leary's claims via a press release which stated that O'Leary's accusations were "baseless" and that "[t]he only foreign interest in this data center is Kevin from Canada." Compl. ¶94. However, that same day, O'Leary appeared on Fox News' *Saturday in America* hosted by Kayleigh McEnany. Compl. ¶¶95-101; *see also* Compl., Ex. 4. He again explained that his team had found an "organization in Utah [ABU] that was really, really pushing out misinformation into Box Elder County." Fox Mot., Ex. 39-12, at 4:21-23; O'Leary Mot., Ex. 41-4, at 2. So, O'Leary explained, he "launched an audit," "looked at all the IRS Form 990s," and found that the money was coming from China through "clandestine" means. Fox Mot.,

Ex. 39-12, at 5:2-12; O'Leary Mot., Ex. 41-4, at 2. He finished: "This is irrefutable. This is Form 990 from the IRS. . . . And I hope these people, . . . Josh Kanter, whoever they are who run this organization, they got a lot of explaining to do to their fellow citizens in Utah . . . [t]hey're supporting China." Fox Mot., Ex. 39-12, at 6:3-15; O'Leary Mot., 41-4, at 2.

Four days later, May 20, O'Leary appeared on Fox's *The Big Money Show*. Compl. ¶¶102-106; *see also* Compl., Ex. 5. He explained that he had hired "data scientists" and "some deep guys, very, very, very strong at scraping IP addresses" who found Chinese-linked entities posting "misinformation" about the data center project on social media. Fox Mot., Ex. 39-13, at 3:9, 4:6-13; O'Leary Mot., Ex. 41-5, at 2. Fox co-host Taylor Riggs interjected by explaining that she wanted to "echo" O'Leary's claims that opposition to data center projects was being funded by China. Fox Mot., Ex. 39-13, at 4:20; O'Leary Mot., Ex. 41-5, at 2. O'Leary then explained that he had reported Plaintiffs to the government because of their alleged links to China:

> [T]his is breaking some news here. I got a call yesterday from a special agent. . . . So, I said to the government, guys, let's form a team. . . . I will give you 90 pages of IP addresses that hit my social media. I know who they are because I hired my own guys, PhD guys that can do this stuff. . . . Now you have them . . . . So, let's shine the light of transparency on these people . . . . IRS 990 filings, just to the Alliance for a Better Utah. . . . What the hell are they taking Chinese money for? All proven, all through these nefarious entities. . . . My guys found this. I gave it to the government. Good luck, boys. Enjoy your new friends.

Fox Mot., Ex. 39-13, at 10:10-11:17; O'Leary Mot., Ex. 41-5, at 4. As O'Leary made these statements live on the Fox set, he waved a piece of paper depicting a flow chart with the alleged "proof" that Plaintiffs were taking money from China. Compl. ¶103. None of the Fox hosts questioned the legitimacy of O'Leary's "proof." Compl. ¶¶104-05.

That same afternoon, O'Leary appeared on Fox's *The Bottom Line* and repeated his accusations. Compl. ¶¶107-114; *see also* Compl., Ex. 6. He stated: "Alliance for a Better Utah,

where are they getting the money from? Bad places. This is all IRS filings . . . . I mean, there's some bad dudes doing this stuff . . . . I took my 90 pages of IP addresses from foreign countries and gave it to the government. They're having a heyday with it." Fox Mot., Ex. 39-14, at 8:7-9:6; O'Leary Mot., Ex. 41-6, at 3. And O'Leary again waved around the flow chart that supposedly proved his claims. Compl. ¶109.

On May 21, Plaintiffs, and others, again, refuted O'Leary's claims. In an article published that day a representative from ABU reiterated that the organization was "not beholden to China," did not "take directives from the Chinese government," and did not "work on behalf of the Chinese government." Compl. ¶113. In that same article, the Chief Executive Officer of one of O'Leary's companies publicly contradicted O'Leary, stating "[w]e are not asserting that any specific local organizer is acting on behalf of a foreign government, and we are not characterizing any individual . . . as a foreign agent." Compl. ¶112.

O'Leary, however, continued to make clear that he was, in fact, making those very accusations. On May 24, he returned to Fox, this time on *The Big Weekend Show*. Compl. ¶¶115-21; *see also* Compl., Ex. 7. He stated "[s]omething called Alliance for a Better Utah, run by . . . Josh Kanter, who is funding them? Arabella Ventures. How did I find that out? I put my auditors on top of them and look at the IRS filings, 990s. Foreign money going into Utah?" Fox Mot., Ex. 39-15, at 6:20-7:1; O'Leary Mot., Ex. 41-7, at 2-3. During this appearance, O'Leary also repeatedly stated that it was a "fact[]," Fox Mot., Ex. 39-15, at 7:8, 7:13; O'Leary Mot., Ex. 41-7, at 3, proven by "irrefutable" IRS filings, Fox Mot., Ex. 39-15, at 9:25-10:1; O'Leary Mot., Ex. 41-7, at 3, that Plaintiffs were receiving "foreign dark money," Fox Mot., Ex. 39-15, at 9:11; O'Leary

Mot., Ex. 41-7, at 3. And he again noted that he had reported Plaintiffs to the government for allegedly taking "this money." Fox Mot., Ex. 39-15, at 9:13-15; O'Leary Mot., Ex. 41-7, at 3.

After his May 24 appearance on *The Big Weekend Show*, O'Leary turned to other programs beyond Fox to air his false and malicious claims. On May 25, he gave an interview to an unidentified reporter or producer, which he then posted to his social media pages. Compl. ¶¶122-26; *see also* Compl., Ex. 8. When asked by the interviewer whether he was "suggesting" that Plaintiffs were taking funds from the CCP and using those funds to oppose his data center project, O'Leary declared: "I'm not suggesting it. It's an irrefutable fact. This is IRS 990 filings with the exact dollars and dates. From exactly where it came from. No, no not inf[erring] it. I'm saying that is exactly what's happening." O'Leary Mot., Ex. 41-8, at 2.

O'Leary aired his false and defamatory accusations on at least two more occasions. Compl. ¶¶127-135; *see also* Compl., Exs. 9, 10. First, he appeared on NBC News' *Top Story* and stated that "[t]here are some very bad people funding this misinformation . . . . I'm talking about money coming from nefarious foreigners by the hundreds of millions funding organizations within Utah, like the Alliance for a Better Utah." O'Leary Mot., Ex. 41-9, at 3-4. He added that he had "proven it with IRS filings" and "handed" the information "over to the government." *Id.* at 4. Second, he appeared on CNN's *The Lead with Jake Tapper* and again stated that an "audit" of IRS 990 filings showed "irrefutabl[y]" that Plaintiffs were funded by entities linked to China and that he had provided this information to the government. O'Leary Mot., Ex. 41-10, at 2-3.

Despite O'Leary's statements that he possessed "irrefutable" evidence that Plaintiffs were funded by China and the CCP, he *never* produced such evidence. Compl. ¶¶137-45. Instead, after Plaintiffs sent him and Fox a letter seeking, among other things, a retraction, O'Leary posted on

his social media accounts that he had "no evidence that the Alliance for a Better Utah, Elevate Strategies, Gabrielle Finlayson, . . . or Josh Kanter are funded by China or the Chinese Communist Party." Compl. ¶¶146-47. Multiple Fox hosts repeated O'Leary's admission, explaining, on air, that "Fox News Media is . . . aware of no evidence that" Plaintiffs were funded by China or the CCP. Compl. ¶148. Because Defendants' belated admissions were insufficient to remedy the damage to Plaintiffs' reputations, Plaintiffs filed the instant suit, alleging: (1) defamation on behalf of all Plaintiffs against O'Leary, and (2) defamation on behalf of ABU and Mr. Kanter against Fox.

## LEGAL STANDARD

In evaluating a motion to dismiss a defamation claim under Rule 12(b)(6), courts apply the well-worn federal pleading standards rather than any state-court heightened pleading standard. *See Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014) (applying federal pleading standards to defamation claim in federal court). That means the court must "accept as true all well-pleaded factual allegations in [the] complaint," "view these allegations in the light most favorable to the plaintiff," and determine whether the plaintiff has stated a claim for relief that is "plausible." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (cleaned up). It does not "weigh potential evidence." *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir.1991).

## ARGUMENT

Defendants' arguments for dismissal are meritless. *First*, the actual malice standard does not apply because Plaintiffs are private figures who need only prove negligence. *Second*, even if Plaintiffs are limited-purpose public figures, they have plausibly alleged that both Defendants acted with actual malice. *Third*, Plaintiffs have adequately alleged that Defendants' statements are capable of a defamatory meaning. *Fourth*, the Complaint plausibly alleges that the statements

constitute defamation *per se* and, even if not, Plaintiffs have plausibly alleged special damages. *Fifth*, Defendants' additional arguments are baseless: the Complaint adequately identifies the defamatory statements, all of the statements defamed each Plaintiff, and none of the statements were protected opinion. Thus, the Court should deny Defendants' motions to dismiss.

## I. THE ACTUAL MALICE STANDARD DOES NOT APPLY.

Plaintiffs need not prove actual malice because they were not public figures at the time of O'Leary's initial defamatory statement on May 11. Defendants do not suggest that Plaintiffs were general-purpose public figures. And a person is a limited-purpose public figure only when they "thrust themselves to the forefront of [a] particular public controvers[y] in order to influence the resolution of the issues involved." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). Plaintiffs did no such thing.

Under Utah law, "[t]he first step in analyzing whether a defamation plaintiff is a limited-purpose public figure . . . is to isolate the particular public controversy related to the defamation." *Wayment v. Clear Channel Broad., Inc.*, 116 P.3d 271, 282-83 (Utah 2005) (internal quotation marks omitted).[3] The Court "then examine[s] the nature and extent of the plaintiff's participation in that controversy in order to determine whether she has thrust herself to the forefront of the controversy in order to influence the resolution of the issues involved." *Id.* at 283 (cleaned up). The plaintiff must have "intentionally sought or attained a position of influence with respect to the

[3] Defendants assume that Utah law applies to the issues raised in their motions, so Plaintiffs do the same. However, Plaintiffs reserve the right to make choice of law arguments with respect to any other issues that may subsequently be raised during these proceedings. *See Diamond Ranch Acad., Inc. v. Filer*, 117 F. Supp. 3d 1313, 1322 (D. Utah 2015) (applying the doctrine of depecage "whereby the rules of different states are applied on the basis of the precise issue involved" (internal quotation marks omitted)).

particular controversy, and thus in some sense waived or rendered unnecessary the full protection afforded by state law." *Id.* And the plaintiff must have done so prior to the date on which the defamatory statements were first uttered. *See id.* at 281 (citing *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1295 n.19 (D.C. Cir. 1980)). Thus, here, only facts before May 11—when O'Leary first appeared on *Mornings with Maria*—are relevant to the public figure inquiry.

### A. The Relevant Controversy Is Foreign Interference With The Stratos Project, Not The General Concern Over Data Center Construction.

The definition of the "particular controversy" is crucial to the limited-purpose public figure inquiry. *Gertz*, 418 U.S. at 352. A public controversy is "not simply a matter of interest to the public," but a "real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Wayment*, 116 P.3d at 284 (cleaned up). "[P]ersons actually must have been discussing some specific question;" by contrast, discussion of a "general concern or interest will not suffice." *Id.* (quoting *Waldbaum*, 627 F.2d at 1297).

Defendants at times appear to erroneously define the controversy as the building of data centers. *See* Fox Mot. at 3, 8, 17; O'Leary Mot. at 12-13. That issue is certainly a topic of general concern: nearly fifty jurisdictions nationwide considered data center ballot questions in the November elections and the vast majority of Americans oppose data center construction in their communities. *See, e.g.*, Compl. ¶¶39.[4] But the limited-purpose public figure test requires far more specificity: "a public controversy is a concept distinct from a matter of public concern." *Wayment*, 116 P.3d at 284 (cleaned up).

[4] *See also* Marc Levy, *AI data centers took a beating in the midterm elections. A reckoning may be ahead for tech giants*, AP (Nov. 6, 2026), https://apnews.com/article/data-centers-artificial-intelligence-texas-tech-trump-63b33be8884d867d3ac831040d683a2c (attached as Exhibit A).

Defendants' focus on the public concern about data centers thus misses the mark. Given the centrality of concerns about data centers in today's civic life, it cannot be the case that anyone who has spoken at a town hall, written a letter to the editor, or posted on social media about the issue is now a public figure with lesser protections against defamation. The Supreme Court's decision in *Hutchinson v. Proxmire*, 443 U.S. 111, 135-36 (1979) is instructive. There, a United States Senator singled out a researcher who obtained federal funding for his published research, labeling the funding as wasteful government spending. The Court rejected the notion that the researcher was a limited-purpose public figure based on "concern about general public expenditures:" after all, "that concern is shared by most and relates to most public expenditures." *Id.* Recognizing that the strong medicine of the actual malice standard should not apply to otherwise private individuals whose profession or participation in civic life touches on an issue of public concern, the Court noted that the "use of such subject-matter classifications to determine the extent of constitutional protection afforded defamatory falsehoods may too often result in an improper balance between the competing interests in this area." *Id.* (quoting *Time, Inc. v. Firestone*, 424 U.S. 448, 456 (1976)).

Similarly, in *Wayment*, 116 P.3d at 284-85, the Utah Supreme Court confirmed that broad public concerns like "assisting children who were terminally-ill with cancer" and "news reporter conduct and media bias" were not relevant to the public figure inquiry in a suit brought by a health news reporter who claimed her employer published defamatory statements about the reasons for her resignation after she sought to secure philanthropic funding to support child cancer patients. The Court rejected the notion that public concerns like the topics of treatment of children with cancer and media bias could constitute the "particular controversy giving rise to the alleged

defamation in this case." *Id.* at 285 (noting reporter's prior article about the struggles of a child with cancer was insufficient to create a public controversy and make her a public figure).

Instead, the law requires more specificity. Courts should "reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation *in the particular controversy giving rise to the defamation*." *Gertz*, 418 U.S. at 352 (emphasis added). Here, the "particular controversy giving rise to the defamation" that O'Leary and Fox disseminated is not the general public concern about building data centers, the Stratos project, or even the lack of transparency surrounding the approval of the Stratos project. Rather, the controversy that gave rise to the defamation is whether opposition to the Stratos project was being funded by the Chinese government and aided by agents of the CCP. Indeed, at times, O'Leary appears to acknowledge this, arguing that the "statements at issue [in this suit] concern … who funds the Alliance." O'Leary Mot. at 15-16.

On that "specific question," *Wayment*, 116 P.3d at 284, there was no public controversy around foreign government interference with the data center prior to O'Leary's defamatory statements on May 11. Certainly, none of the Plaintiffs had ever participated in any such controversy. Thus, Defendants' limited-purpose public figure arguments fail at the threshold.

### B. Even If the Relevant Controversy Was Data Center Construction, Plaintiffs Are Not Public Figures On That Issue.

Even assuming arguendo that the construction of the Stratos data center constitutes a "public controversy," Plaintiffs did not "assume special prominence in the resolution of" the debate. *Wayment*, 116 P.3d at 280 (cleaned up). At most, some Plaintiffs engaged in limited instances of civic participation in calling for more accountability around government approvals of

the project. But such sporadic civic engagement is insufficient to render Plaintiffs public figures prior to May 11.

**ABU**, **Elevate, and Ms. Finlayson** had only posted about Stratos on social media a couple of times, each time focusing on the fast-tracking of government approvals and calling for more transparency and accountability by public officials. *See* Compl. ¶¶53-55, 56-57, 59. "[V]oluntary discussion of events . . . does not per se indicate that a defamation plaintiff has thrust herself to the forefront of a public controversy." *Wells v. Liddy*, 186 F.3d 505, 537 (4th Cir. 1999) (cleaned up). Instead, limited-purpose public figure status turns on sustained and intentional engagement with the media related to the public controversy. For example, in *Time, Inc. v. Firestone*, 424 U.S. at 454 n.3, the plaintiff "held a few press conferences," which was insufficient for the Supreme Court to deem an otherwise private individual a public figure. *See also Diamond Ranch Acad., Inc. v. Filer*, No. 2:14-CV-751, 2016 WL 633351, at *17 (D. Utah Feb. 17, 2016) (concluding that the plaintiff was not a limited-purpose public figure where its involvement in the public controversy consisted of "a relatively finite set of media coverage and other examples of public exposure").

By comparison, the Tenth Circuit found the plaintiff organization was a limited-purpose public figure in *World Wide Association of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1137 (10th Cir. 2006), because it had, among other things, "given dozens of interviews to media" and placed itself in the "national spotlight" through its marketing strategies. Similarly, in *SCO Group, Inc. v. Novell, Inc.*, 692 F. Supp. 2d 1287, 1296 (D. Utah 2010), the plaintiff "actively sought media coverage to air its position." In *Thomas M. Cooley Law School v. Kurzon Strauss, LLP*, 759 F.3d 522, 530-31 (6th Cir. 2014), the plaintiff "entered the public debate" by publicly responding to

certain issues, producing its own "report," and disseminating such messages via "its website, advertisements, recruiting materials, written publications, and [other] presentations."

Before May 11, ABU, Elevate, and Ms. Finlayson did not make any comments on the data center project or the role of foreign money in opposing it to the press, engage in interviews or other media appearances, or even seek out such appearances.[5] And even accepting Fox's characterization that one of ABU's social media posts urged Utahns to participate in public proceedings on the project, *see* Fox Mot. at 4, encouraging ordinary civic participation—focusing largely on government transparency and accountability—is a far cry from the sustained media campaigns at issue in the cases cited by Defendants.[6] Rather, like the plaintiff in *Firestone*, 418 U.S. at 345, there is little from which the Court could conclude that their engagement was intended to, or did, result in ABU, Elevate, or Ms. Finlayson obtaining "[]special prominence," with regard to the data center debate.

That their limited engagement was via social media also cuts against deeming ABU, Elevate, and Ms. Finlayson public figures. At least one court has "decline[d] to find that an otherwise private individual who makes statements on Twitter could thereby eliminate the heightened protections the law affords his or her reputation." *Flynn v. Cable News Network, Inc.*,

---

[5] Defendants at times point to events after May 11, when they first defamed Plaintiffs. *See* O'Leary Mot. at 15 (Ms. Finlayson's public statements after May 11); O'Leary Mot. at 14; Fox Mot. at 9 (ABU's June 3rd lawsuit regarding MIDA). But it is blackletter law that the inquiry must focus on facts and circumstances prior to the defamation. *See Wayment*, 116 P.3d at 281; *Hutchinson*, 443 U.S. at 135; *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 166 (1979) (plaintiff cannot be "dragged unwillingly into the controversy").

[6] ABU also called for an ethics investigation into Senate President Adams for accepting money from companies with business before the MIDA board, which Elevate endorsed. Compl. ¶¶55-56. This particular form of engagement on a specific state senator's conflicts of interest is even further attenuated from the data center issue.

No. 21 Civ. 2587, 2021 WL 6290046, at *11 (S.D.N.Y. Oct. 22, 2021), *report and recommendation adopted in part and rejected in part on other grounds*, 2021 WL 5964129 (S.D.N.Y. Dec. 16, 2021). "Moreover, even when courts consider a plaintiff's social media activity as a factor weighing towards limited-purpose public figure status, that social media activity is typically accompanied by other efforts by the plaintiff to insert itself into the debate." *Lewis v. Abramson*, No. 22-cv-126, 2026 WL 2110989, at *10 (D.N.H. July 22, 2026). For example, in *McCafferty v. Newsweek Media Group, Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020), the plaintiff engaged with the issues on social media *and* "news outlets both" in the United States and abroad had sought him out. *See also Nelsen v. S. Poverty Law Ctr.*, 513 F. Supp. 3d 1101, 1107-11 (W.D. Mo. 2021) (in addition to publicizing his views on "online platforms" the plaintiff also "gave 'hundreds' of press interviews to reporters from all over the world"). No such facts exist here.

Nor does ABU's status as a public advocacy organization, or Elevate's status as a political consultancy, mean that they are limited-purpose public figures with respect to every issue on which they comment, including the data center project. *See* O'Leary Mot. at 13-14; Fox Mot. at 9-10. The focus of the limited-purpose public figure inquiry is on "the . . . extent of the plaintiff's participation" rather than the plaintiff's status. *Wayment*, 116 P.3d at 283; *see also Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1162 (C.D. Cal. 1998) ("[W]hen called upon to make a determination of public figure status, courts should look for evidence of affirmative actions." (cleaned up)). Thus, "lobbyists" or "advocacy groups," Fox Mot. at 9, are limited-purpose public figures only when they do, in fact, voluntarily seek to influence a public controversy via their conduct. *See, e.g.*, *Rent Stabilization Ass'n of N.Y.C., Inc. v. McKee*, 236 A.D.3d 413, 413-14 (N.Y. App. Div. 2025) (real estate trade association was a limited-purpose public figure "in the field of

rent regulation and landlord-tenant legislation" where the group lobbied for change with respect to these issues, its president wrote articles and participated in interviews and it sought media attention); *Southbark, Inc. v. Mobile Cnty. Comm'n*, 974 F. Supp. 2d 1372, 1382 (S.D. Ala. 2013) (advocacy organization had frequently and publicly complained about issues related to the public controversy, solicited members of the public to get involved, and been approached by local media). ABU and Elevate did not do so.

**Mr. Kanter** is a private figure because, like the plaintiff in *Gertz*, 418 U.S. at 352, he has "never discussed" the data center "with the press and was never quoted as having done so." *See also Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 167 (1979) (noting as relevant the fact that "petitioner never discussed this matter with the press"); *Shanley v. Hutchings*, 716 F. Supp. 3d 1179, 1191 (D. Utah 2024) (plaintiff was not a public figure where "nothing in the record before the court suggest[ed] that [the plaintiff] *voluntarily* injected herself into" a public controversy (emphasis added)); *Wayment*, 116 P.3d at 285 (plaintiff was not a public figure where "nothing in the record even hint[ed] that" the plaintiff sought to engage in the public controversy).

Contrary to Defendants' arguments, Mr. Kanter's affiliation with ABU is insufficient to render him a limited-purpose public figure.[7] *See* O'Leary Mot. at 15-16; Fox Mot. at 10-11. First, ABU is itself not a limited-purpose public figure for the reasons explained above. Second, even if it was, Mr. Kanter's status as a member of ABU's board is insufficient to impute ABU's status to him. Mr. Kanter "no longer has any public facing role with" ABU. Compl. ¶58. And there is

[7] The same is true for Ms. Finlayson's affiliation with Elevate. The only difference between her and Mr. Kanter is that prior to May 11, Ms. Finlayson appeared in one social media video on Elevate's page discussing the lack of government accountability with respect to the project. *See* Compl. ¶56.

nothing to indicate that he played any part in ABU's limited engagement with the data center project prior to May 11. For example, the Complaint lacks any allegation that Mr. Kanter was "solely in charge of the company's activities" or that he "directed . . . and managed" ABU's statements regarding the data center. *Carr v. Forbes, Inc.*, 259 F.3d 273, 280-81 (4th Cir. 2001).

Indeed, simply "[b]eing an executive within a prominent and influential company does not by itself make [an individual] a public figure." *Waldbaum*, 627 F.2d at 1299. Instead, courts look to the executive's conduct and specific role regarding the controversy. *See id.* at 1299-1300 (holding corporate official was public figure not because of his corporate relationship but because he "became an activist" (internal quotation marks omitted)).[8] Defendants' own cases confirm this point. In *Trotter v. Jack Anderson Enterprises, Inc.*, 818 F.2d 431, 435 (5th Cir. 1987), for example, the plaintiff had "primary responsibility for [the] general overall policy" of his organization, and "undertook important efforts to influence the resolution" of the public controversy.

And in Fox's other cited cases, the plaintiffs had "attained a position of influence with respect to the particular controversy," *Wayment*, 116 P.3d at 283, precisely because the public controversy directly involved the plaintiff, their voluntary conduct, or their employment. *See Davidson v. Baird*, 438 P.3d 928, 940-41 (Utah Ct. App. 2019) (plaintiff company and its co-founder were public figures for purposes of public controversy surrounding their receipt of government funds); *Fiacco v. Sigma Alpha Epsilon Fraternity*, 484 F. Supp. 2d 158, 172 (D. Me.

[8] *See also Mason v. Am. Prospect, Inc.*, No. 23-cv-2238, 2024 WL 4345855, at *14 (D.D.C. Sept. 30, 2024) (plaintiff was a public figure because she "took on a public role over and above that of a typical executive" by "participat[ing] in public forums and networking events," leading "two large conferences, receiv[ing] an industry award," and otherwise becoming "the subject of other press coverage" (cleaned up)); *Espinoza v. Hewlett-Packard Co.*, No. 6000-VCP, 2011 WL 941464, at *11 (Del. Ch. Mar. 17, 2011) (individual was unlikely to be considered a public figure where he did not "engage[] in additional activities similar to those described in . . . *Waldbaum*").

2007) (public controversy existed regarding the student-disciplinary process, which the plaintiff oversaw); *Little v. Breland*, 93 F.3d 755, 758 (11th Cir. 1996) (controversy regarding plaintiff's own departure from nonprofit and his efforts to seek out press); *Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072, 1084-87 (3d Cir. 1985) (plaintiff's criminal conduct); *Freedlander v. Edens Broad., Inc.*, 734 F. Supp. 221, 230 (E.D. Va. 1990) (plaintiff's allegedly criminal business dealings "created" the public controversy); *Stolz v. KSFM 102 FM*, 30 Cal. App. 4th 195, 206-07 (Cal. Ct. App. 1994) (owner and operator of radio station was public figure on "matters directly related to the operation and management of his radio station"). On the other hand, here, Mr. Kanter did not create any public controversy related to the data center project and, prior to May 11, that public controversy did not in any way implicate Mr. Kanter's conduct, his role at ABU, or even ABU's operations at all.

Finally, concluding that Mr. Kanter's position at ABU is sufficient to make him a limited-purpose public figure with respect to *any* public controversy on which ABU foreseeably might comment, Fox Mot. at 10-11, would impermissibly expand the limited purpose public figure category. The Supreme Court has explained that "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Wolston*, 443 U.S. at 167. Because Mr. Kanter has done nothing to "thrust" himself to "the forefront of [a] particular public controvers[y]," *Gertz*, 418 U.S. at 345, he remains a private figure.

## II. PLAINTIFFS HAVE PLAUSIBLY ALLEGED BOTH NEGLIGENCE AND ACTUAL MALICE.

Because Plaintiffs are private figures, they need only allege that Defendants acted negligently. *Seegmiller v. KSL, Inc.*, 626 P.2d 968, 973 (Utah 1981); *Wayment*, 116 P.3d at 283

n.13. But Plaintiffs' allegations, which clearly amount to negligence, also plausibly establish that Defendants acted with actual malice.

**A. Plaintiffs Have Plausibly Alleged Negligence.**

Under the negligence standard, a defamation defendant must act with "due care," or in other words, "act as [a] reasonably prudent person . . . would act to ascertain the truth." *Seegmiller*, 626 P.2d at 974. "Putting the question in terms of conduct is to ask whether the defendant acted reasonably in checking on the truth or falsity or defamatory character of the communication before publishing it." *Id.* at 976 (quoting Restatement (Second) of Torts § 580B, cmt. g).

Here, both Defendants acted negligently. To start, O'Leary's conduct plainly fell below what a reasonably prudent person would do to assess the truth of his allegations. On *ten* different occasions, O'Leary accused Plaintiffs of committing serious federal crimes because they purportedly obtained funding from China and were acting as Chinese agents, *see generally* Compl. ¶¶73-136, Exs. 1-10, only to later admit, in a blatant about face, that he had "no evidence" supporting his allegations whatsoever, Compl. ¶147. A reasonable person would not make such baseless allegations once—let alone on ten different occasions on national television outlets and social media platforms—"without first confirming the truth of the statement[s]." *Shanley*, 716 F. Supp. 3d at 1196.

Moreover, even if O'Leary believed the statements to be true or had information that suggested they might be true (which he later admitted he did not), "a reasonable person would have taken steps to confirm the veracity of" such supporting information "before repeating, expanding, and professing" the accusations on numerous occasions. *Id.* at 1196-97. But O'Leary never sought to confirm the veracity of his information. Instead, he only admitted his "evidence"

did not exist *after* Plaintiffs threatened legal action and he was facing substantial financial exposure for his unlawful conduct. Compl. ¶¶146-47. That is textbook negligent behavior.

Fox similarly failed to act with due care. A media defendant like Fox is "held to the skill and experience normally possessed by members of that profession." *Seegmiller*, 626 P.2d at 976 (cleaned up). Here, Plaintiffs have plausibly alleged that Fox failed to adhere to "[c]ustoms and practice[s]" within the media profession because it apparently failed to perform any investigation into O'Leary's claims. *Id.* It failed to ascertain the basis for O'Leary's comments during any of his appearances, including those in which O'Leary waved around hard copies of his purported evidence on Fox's set. Compl. ¶165. It also did not contact Plaintiffs to confirm or deny the allegations, even after Plaintiffs, and others, publicly refuted the comments. Compl. ¶164. Instead, Fox's anchors uncritically accepted O'Leary's statements and affirmed his accusations. *See infra* at 33-36 (discussing Fox's statements affirming O'Leary's claims). Any minimal investigation would have revealed that the accusations were false—as Fox itself conceded once it was forced to reckon with them. Compl. ¶148. Fox was therefore negligent.

**B. Plaintiffs Have Plausibly Alleged Actual Malice.**

Though not required, Plaintiffs have also established that Defendants acted with actual malice. A plaintiff may plausibly allege actual malice by alleging that the defendant had "actual knowledge that" the statement was "false" or acted "with reckless disregard of whether" it "was false or not." *Revell v. Hoffman*, 309 F.3d 1228, 1233 (10th Cir. 2002) (cleaned up). Reckless disregard exists when "the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). While "[a]ctual malice is a subjective standard that requires proof of a mental element," *Talley v. Time, Inc.*, 923 F.3d 878,

895 (10th Cir. 2019) (cleaned up), it may be alleged and proven using circumstantial evidence, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989). A court may find actual malice where, for example, "a story is fabricated," it "is the product of [the publisher's] imagination," the "allegations are . . . inherently improbable," "there are obvious reasons to doubt" the truth of the information, *St. Amant*, 390 U.S. at 732, or the publisher "purposeful[l]y avoid[s] . . . the truth," *Harte-Hanks*, 491 U.S. at 692.

### 1. O'Leary Acted With Actual Malice.

O'Leary acted with actual malice because his statements were complete "fabric[ations]" or "product[s] of . . . [his] imagination" and were "so inherently improbable that only a reckless man would have put them in circulation." *St. Amant*, 390 U.S. at 732. Although O'Leary repeatedly told his audience that he had analyses, evidence, and proof underlying his claims, such evidence was apparently nonexistent. O'Leary claimed his team of "data scientists" had "dug in" to IP addresses. Fox Mot., Ex. 39-11, at 8:5-12; O'Leary Mot., Ex. 41-1, at 2. He then touted these data scientists as "one of the best teams privately" and that "[y]ou can make the assumption they once worked" for various government agencies. O'Leary Mot., Ex. 41-2, at 3. In subsequent appearances, O'Leary referenced IRS Form 990s which, apparently, provided "irrefutable" evidence for, and had "proven," his claims.[9] He also claimed he had "the exact dollars and dates" showing Plaintiffs were taking funds from the CCP. O'Leary Mot., Ex. 41-8, at 2.

But none of this evidence existed or supported O'Leary's claims. O'Leary acknowledged on June 10 that he did not "know who [was] doing this." Compl. ¶146. Then, he outright admitted

[9] Fox Mot., Ex. 39-12, at 6:3-6, Ex. 39-13, at 11:8-12, Ex. 39-15, at 6:24-7:1, 9:25-10:1; O'Leary Mot., Ex. 41-3, at 3, Ex. 41-4, at 2, Ex. 41-5, at 4, Ex. 41-7, at 3, Ex. 41-8, at 2, Ex. 41-10, at 2, 3.

that he had "no evidence" that Plaintiffs were funded by China or the CCP. Compl. ¶147. These subsequent admissions are probative of actual malice because there is nothing to suggest that O'Leary somehow received new information between his defamatory statements and June 10 that invalidated his prior "data" and "irrefutable" evidence. Thus, the about face shows O'Leary's claims were fabricated. Indeed, the Complaint alleges that O'Leary's purported "evidence" never provided any support for his defamatory claims: the Form 990s, for example, did not "reference China or even suggest that [Plaintiffs were] funded by China or Chinese interests" and his "investigative report" contains no such evidence either. Compl. ¶¶139-141. And fabricating a claim without any evidence is a quintessential example of actual malice. *See, e.g.*, *Hildebrandt v. Meredith Corp.*, 63 F. Supp. 3d 732, 746 (E.D. Mich. 2014) ("Fabricating a story is evidence of actual malice.").

Courts routinely find actual malice in analogous situations. For example, in *U.S. Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 60 (D.D.C. 2021), the defendant relied on evidence "that she . . . never produced." From this fact, the court explained, "a reasonable juror could conclude that" the defendant had not produced the evidence "because she doesn't have it." *Id.* Similarly, in *Combs v. Burgess*, No. 25-cv-650, 2026 WL 2620459, at *12 (S.D.N.Y. Sept. 4, 2026), the court found the plaintiff had alleged actual malice where the defendant "repeatedly professed personal knowledge of evidence that did not exist," including police reports, videos, and other independent research. *See also Biden v. Byrne*, No. 2:23-cv-09430, 2025 WL 2427835, at *7 (C.D. Cal. July 18, 2025) (reasonable jury could find that the defendant's story was not true, which would "constitute clear evidence of actual malice," in part because the defendant failed "to produce credible supporting evidence").

**2. Fox Acted With Actual Malice.**

Plaintiffs have also plausibly alleged that Fox acted with actual malice in publishing O'Leary's fabricated claims. First, there were "obvious reasons to doubt" O'Leary's "veracity" and the "accuracy of his" information. *St. Amant*, 390 U.S. at 732. For one, Fox knew that O'Leary had a clear motive and bias in attempting to discredit those he believed opposed the data center given his financial stake in the project. *See, e.g.*, *Houlahan v. World Wide Ass'n of Specialty Progs. & Schs.*, No. 04-cv-01161, 2006 WL 2844190, at *6-7 (D.D.C. Sept. 29, 2006) (genuine issue of material fact as to actual malice where the defendants relied on a "biased source").[10] What's more, Plaintiffs repeatedly denied O'Leary's claims after they initially aired and their denials were "widely shared." Compl. ¶¶78-83, 94. Others, such as O'Leary's business partner, Compl. ¶112, similarly disavowed his statements. Thus, it is plausible that Fox was aware of these counterpoints but proceeded only to air O'Leary's biased perspective. *See Gilmore v. Jones*, 370 F. Supp. 3d 630, 680 (W.D. Va. 2019) (failure to reach out to the plaintiff for comment and verify the veracity of a police officer's account supported plausible inference of actual malice).

Even further, O'Leary's allegation that the Chinese government was providing millions of dollars to local citizens in Utah through nefarious entities and corporate structures were so inherently "incredible and sensational" that it is plausible that Fox "recognized their improbability but published them anyway." *Goldfarb v. Channel One Russia*, 663 F. Supp. 3d 280, 311 (S.D.N.Y. 2023). In *Powell*, 554 F. Supp. 3d at 63, for example, the court found that "a reasonable juror could conclude that the existence of a vast international conspiracy that is ignored by the

[10] Obviously, O'Leary's bias is another reason to find that he acted with actual malice. *See Harte-Hanks*, 491 U.S. at 668 (evidence of ulterior motive can support a finding of actual malice).

government but proven by a spreadsheet on an internet blog is so inherently improbable that only a reckless man would believe it."

The same is true for O'Leary's allegations that ordinary Utahns with sterling reputations for good government were actually secretly acting as proxies for the CCP. Indeed, Fox itself apparently recognized the inherent improbability of O'Leary's claims. Only days after O'Leary's final appearance on Fox, a Fox Business correspondent twice told viewers that Fox had no "independent verification" for O'Leary's claims, and another pundit conceded that he did not have "any evidence for" the notion of "the Chinese infiltrating" opposition to data center projects in the United States. Compl. ¶¶161-63.

This case is, therefore, akin to *Gilmore*, 370 F. Supp. 3d at 680, where the court concluded the plaintiff had plausibly alleged actual malice because the defendants had published "unverified" and inherently improbable claims that the plaintiff was an actor in a deep state plot to stage the Charlottesville Unite the Right rally. Even worse, here, the very same Fox hosts and shows that uncritically aired O'Leary's false accusations had previously run segments about a far more obvious explanation for the opposition to Stratos: nearly universal public opposition to data center construction. *See* Compl. ¶¶41-48, 153-58. Like *Gilmore*, these facts raise a "plausible inference" that Fox knew O'Leary's claims were "either false or inherently improbable" and acted with actual malice by publishing them anyway. 370 F. Supp. 3d at 680 (cleaned up).

Fox also purposely avoided the truth. *Harte-Hanks*, 491 U.S. at 692. True, mere failure to investigate does not constitute actual malice where nothing prompts the defendant to doubt the information it is publishing. But where, as here, a defendant has "obvious reasons to doubt the veracity" of the information, *St. Amant*, 390 U.S. at 732, declining to ensure the information's

accuracy is not mere negligence, but "purposeful avoidance of the truth," which is a "different category," *Harte-Hanks*, 491 U.S. at 691-93 (newspaper-defendant acted with actual malice when it was faced with obvious reasons to doubt the truth of the information but still never reviewed certain pieces of evidence or otherwise verified the claims); *see also Lohrenz v. Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir. 2003) ("[O]nce the publisher has obvious reasons to doubt the accuracy of a story, the publisher must act reasonably in dispelling those doubts.").

Indeed, investigating O'Leary's claims would have taken minimal effort. Fox could have contacted Plaintiffs. Compl. ¶164. It could have asked O'Leary about the "data scientists" he identified. Compl. ¶73. It could have asked to review his "evidence," including the document he waved around *on Fox's set* on multiple occasions. Compl. ¶¶103, 109. It could have used its internal mechanism, the "Brain Room," to independently fact-check O'Leary's claims. Compl. ¶166. Assuming arguendo that Fox did not act with knowledge of the falsity of the claims, it nonetheless chose not to take any of these obvious steps. Instead, Fox invited O'Leary back onto its shows repeatedly, apparently without any concern for the absurd claims he was making. From these facts, it is plausible that Fox made "a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of O'Leary's claims. *Harte-Hanks*, 491 U.S. at 692.

Fox's remaining arguments with respect to actual malice fail. Plaintiffs have alleged sufficient facts to "bring home" Fox's state of mind to specific hosts, producers, and employees. *See* Fox Mot. at 16. The Complaint alleges that show hosts, production teams, and even senior editorial leadership at Fox make content and booking decisions, thereby indicating that a myriad of individuals were involved in, and aware of, the decision to book O'Leary and the content of his appearances. Compl. ¶¶167, 171-72. The Complaint also plausibly alleges that specific hosts and

production employees acted with actual malice in publishing O'Leary's statements. For example, with respect to Maria Bartiromo, the Complaint identifies information disclosed in past litigation indicating that Ms. Bartiromo has prior knowledge regarding her guests' statements and has, in at least one instance, aired guest claims that she knew were unreliable and false. Compl. ¶¶168-69.

The Complaint also alleges that certain shows on which O'Leary appeared had previously aired segments on local opposition to data center projects. *See* Compl. ¶¶41-48. For instance, on December 3, 2025, only months before O'Leary's statements, Ms. Bartiromo's show aired a segment that noted "concern[s] from the locals" regarding data centers. Compl. ¶154. Multiple times in 2025, Fox host Dagen McDowell discussed the legitimate local concerns about data centers. *See* Compl. ¶¶41, 44, 47, 155. And, just the day before Ms. McDowell and her co-host Brian Brenberg had O'Leary on *The Bottom Line* to level his false accusations, Ms. McDowell noted on Fox that she believed "a lot of the opposition" to data centers was "grassroots." Compl. ¶156. The prior coverage of the data center controversy indicates that the Fox hosts and producers of these shows knew that data opposition was local and grassroots and that there were "obvious reasons to doubt" accusations suggesting otherwise. *St. Amant*, 390 U.S. at 732. These hosts' and producers' decision to continually platform O'Leary despite this knowledge is sufficient to plausibly allege that they acted with actual malice.

Finally, Fox weakly contends that its hosts could not have been expected to recognize "in the moment" on "live television" that O'Leary's "unscripted" comments were false. Fox Mot. at 13-14. For one, this argument is facially invalid as to the four segments that aired days and weeks after O'Leary's initial May 11 appearance. For another, the analysis above shows that Fox acted

with actual malice on May 11 given the inherently improbable claims, O'Leary's obvious bias, and Fox and Ms. Bartiromo's refusal to check basic facts.

## III. THE STATEMENTS WERE DEFAMATORY.

O'Leary's statements were capable of a defamatory meaning and, contrary to Defendants' arguments, a reasonable audience member would not have viewed them as exaggeration or hyperbole. And the defamatory meaning of the statements is "attributable" to both Defendants.

### A. The Statements Are Capable Of A Defamatory Meaning.

The Complaint amply alleges that the statements in question are capable of a defamatory meaning. "To be defamatory under Utah law, a communication must impeach an individual's honesty, integrity, virtue, or reputation . . . or expose him or her to public hatred, contempt, or ridicule." *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988). "[W]hat may be considered defamatory" is "rather broad" and "the guiding principle is the statement's tendency to injure a reputation in the eyes of" at least "a substantial and respectable minority of its audience." *West v. Thomson Newspapers*, 872 P.2d 999, 1008-09 (Utah 1994). At the motion to dismiss posture, a court must examine the statement as well as "the context in which the statement was made, giving the words their most common and accepted meaning." *Id.* at 1009. "[I]f the court concludes that a reasonable person could find that a statement conveys a defamatory meaning, the plaintiff has done what she needs to do at the pleading stage." *Mathews v. McCown*, 575 P.3d 1114, 1127 (Utah 2025).

Defendants do not dispute that the allegations that Plaintiffs were funded by and agents of the China and the CCP posed a risk of impugning their reputations and subjecting them to public hatred, contempt, and ridicule. Statements that associate a plaintiff with a foreign government are capable of defamatory meaning when the "tie" to the foreign political regime "is sufficiently

odious, infamous, or ridiculous." *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1091 (D.C. Cir. 2007). Accusing Plaintiffs—a nonprofit organization, a political consulting firm, and their founders—of being agents of a foreign government that has been deemed a foreign adversary, *see* 15 C.F.R. § 791.4(a), certainly impugns their "honesty, integrity, virtue, or reputation" and risks exposing them to "public hatred, contempt, or ridicule." *Cox*, 761 P.2d at 561.

Unable to dispute that the statements were incredibly damaging, Defendants instead insist they were exaggeration or hyperbole such that no reasonable audience would have believed them. O'Leary Mot. at 24-29; Fox Mot. at 17-22. But that defense is impossible to square with the fact that listeners—including prominent leaders in Utah—*did* believe the claims. *See Tah v. Global Witness Publ'g, Inc.*, 413 F. Supp. 3d 1, 10-12 (D.D.C. 2019) (the "most compelling" evidence that a report "could reasonably be read to suggest bribery" was that members of the audience "*actually* understood [it] that way" (emphasis in original)); *Gaprindashvili v. Netflix, Inc.*, No. 2:21-cv-07408, 2022 WL 363537, at *7 (C.D. Cal. Jan. 27, 2022) (evidence that "viewers did in fact attribute a defamatory meaning" to statements "supports how a 'reasonable' viewer might have understood" them). For example, on June 6, Todd Weiler, a lawyer and long-time legislator who was the Utah State Senate Parliamentarian at the time, posted on X: "You can hate Kevin O'Leary, Stratus, and the data center – but still ask yourself why alliance for a better Utah is being partially funded with Chinese money." Compl. ¶182. After Defendants issued their apologies, Weiler acknowledged, "Oops. I was duped. Sorry everyone." *Id.*

He was not the only one. On May 17, Utah State Representatives Candice Pierucci and Kristen Chevrier reposted a social media image of O'Leary and Ms. Finlayson with an overlay of text that read "KEVIN O'LEARY CLAIMS UTAH GROUP WORKS FOR CHINA." Compl.

¶183. In the caption, the post asked "[w]here's the media on this," stated "[t]ransparency goes both ways," and made further baseless connections between Ms. Finlayson, her family, and the Chinese government. *Id.* And United States Senator Mike Lee reposted a clip of O'Leary lodging his defamatory accusations, adding a series of tweets outlining O'Leary's alleged evidence. Compl. ¶184.

Listeners were primed to take the defamatory statements seriously because neither the plain language nor the context of O'Leary's statements included any "signals that would lead a reasonable [audience] to not take the statements at face value." *Mathews*, 575 P.3d at 1133. Indeed, throughout his appearances, O'Leary "conveyed more serious, matter-of-fact tones." *Id.* And he barely "hedged" or "couched" his statements. *Coomer v. Donald J. Trump for President, Inc.*, 552 P.3d 562, 589 (Colo. App. 2024). Instead, O'Leary purported to rely on documentary evidence.[11] As the Utah Supreme Court explained just last year, when defendants make "statements as if they were settled facts" and "cite[] the[ir] factual basis," their statements are actionable. *Mathews*, 575 P.3d at 1136-38;[12] *see also Bentley v. Bunton*, 94 S.W.3d 561, 583 (Tex. 2002) (holding statements were actionable where defendant "plainly and repeatedly stated that his accusations . . . were based on actual fact"); *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 155-56 (N.Y.

[11] *See* Fox Mot., Ex. 39-11, at 8:1-10:15, Ex. 39-12, at 5:8-21, 6:3-6, Ex. 39-13, at 10:9-11:17, Ex. 39-14, at 8:3-13, Ex. 39-15, at 6:14-7:1; O'Leary Mot., Ex. 41-1, at 2-3, Ex. 41-2, at 2-3, Ex. 41-3, at 3, Ex. 41-4, at 2, Ex. 41-5, at 4, Ex. 41-6, at 3, Ex. 41-7, at 2-3, Ex. 41-8, at 2, Ex. 41-9, at 3-4, Ex. 41-10, at 2-3; Compl. ¶¶103, 109, 124, 133 (waving around paper with purported evidence).

[12] The cited portions of *Mathews* appear in the court's discussion of whether the defendants' statements were constitutionally-protected opinion. But, as the Tenth Circuit recently explained, the inquiry as to whether a statement is an opinion "partial[ly] overlaps" with the defamatory meaning analysis. *Lichfield v. Kubler*, 183 F.4th 1248, 1264 n.6 (10th Cir. 2026). And the surrounding context of the *Mathews* court's analysis makes clear it was discussing factors that could be relevant to both inquiries. *See Mathews*, 575 P.3d at 1135-36.

1993) (holding a defamatory assertion could not "be treated as a mere rhetorical flourish" where it was made "after what purported to be a thorough investigation"). Like each of these cases, O'Leary continually asserted, in multiple appearances spanning several weeks, that his accusations were based on objectifiable evidence and, therefore, "encouraged the [audience] to be less skeptical and more willing to conclude that [the statements] stated or implied facts." *Gross*, 82 N.Y.2d at 156 (cleaned up). Importantly, no one at Fox challenged O'Leary's assertions either, making it all the more likely a viewer would take the accusations at face value. *See infra* at 33-36 (discussing Fox's statements legitimizing O'Leary's accusations); *U.S. Dominion, Inc. v. Fox News Network, LLC*, No. N21C-03-257 EMD, 2021 WL 5984265, at *27 (Del. Super. Ct. Dec. 16, 2021) (plaintiff adequately alleged statements of fact, rather than opinion, where the defendant's "personnel repeatedly framed the issue as one of truth-seeking").

Defendants also harp on the notion that the statements were made in the context of the public debate about the data center project, Fox Mot. at 19-21; O'Leary Mot. at 25-28, but that does not save them. The *Mathews* court unequivocally rejected the notion that "speech related to a matter of public concern, made within the context of a public debate, can *never* be capable of defamatory meaning." 575 P.3d at 1130 (emphasis in original). And the facts here—O'Leary's unambiguous language, Fox's failure to question him (and at times legitimizing him), and the observed effect the statements had on actual listeners—make plain that Defendants cannot shroud themselves in the cloak of public debate. *Powell* is again instructive: there, the defendant argued that her statements were not actionable because "they concern[ed] the 2020 presidential election, which was both bitter and controversial." 554 F. Supp. 3d at 57. The court held, however, that it was "not a close call;" the defendant's statements were actionable in part because she had

repeatedly asserted that she was able to produce evidence to support her claims regarding rigged voting machines. *Id.* at 57-58.

O'Leary's citation to *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174 (S.D.N.Y. 2020) is also inapposite. O'Leary Mot. at 28-29. First, the allegedly defamatory statements in *McDougal* accused the plaintiff of extortion, which, the court explained, is "almost always construed as nonactionable" hyperbole unless "accompanied by additional specifics of the actions purportedly constituting the crime." *Id.* at 182-83. But O'Leary's allegations were not oft-bandied invectives like accusations of "extortion;" he accused Plaintiffs of being "cells" and "proxies" for the CCP. His statements also would meet *McDougal*'s call for "additional specifics" because O'Leary purported to have proof of Plaintiffs' alleged crimes in the form of IRS Form 990 filings and findings by a team of data scientists.

Second, the *McDougal* court concluded that reasonable viewers would likely view statements made by then-Fox host Tucker Carlson on his cable show as "nonactionable hyperbole" because the "general tenor of the show" was to "challenge political correctness and media bias" and, therefore, "viewers arrive[d]" to the show "with an appropriate amount of skepticism about the statements" made by Mr. Carlson. *Id.* at 183 (cleaned up). To be clear, *McDougal* was not suggesting all appearances on cable news generally militate the same conclusion, and such a conclusion is inapt here. *See U.S. Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1061-62 (Del. Super. Ct. 2023) (rejecting argument that statements made by Fox hosts on its opinion shows could not support defamation claim). After all, O'Leary does not identify any allegations in the Complaint indicating that the tenor of any of the shows on which he appeared was such that reasonable audiences should have known he was not presenting facts. *See Coomer*

*v. Make Your Life Epic LLC*, 780 F. Supp. 3d 1129, 1148 n.6 (D. Colo. 2025) (distinguishing *McDougal* on similar grounds). Fox has not suggested that either.[13] And the fact that five *different* Fox shows platformed O'Leary's statements over the course of several weeks also defeats any suggestion that *McDougal* applies.

**B. The Defamatory Meaning Is Attributable To Fox.**

Fox is wrong that the defamatory meaning of O'Leary's statements is not "attributable" to Fox. Fox Mot. at 21-22. The default rule is that a republisher, such as a broadcast network publishing a guest's statements, "is subject to liability, as if [it] had originally published" the statement. Restatement (Second) of Torts § 578. For example, in a recent case involving Fox News, a New York court explained that Fox News could be liable because it "allowed allegedly defamatory statements . . . to be repeated on its network." *Smartmatic USA Corp. v. Fox Corp.*, No. 151136/2021, 2022 WL 685407, at *22 (N.Y. Sup. Ct. Mar. 8, 2022), *modified on other grounds by* 213 A.D.3d 512 (N.Y. App. Div. 2023).

Fox argues the default rule should not apply here because it simply "present[ed] newsworthy allegations . . . with appropriate qualifying language." Fox Mot. at 19 (quoting *Croce v. N.Y. Times Co.*, 930 F.3d 787, 791, 795 (6th Cir. 2019)). To the extent that Fox is invoking the neutral reporting privilege (which it does not do so explicitly), the Supreme Court has never adopted that affirmative defense, which asserts that "the First Amendment protects the accurate and disinterested reporting of [serious] charges, regardless of the reporter's private views regarding

[13] Indeed, O'Leary's position that "[c]able news" is akin to "political opinion programming" subject to "exaggeration," O'Leary Mot. at 1, 3, 28-29, seems to contradict Fox's position that its programs at issue are "news" and neutral "coverage of [an] ongoing controversy," Fox Mot. at 1, 17, 20.

their validity." *Edwards v. Nat'l Audobon Soc'y, Inc.*, 556 F.2d 113, 120 (2d Cir. 1977). Indeed, courts have questioned the viability of the neutral reporting privilege because it creates an almost freestanding exemption to defamation liability merely because certain reports are "newsworthy." Such an exemption conflicts with Supreme Court decisions, like *Gertz*, 418 U.S. at 347, that hold "a publisher's immunity" should be "based upon the status of the plaintiff, not the subject matter of the publication." *Hogan v. Herald Co.*, 84 A.D.2d 470, 478 (N.Y. App. Div. 1982); *see also Dominion*, 2021 WL 5984265, at *23 ("[T]he Court questions whether Fox can raise the neutral reporting privilege or analogous newsworthiness privilege as an absolute defense to liability for defamation under New York law.").

In any event, Fox cannot avail itself of the neutral reporting privilege here. For one, the Tenth Circuit has held that the neutral reporting privilege does not apply to private figures like Plaintiffs. *Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir. 1977). Moreover, the privilege only applies when the broadcaster reports the accusations "accurately" and "dispassionate[ly]." *Edwards*, 556 F.2d at 120. Indeed, in another recent case involving Fox, the court explained that even if the neutral reporting privilege was still viable as a matter of law, it did not apply because Fox's hosts "refused to report contrary evidence," and in "numerous instances . . . Fox personnel did not merely ask questions and parrot responses but, rather, endorsed or suggested answers." *Dominion*, 2021 WL 5984265, at *24.

The same is true here. As alleged in the Complaint, Fox hosts affirmed or agreed with O'Leary's statements on multiple occasions. Compl. ¶¶75, 98, 104. For example, right after O'Leary singled out Plaintiffs by name on *Mornings with Maria*, the show's host, Ms. Bartiromo, endorsed O'Leary's accusations by referencing a different individual, Neville Singham, stating

"[w]e've done stories" on Singham and that he "has ties to the Communist Party of China." Fox Mot., Ex. 39-11, at 10:24-11:3. O'Leary then immediately piled on: "Neville, . . . Josh, Gabi, come out, come out wherever you are." *Id.* at 11:9-11. Bartiromo legitimized O'Leary's accusations against all his named subjects, answering "[y]eah, [y]eah. All right. We'll be watching all of that, Kevin," *id.* at 11:18-19, without stating that there was no evidence to link Singham or the CCP to Plaintiffs. Other Fox personnel similarly endorsed—explicitly or implicitly—O'Leary's specific falsehoods without qualification. One described O'Leary's claims as "fascinating," Fox Mot., Ex. 39-12, at 5:23, another "echo[ed]" his statements, Fox Mot., Ex. 39-13, at 4:20-5:11, and another agreed with O'Leary that it was "obvious . . . that there are definitely . . . foreign-funded campaigns into discouraging AI," Fox Mot., Ex. 39-15, at 7:25-8:2.

A comparison between Fox's hosts and the other shows that platformed O'Leary underscores this point. When O'Leary appeared on *The Tucker Carlson Show*, for example, Mr. Carlson questioned O'Leary about the merits of his data center project, including whether it would be built using American-made materials, and how much O'Leary would pay for the gas needed to power the data center. O'Leary Mot., Ex. 41-2, at 2-3. Instead of answering these questions, O'Leary wanted to air his false allegations about Plaintiffs, telling Mr. Carlson that he was not understanding "the enormity of what's going on here." *Id.* at 3. Mr. Carlson assured him that he did, but that he wanted to focus on "relevant" questions like "where's the water coming from?" *Id.* O'Leary did not encounter similar resistance or debate during his appearances on Fox.

At the very least, Fox did not neutrally present O'Leary's claims. The District of Utah's decision in *International Association of United Mine Workers Union v. United Mine Workers of America*, No. 2:04-CV-00901, 2006 WL 1183245 (D. Utah May 1, 2006), cited by Fox, is

illustrative. There, the court held that two newspapers could avail themselves of the privilege in part because they sought out both sides of the debate and "routinely attributed" opinions to the party that offered them. *Id.* at *32. A third newspaper, on the other hand, could not avail itself of the privilege because it did not provide a neutral forum where it "did not seek out comments from the plaintiffs or appear to offer them the chance to rebut the published accusations." *Id.* at *34. Fox is analogous to the third newspaper here; it did not offer a "neutral forum," nor did it seek any comment from Plaintiffs even after they denied O'Leary's allegations.

For similar reasons, Fox's citation to the Sixth Circuit's decision in *Croce* is inapposite. In that case, the court concluded that "a reasonable reader would interpret" the article at issue "as a standard piece of investigative journalism" because the article did not say the plaintiff was "guilty of any of the[] allegations" nor did it suggest the allegations were true, and the article was "not entirely unfavorable" to the plaintiff. *Croce*, 930 F.3d at 794-95. Rather, the article "couched" certain accusations against the plaintiff with "terms like, '[s]ome scientists argue,' 'allegations,' [and] 'claims of.'" *Id.* at 795. Fox does not identify any similar facts. It merely argues that it called the interviews with O'Leary "installments," Fox Mot. at 20, O'Leary was not introduced as a neutral observer, Fox Mot. at 20, and that Fox highlighted "the other side of" the data center debate, Fox Mot. at 21. But none of those facts show that Fox sufficiently communicated to its audience that the specific allegations leveled against Plaintiffs were not true or even that they were only allegations rather than facts supported by evidence. Thus, Fox is liable for publishing O'Leary's statements.

## IV. THE STATEMENTS ARE DEFAMATION *PER SE*.

Plaintiffs need not allege special damages because O'Leary's statements constitute

defamation *per se*. *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1234 (D. Utah 2018). Defamatory statements "constitute defamation per se" when they "allege criminal conduct on the part of the plaintiff or conduct which is incongruous with the exercise of a lawful business, trade, profession, or office." *Westmont Residential LLC v. Buttars*, 340 P.3d 183, 188 (Utah Ct. App. 2014) (cleaned up). Here, the statements are defamation *per se* for both reasons. But even if the statements are not defamation *per se*, Plaintiffs have adequately alleged special damages.

**A. The Statements Accused Plaintiffs Of Criminal Conduct.**

First, the statements "charg[ed]" Plaintiffs with criminal conduct. *Baum v. Gillman*, 667 P.2d 41, 43 (Utah 1983). At various times, O'Leary described Plaintiffs as Chinese "cells" inside Utah. Fox Mot., Ex. 39-11, at 8:24, 9:5, 11:16; O'Leary Mot., Ex. 41-1, at 2-3, Ex. 41-2, at 3. Merriam-Webster's dictionary defines a "cell" as a "basic and usually small unit of an organization or movement."[14] O'Leary also referred to Plaintiffs as "proxies," Fox Mot., Ex. 39-11, at 9:20-24; O'Leary Mot., Ex. 41-1, at 2, which is defined as "the agency, function, or office of a deputy who acts as a substitute for another" or "a person authorized to act for another."[15]

O'Leary's post-hoc effort to label these statements as merely asking "questions concerning Plaintiffs' funding," O'Leary Mot. at 22, is plainly contradicted by the record. O'Leary repeatedly stated that his claims were backed up by "data," "proof," and "evidence" that he claimed was "irrefutable." *See supra* notes 9 & 11 (citing instances when O'Leary identified "irrefutable" evidence and data for his claims). He stated that he was "breaking . . . news" and implied that

---

[14] Merriam-Webster, *Cell*, https://www.merriam-webster.com/dictionary/cell (last visited Nov. 16, 2026) (attached as Exhibit B).
[15] Merriam-Webster, *Proxy*, https://www.merriam-webster.com/dictionary/proxy (last visited Nov. 16, 2026) (attached as Exhibit C).

Plaintiffs' purported connections to China were not previously known. *See, e.g.*, Fox Mot., Ex. 39-13, at 10:10-11:17; O'Leary Mot., Ex. 41-5, at 4. It is, therefore, clear that O'Leary was accusing Plaintiffs of being undisclosed agents of the Chinese government and the CCP.

If true, such conduct would violate several federal criminal statutes. For one, 18 U.S.C. § 951(a) makes it a felony to "act[] in the United States as an agent of a foreign government without prior notification to the Attorney General." Similarly, another statute, the Foreign Agents Registration Act ("FARA"), prohibits acting as an agent of a foreign principal without filing a "true and complete" registration statement with the Attorney General. 22 U.S.C. §§ 612(a), 618(a)(1).

Moreover, O'Leary's accusations that Plaintiffs disseminated content originating with the Chinese government also charges Plaintiffs with serious criminal conduct. For example, on *The Tucker Carlson Show*, O'Leary stated that Plaintiffs were "taking the content from the CPP [sic], repurposing it, and jamming it down the throats of the people in Utah." O'Leary Mot., Ex. 41-2, at 3. On *Saturday in America*, O'Leary stated that Plaintiffs were "bring[ing] in millions of dollars" from China to "push out PR." Fox Mot., Ex. 39-12, at 5:13-14; O'Leary Mot., Ex. 41-4, at 2; *see also* O'Leary Mot., Ex. 41-8, at 2 (accusing Plaintiffs of taking money from China to "run a digital . . . blackmail campaign"). Such conduct would violate 22 U.S.C. § 614(b), which prohibits the distribution of "any informational materials for or in the interests of" a foreign principal "without placing in such informational materials a conspicuous statement that the materials are distributed by the agent on behalf of the foreign principal."

O'Leary also accused Plaintiffs of violating the federal money-laundering statutes. He continually stated and implied that Plaintiffs received Chinese funding through nefarious and covert means. Fox Mot., Ex. 39-12, at 6:5-6; O'Leary Mot., Ex. 41-4, at 2 (money received via "a

whole bunch of clandestine different entities"), Fox Mot., Ex. 39-13, at 11:13; O'Leary Mot., Ex. 41-5, at 4 ("nefarious entities"), Fox Mot., Ex. 39-15, at 9:11; O'Leary Mot., Ex. 41-7, at 3 ("foreign dark money"), O'Leary Mot., Ex. 41-9, at 3 ("nefarious foreigners"), *id.* at 4 ("foreign money"). And because felony FARA violations constitute a criminal predicate under the money laundering statutes, 18 U.S.C. § 1956(c)(7)(D), the movement of money in aid of, and to promote, Plaintiffs' purported role as agents of the Chinese government and the CCP would violate the money-laundering statutes.

The prospect that Plaintiffs would be subject to criminal prosecution if they did in fact maintain funding connections to, and an agency relationship with, the Chinese government and the CCP is not hypothetical. O'Leary repeatedly noted that he had referred Plaintiffs to federal law enforcement for investigation.[16] And, in recent memory, the United States has prosecuted individuals for these exact crimes based on their connections to China and the Chinese government.[17]

Despite all this, Defendants contend that O'Leary's allegations were not sufficiently specific to constitute defamation *per se*. O'Leary Mot. at 22-23; Fox Mot. at 23-24. But to allege criminal conduct, a defendant need not use "technical language;" rather, "[i]t is enough that the language used imputes . . . the criminal offense." Restatement (Second) of Torts § 571, cmt. c; *see*

[16] Fox Mot., Ex. 39-13, at 10:10-11:17, Ex. 39-14, at 8:12-9:6, Ex. 39-15, at 9:13-15; O'Leary Mot., Ex. 41-5, at 4, Ex. 41-6, at 3, Ex. 41-7, at 3, Ex. 41-8, at 2, Ex. 41-9, at 3-4.

[17] *See, e.g.*, Plea Agreement, *United States v. Yaoning Sun*, No. 2:24-cr-00777 (C.D. Cal. Oct. 3, 2025), Dkt. No. 26 (attached as Exhibit D) (pleading guilty to violating 18 U.S.C. § 951 for acting as an agent of the Chinese government); Information, *United States v. Eileen Wang*, No. 2:26-cr-00186 (C.D. Cal. Apr. 1, 2026), Dkt. No. 1 (attached as Exhibit E) (information charging violation of 18 U.S.C. § 951 for acting as an agent of the Chinese government). The Court may take judicial notice of filings in other courts. *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

*also Mathews*, 575 P.3d at 1134 (rejecting the argument that statements were not defamatory because they did not "directly accuse" the plaintiffs of criminal conduct). Here, O'Leary's statements "impute[d]" the commission of the crimes because he accused Plaintiffs of taking detailed and specific actions, all of which, if true, would amount to violations of the criminal statutes discussed above. This case is, therefore, not like the ones in which the plaintiffs were accused in general and unspecified terms like "extortion," *Hogan*, 762 F.3d at 1108, "lying and stealing," *John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1323 (D. Utah 2020), "crook," *Westmont*, 340 P.3d at 188-89, "fraud," "hoax," or "scam," *Nunes*, 299 F. Supp. 3d at 1231-32, 1234.

**B. The Statements Impugned Plaintiffs' Business Reputations.**

The Complaint adequately alleges that O'Leary's statements accused Plaintiffs of "conduct which is incongruous with the exercise of a lawful business, trade, profession, or office." *Westmont*, 340 P.3d at 188 (cleaned up). Defendants accused Plaintiffs of acting on behalf of China, a hostile, communist foreign government that the United States has identified as an adversary, *see, e.g.*, 15 C.F.R. § 791.4(a)(1), and which the United States has accused of committing human rights violations.[18] It is difficult to imagine an allegation more damaging to Plaintiffs' reputations for trustworthiness, loyalty, and integrity. Indeed, the Tenth Circuit has long

[18] Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Chinese Entity and Officials Pursuant to Global Magnitsky Human Rights Accountability Act* (July 9, 2020), https://home.treasury.gov/news/press-releases/sm1055 (attached as Exhibit F); Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Chinese Government Officials in Connection with Serious Human Rights Abuse in Xinjiang* (Mar. 22, 2021), https://home.treasury.gov/news/press-releases/jy0070 (attached as Exhibit G). The Court may take judicial notice of materials publicly available on government websites. *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009).

held that "to write or speak of a person or an organization as being 'communist' or a 'communist sympathizer' is to subject such person or organization to public hatred, odium and contempt, to his immediate harm, and is therefore libelous per se." *Utah State Farm Bureau Fed'n v. Nat'l Farmers Union Serv. Corp.*, 198 F.2d 20, 23 (10th Cir. 1952).

As the Complaint explains, to perform their professional obligations, ABU, Elevate, and Ms. Finlayson must maintain the trust of their donors and clients by acting with loyalty and integrity. *See* Compl. ¶186 ("Plaintiffs' line of work is heavily reliant on their credibility and reputations as community-oriented and grassroots-driven organizations and individuals."). ABU's mission includes "hold[ing] public officials accountable, championing good governance, transparency, and civic engagement," Compl. ¶34, a difficult task if the public believes ABU is a proxy for the Chinese government. Similarly, Elevate is "a political consulting firm" that "support[s] candidates, elected officials, causes, and organizations." Compl. ¶35. Ms. Finlayson is herself a "political consultant and strategist." Compl. ¶31. Accusations that they act at the behest of, and receive funding from, a foreign power obviously undermines their ability to accomplish their professional goals. *See, e.g.*, *Deem v. Baron*, No. 2:15-cv-00755, 2019 WL 959704, at *3 (Feb. 27, 2019 D. Utah) (statements that the plaintiffs had committed crimes and "could not be trusted" impugned their business reputation); *Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 518 (S.D.N.Y. 2017) (statements concerning an attorney's unethical conduct and disloyalty were defamatory *per se*). And as alleged in the Complaint, the allegations *have* impacted ABU, Elevate, and Ms. Finlayson's client and donor development and retention efforts. Compl. ¶¶187, 188, 190.

The same is true of Mr. Kanter. In addition to founding ABU, Mr. Kanter leads a family foundation and maintains prominent roles in numerous nonprofit and advocacy organizations. Compl. ¶29. He is also an attorney, runs a single-family office and acts as an "advisor to other families and family offices," including through his business leafplanner Inc. Compl. ¶30. Like ABU, Elevate, and Ms. Finlayson, Mr. Kanter simply cannot perform his professional duties, both with respect to the nonprofit and advocacy associations and his personal businesses, if clients and donors believe that he is loyal to a foreign power. For example, via leafplanner, Mr. Kanter routinely collects private and sensitive information from families and family offices, *see* Compl. ¶¶ 30, 189; any suggestion that he is compromised by a foreign power would greatly impact his ability to maintain that business. *See Apelbaum v. Bloom*, No. 1:25-cv-00147, 2025 WL 1869578, at *4 (E.D. Va. July 7, 2025) (allegation that cybersecurity professional was an Israeli spy impugned his business reputation). Indeed, business partners and clients have raised O'Leary's allegations with Mr. Kanter. Compl. ¶189. Thus, the allegations that Plaintiffs are loyal to a foreign power is necessarily hurtful to Plaintiffs' professional reputations.

### C. Even if the Statements Are Not Defamation *Per Se*, Plaintiffs Have Plausibly Alleged Special Damages.

Even if the Court concludes the statements were not defamation *per se*, Plaintiffs have adequately alleged special damages. "Special damages are a particular type of damages which are a natural consequence of the injury caused but are not the type of damages that necessarily flow from the harmful act." *Hodges v. Gibson Prods. Co.*, 811 P.2d 151, 162 (Utah 1991); *see also Cohn v. J.C. Penney Co.*, 537 P.2d 306, 308 (Utah 1975) ("The term 'special damages' denotes such damages as arise from the special circumstances of the case, which, if properly pleaded, may be added to the general damages which the law presumes or implies from the mere invasion of the

plaintiff's rights."). Under Rule 9(g), special damages must be "specifically stated" in a pleading. Fed. R. Civ. P. 9(g). However, a plaintiff need not allege "special damages with particularity, which Rule 9(b) requires when pleading fraud." *TLS Grp., S.A. v. NuCloud Global, Inc.*, No. 2:15-cv-00533, 2016 WL 1562910, at *6 (D. Utah Apr. 18, 2016). Instead, Rule 9(g) simply requires the plaintiff to give "the opposing party 'an adequate opportunity to defend against' the different theories of recovery." *Id.* (quoting *Hodges*, 811 P.2d at 162).

Plaintiffs have met this standard. The Complaint alleges that ABU has suffered "economic harm" because it has had to "diver[t] organizational resources from its core advocacy work" and its "critical fundraising efforts" have been impacted. Compl. ¶187. Indeed, because of Defendants' defamation "would-be donors" to ABU "have been led to believe that [ABU] may not have pressing financial needs if they are being funded by foreign entities" and other would-be donors are chilled from donations "for fear of being associated with an entity that has been accused of operating on behalf of a foreign adversary and engaging in criminal conduct." *Id.*

The other Plaintiffs' allegations are similarly sufficient. Elevate alleges that it has "lost profits as a result of the loss of current and prospective clients, who have terminated or declined to enter into business relationships with Elevate" because of Defendants' defamation. Compl. ¶188. And Mr. Kanter and Ms. Finlayson allege that they have lost business, lost income, lost profit, and lost employment and other economic opportunities. Compl. ¶¶189-90. Therefore, Plaintiffs' allegations make "clear" that they intend to "seek[] recovery of money for lost [business] opportunities." *TLS Grp., S.A.*, 2016 WL 1562910, at *7.

## V. DEFENDANTS' OTHER ARGUMENTS FOR DISMISSAL ARE MERITLESS.

Defendants' remaining arguments are even weaker. Contrary to O'Leary's argument, the

Complaint is plainly adequate because it identifies the statements that form the basis of the claims and the Plaintiffs stating those claims. And Fox's arguments that some of the statements did not defame Mr. Kanter and O'Leary's statements on *Mornings with Maria* were opinions fail.

**A. The Complaint Adequately Identifies The Basis For The Claims Against O'Leary.**

O'Leary's argument (tellingly not joined by Fox) that the facts supporting the claims are insufficiently particular is baseless. O'Leary Mot. at 7-11. With respect to defamation claims "in federal court[,] a claimant need only allege facts sufficient to establish plausibility in accordance with Rule 8 of the Federal Rules of Civil Procedure." *TLS Grp., S.A.*, 2016 WL 1562910, at *3. The Tenth Circuit has explained that, in the defamation context, Rule 8 requires a complaint to "provide sufficient notice of the communications complained of to allow" the defendant "to defend itself." *McGeorge v. Cont'l Airlines, Inc.*, 871 F.2d 952, 955-56 (10th Cir. 1989). Some courts in the District of Utah have explained that a plaintiff should "identify the defamatory statement either by its words or words to that effect."[19] *Eagle Air Med. Corp. v. Sentinel Air Med. Alliance, LLC*, No. 2:16-cv-00176, 2019 WL 6879252, at *4 (D. Utah Dec. 17, 2019) (quoting *Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 800 (D. Utah 1988)).

The Complaint easily meets these pleading standards. It traces O'Leary's defamation campaign through ten media appearances. *See* Compl. ¶¶73-135. Each time it discusses a new

---

[19] To the extent O'Leary describes these requirements as a "heightened" pleading standard beyond Rule 8, O'Leary Mot. at 8, he is wrong. Because the pleading standard is a procedural rule, federal pleading rules, rather than any "heightened" state standard apply. *See Hogan*, 762 F.3d at 1104 (applying federal pleading standards to defamation claim); *TLS Grp., S.A.*, 2016 WL 1562910, at *3. And courts that have required plaintiffs to identify the defamatory "words or words to that effect" did not apply any state pleading standard; rather, they explained such allegations were necessary to satisfy Rule 8. *See Eagle Air Med Corp. v. Sentinel Air Med. Alliance, LLC*, No. 2:16-cv-00176, 2019 WL 6879252, at *3-4 (D. Utah Dec. 17, 2019); *see also Royal Pac. Ltd. v. Faith Elec. Manufacture Co.*, 322 F. Supp. 3d 1178, 1184 (D.N.M. 2018).

media appearance, it contains bold signposting to alert the reader. *See* Compl. ¶¶73, 85, 91, 95, 102, 107, 115, 122, 127, 132. With respect to the specific statements, the Complaint includes quotes from O'Leary, either in quotation marks or block quotes, from each media appearance. *See* Compl. ¶¶73-74, 86, 88, 91, 95-97, 102, 108, 116, 118, 123-25, 129, 133. It also includes screenshots and quotes from social media posts in which O'Leary amplified the statements made during his media appearances. *See* Compl. ¶¶77, 100, 120, 125, 130, 135. As if all this were not enough, where publicly available, the Complaint includes hyperlinks to O'Leary's media appearances and videos of each appearance were attached to the Complaint. Compl. ¶¶77 n.13, 90 n.17, 106 n.22, 111 n.24; Compl., Exs. 1-10. The Complaint, therefore, provides O'Leary with more than adequate notice of the statements that form the basis of the claims against him.

O'Leary's objection to Plaintiffs' purported failure to identify which Plaintiffs are relying on which statements to support their claims is also meritless. O'Leary Mot. at 10-11. Count I states that it was brought on behalf of all Plaintiffs and it specifically identifies the paragraphs of the Complaint outlining the numerous defamatory statements made by O'Leary. Compl. p.65, ¶196. Nothing more is required. To the extent O'Leary objects that Plaintiffs did not explain how or why each statement was "of and concerning" each Plaintiff, the statements reviewed in context speak for themselves, and in any event, the Complaint need not include such "legal theories." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011); *see also Salas v. Univ. of Utah Madsen Health Ctr.*, No. 2:21-cv-00437, 2022 WL 170066, at *5 (D. Utah Jan. 19, 2022).[20] And because O'Leary only

[20] For similar reasons, Plaintiffs' inclusion of both defamation and defamation *per se* in Count I is not a basis for dismissal. As O'Leary recognizes, defamation and defamation *per se* are two distinct legal theories, O'Leary Mot. at 11, and "a complaint need not pin plaintiff's claim for relief to a precise legal theory." *Skinner*, 562 U.S. at 530.

objects to the form of the Complaint, not its substance, he has forfeited any argument that Plaintiffs have failed to allege that certain statements were not "of and concerning" certain Plaintiffs. *Mark O v. Colvin*, No. 1:22-cv-00173, 2025 WL 392735, at *3-4 (D. Utah Jan. 8, 2025) (court would not consider argument because it was not "develop[ed] . . . sufficiently to permit judicial review"); *Deseret Trust Co. v. Unique Inv. Corp.*, No. 2:17-cv-00569, 2018 WL 8110959, at *3 (D. Utah Jul. 3, 2018) ("[T]his court ordinarily does not consider arguments raised for the first time in a reply brief.").[21]

Finally, if O'Leary truly was at a loss as to basis for the claims against him, dismissal is not the remedy. Rather, "when a party is unable to determine the issues to which a response is required," it may bring a motion for a definite statement under Rule 12(e). *Codex United, LLC v. Cryptech Sols. LLC*, No. 1:20-cv-00036, 2021 WL 3815839, at *1 (D. Utah Jan. 19, 2021) (cleaned up). O'Leary did not bring such a motion here and there is nothing to indicate that he is a litigant who "cannot defend" himself. O'Leary Mot. at 10.

**B. Every Statement Defamed All Of The Plaintiffs.**

Every defamatory statement concerned all of the Plaintiffs. A plaintiff "must show that defendants published . . . statements concerning him." *West*, 872 P.2d at 1007. At the pleading stage, a plaintiff "need only plead sufficient facts to make it plausible—not probable or even reasonably likely—that a [viewer] familiar with [the plaintiff] would identify him as the subject of the statements at issue." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 105 (2d Cir. 2017). The plaintiff may carry this burden "by directly being named, or so intended from the extrinsic facts and

[21] Even if the Court considers O'Leary to have sufficiently raised such an argument (which it should not), Plaintiffs' allegations are sufficient to establish that each of O'Leary's statements concerned every Plaintiff for the reasons discussed *infra*.

circumstances." *Pratt v. Nelson*, 164 P.3d 366, 382 (Utah 2007) (cleaned up).

In O'Leary's first appearance on *Mornings with Maria*, he "directly . . . named" each Plaintiff. *See* Fox Mot., Ex. 39-11, at 8:23-9:6, 11:9-12; O'Leary Mot., Ex. 41-1, at 2-3. And this appearance resulted in widespread publicity. *Mornings with Maria* averages approximately 123,000 daily viewers. Compl. ¶17. Moreover, O'Leary shared clips of his appearance on *Mornings with Maria* to his 12 million followers across his various social media platforms. Compl. ¶76. At the time the Complaint was filed, O'Leary's posts had received over 650,000 views. Compl. ¶77. Even further, immediately after O'Leary's *Mornings with Maria* appearance, Plaintiffs denied O'Leary's claims and their statements and posts were shared widely. Compl. ¶83.

Given the viral nature of O'Leary's initial statements, and Plaintiffs' denials, it is plausible that reasonable viewers would associate all of O'Leary's subsequent statements with every Plaintiff, even when those statements did not explicitly name each Plaintiff. In *Pratt*, 164 P.3d at 382, for example, the defendants made various statements about "the Kingston Polygamist Family" and the "leaders of the Kingston Organization." The Utah Supreme Court explained that, on their own, these statements could not reasonably refer to the plaintiffs, who were members of the identified organization. *Id.* However, the defendants had also filed a legal complaint related to the Kingston Organization, which named the plaintiffs, among others. *Id.* at 383. Because the complaint specifically, and publicly, identified the plaintiffs and tied them to the Kingston Organization, the court held that it was "arguable" that the defendant's other statements also referred to the plaintiffs. *Id.*

The same is true here. Because O'Leary grouped Plaintiffs together initially, it is at least "arguable" that a viewer would understand O'Leary's subsequent statements to refer to all of the

Plaintiffs. *See Smartmatic USA Corp. v. Newsmax Media, Inc.*, No. N21C-11-028 EMD, 2023 WL 1525024, at *14-15 (Del. Super. Ct. Feb. 3, 2023) ("of and concerning" requirement does not call for a "hyper-literal reading of every statement;" where statements did not identify each plaintiff every time but "the publications and republications" often "conflated" the plaintiffs, pleading was sufficient). Indeed, viewers did associate each Plaintiff with O'Leary's statements; on May 17, for example, an image of O'Leary and Ms. Finlayson circulated on social media even though O'Leary had only explicitly mentioned Ms. Finlayson during his initial appearance on *Mornings with Maria* and not the three subsequent appearances in which he had leveled his accusations. Compl. ¶183.

For similar reasons, Mr. Kanter may maintain claims based on statements that only explicitly identified ABU. Fox argues that Mr. Kanter's "affiliation with" ABU is not strong enough to "permit him to personally sue for defamation over statements about the organization." Fox Mot. at 27. This argument conflicts with Fox's contention that Mr. Kanter is a public figure based solely on his affiliation with ABU. Fox Mot. at 10-11. Nevertheless, Fox ignores the fact that O'Leary himself drew the connection between ABU and Mr. Kanter in his first appearance and thereafter. For example, on *Cuomo Mornings*, O'Leary stated that ABU was "run by . . . Josh Kanter," O'Leary Mot., Ex. 41-3, at 3, and on *Saturday in America*, O'Leary again identified Mr. Kanter as someone who "run[s]" ABU, Fox Mot., Ex. 39-12, at 6:9-11; O'Leary Mot., Ex. 41-4, at 2.[22] Thus, because O'Leary connected Mr. Kanter to ABU, it is at least "arguable" that subsequent statements that only explicitly mention ABU also concern Mr. Kanter. *Pratt*, 164 P.3d at 383.

[22] Notably, both of these statements were *prior* to O'Leary's appearances on *The Big Money Show* and *The Bottom Line* where O'Leary did not identify Mr. Kanter by name.

**C. O'Leary's Statements On *Mornings with Maria* Were Not Opinions.**

Contrary to Fox's argument, O'Leary's statements on *Mornings with Maria* were not constitutionally-protected opinion. Fox Mot. at 28-30. Rather, they are actionable because they were "capable of being proven to be true or false." *Keisel v. Westbrook*, 542 P.3d 536, 548 (Utah Ct. App. 2023) (cleaned up). Fox identifies various "isolated words" to argue that O'Leary was expressing his subjective view, but the "sting of the charge" was that Plaintiffs were funded by, agents of, or at the very least, acting on behalf of, the Chinese government and the CCP. *Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 110 (D.D.C. 2009) (the "full context" of the statements indicated that the defendant asserted a verifiable fact: that "plaintiffs [were] agents of the Iranian government"). Numerous courts have concluded that similar statements identifying associations with foreign powers were verifiable facts that could form the basis of a defamation claim. *See, e.g.*, *id.*; *Tang v. Guo*, No. 17 Civ. 9031, 2019 WL 6169940, at *6 (S.D.N.Y. Nov. 20, 2019) ("[T]he statements are sufficiently factual because [the defendant's] assertion that [the p]laintiffs are secret agents of the Chinese government . . . may be proven false."); *Wilkins v. Seraphin*, No. 1:25-cv-01375, Slip. Op. at 12 (W.D. Tex. May 22, 2026), Dkt. No. 17 (attached as Exhibit H) (statements that the plaintiff was a "honeypot" and "a former Mossad agent" were "verifiably false"). And the isolated hedging language identified by Fox, Fox Mot. at 29, is itself an insufficient basis from which to conclude that O'Leary's statements constitute protected opinion. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990) ("It would be destructive of the law . . . if a writer could escape liability for accusations of defamatory conduct simply by using, explicitly or implicitly, the words 'I think.'" (cleaned up)).

Moreover, even if the Court concludes O'Leary's statements were opinions, Fox is wrong

that O'Leary disclosed the basis for those opinions. Fox Mot. at 29-30; *see TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1194 (10th Cir. 2007) (defendant may be liable for "expressions of opinion that imply the existence of undisclosed defamatory facts"). O'Leary maintained that his claims were based on a "deep dig into" IP addresses by his "data scientists" and even read off a piece of paper, giving the appearance that he was referencing the results of his data scientists' investigation. Fox Mot., Ex. 39-11, at 8:5-12; O'Leary Mot., Ex. 41-1, at 2; Compl., Ex. 1, at 1:05-:145. But O'Leary never disclosed his data scientists' findings to the audience. Indeed, O'Leary eventually *admitted* that he did not have any evidence to support his claim, thereby wholly vitiating any opinion defense he, or Fox, may have previously held. *See Milkovich*, 497 U.S. at 18-19 ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete . . . the statement may still imply a false assertion of fact.").

Finally, to the extent Fox again asserts that O'Leary's statements on *Mornings with Maria* were rhetoric or hyperbole, Fox Mot. at 28-30, its argument fails for the reasons explained above. That is, O'Leary announced to the audience that his claims were based on data and "IP addresses." *See supra* at 28-33. And he finished with an unequivocal statement that did not include any hedging, couching, or cautionary language: "These two cells . . . . [i]t's the CPP [sic] at work here. There's no question about it." Fox Mot., Ex. 39-11, at 11:16-17; O'Leary Mot., Ex. 41-1, at 3. Nor does the surrounding context of the data center debate mitigate the obvious conclusion that O'Leary was representing to his audience that his claims were verifiable facts. *See supra* at 31-32.

## **CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss should be denied.

Dated: November 16, 2026.

Respectfully submitted,

<u>*/s/ Matthew J. Platkin*</u>

David R. Irvine
(Utah Bar No. 1621)
Attorney and Counselor
at Law
P.O. Box 1533
Bountiful, Utah 84011
(801) 949-6693
drirvine@aol.com

Alan L. Smith
(Utah Bar No. 2988)
Attorney and Counselor
at Law
1169 East 4020 South
Salt Lake City, Utah 84124
(801) 822-6076
alanakaed@aol.com

Matthew J. Platkin*
Angela Cai*
Ravi Ramanathan*
Aaron E. Haier*
Conor Bradley*
**PLATKIN LLP**
One Gateway Center
Suite 1150
Newark, NJ 07102
(973) 561-1951
mplatkin@platkinllp.com

*Attorneys for Plaintiffs*
**admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of November, 2026, I electronically filed the foregoing Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss using the CM/ECF system of the United States District Court for the District of Utah, which sent notification of such filing to:

D. Loren Washburn
Clifford B. Parkinson
Andrew R. Choate
**PARKINSON BENSON POTTER**
2750 Rasmussen Road, Ste. H-107
Park City, Utah 84098
loren@pbp.law
cliff@pbp.law
andy@pbp.law

Jeffrey A. Neiman
Brandon S. Floch
Jordan A. Esteban
**NEIMAN MAYS FLOCH & ALMEIDA PLLC**
550 S. Andrews Avenue
Suite 720
Fort Lauderdale, Florida 33301
jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com
jesteban@nmfalawfirm.com

*Attorneys for Defendant Kevin O'Leary*

Justin T. Toth
Whitney Hulet Krogue
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
jtoth@rqn.com
wkrogue@rqn.com

Thomas G. Hentoff
Stephen J. Fuzesi
Nicholas G. Gamse
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue, S.W.
Washington, D.C. 20024
thentoff@wc.com
sfuzesi@wc.com
ngamse@wc.com

*Attorneys for Defendant Fox News Network, LLC*

*/s/ Matthew J. Platkin*